UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OSCAR DE LA RENTA, LTD.,

        Plaintiff,

    v.

ELIZABETH ARDEN, INC., d/b/a
"EA FRAGRANCES CO.",

        Defendant.

Civil Action No. 08 CIV 5785 (DLC)

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO NON-PARTY YSL BEAUTÉ, INC.'S MOTION TO INTERVENE AND MOTION TO STAY LITIGATION PENDING ARBITRATION

ROPES & GRAY LLP
William I. Sussman
Lee S. Gayer
Carla E. Sereny
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
william.sussman@ropesgray.com
lee.gayer@ropesgray.com
carla.sereny@ropesgray.com

Peter M. Brody
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005
(202) 508-4600
peter.brody@ropesgray.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

     A.    The Famous Oscar De La Renta Brand ...................................................4

     B.    The Fragrance License ............................................................................5

     C.    ODLR's Discovery Of Unauthorized Products ........................................9

     D.    The Response To ODLR'S Complaints About Unapproved Products...................10

     E.    Sales Of Unauthorized Products In Unapproved Packaging Continue ...................12

     F.    YSL Beauté Refuses To Accept Liability For EA's Unlawful Conduct ...............13

     G.    YSL Beauté Amends Its Arbitration Claims ...........................................16

ARGUMENT ......................................................................................................................17

     A.    The Correct Legal Standard....................................................................17

     B.    The Arbitration Involves Distinct Issues And Will Not Resolve ODLR's Claims Against EA.......................................................................18

     C.    A Stay Would Result In Undue Hardship To ODLR .............................21

CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Shipping Line, Inc. v. Massan Shipping Industries, Inc.*,
    885 F. Supp. 499 (S.D.N.Y. 1995)...................................................................2, 17, 18, 20, 21

*Braun Media Services, Inc. v. Taylor*,
    No. 1:06-CV-02002, 2006 U.S. Dist LEXIS 86828, 2006 WL 3484324 (M.D.Pa.
    Nov. 30, 2006) .........................................................................................................................19

*CTF Holdings, Inc. v. Marriott International, Inc.*,
    381 F.3d 131 (3d Cir. 2004)....................................................................................................17

*E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*,
    No. 97 Civ. 7102, 1998 U.S. Dist LEXIS 8678, 1998 WL 314767 (S.D.N.Y. June 12,
    1998) .........................................................................................................................................20

*Petrik v. Reliant Pharmaceuticals, Inc.*,
    No. 8:07-CV-1462-T-24 TBM, 2007 U.S. Dist. LEXIS 82037, 2007 WL 3283170
    (M.D. Fla. Nov. 5, 2007) .........................................................................................................21

*Wright v. SFX Entertainment, Inc.*,
    No. 00 Civ. 5354, 2001 U.S. Dist. LEXIS 1000, 2001 WL 103433 (S.D.N.Y. Feb. 8,
    2001) ..................................................................................................................................17, 21

STATUTES

9 U.S.C. § 3........................................................................................................................1, 2, 17

Lanham Act, 15 U.S.C. § 1114 and § 1125(a), (c) ......................................................................15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OSCAR DE LA RENTA, LTD., <br><br>        Plaintiff, <br><br>   v. <br><br> ELIZABETH ARDEN, INC., d/b/a "EA FRAGRANCES CO.", <br><br>        Defendant. | Civil Action No. 08 CIV 5785 (DLC) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
NON-PARTY YSL BEAUTÉ, INC.'S MOTION TO INTERVENE AND
MOTION TO STAY LITIGATION PENDING ARBITRATION**

Plaintiff Oscar de la Renta, Ltd. ("ODLR") respectfully submits this memorandum in opposition to the motion by non-party YSL Beauté, Inc. ("YSL Beauté") to intervene in this trademark infringement action and, upon such intervention, to stay this action pending arbitration. YSL Beauté has demonstrated no basis for a stay, and its motion should be denied.

## INTRODUCTION

In this action ODLR asserts claims under the Lanham Act and under New York State law against defendant Elizabeth Arden, Inc., d/b/a "EA Fragrances Co." ("EA") for infringement and dilution of ODLR's famous trademarks "Oscar de la Renta" and "Oscar" and ODLR's rights in the distinctive trade dress of its signature "Oscar" perfume, arising from EA's packaging, labeling and sale of unauthorized "Oscar" perfume products. Complaint ¶¶ 9-11. Non-Party YSL Beauté contends that a stay of this action is mandatory under Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, because the claims asserted by ODLR against EA are "subsumed" within the scope of an arbitration pending between YSL Beauté and ODLR before

1

the American Arbitration Association ("AAA").  YSL Beauté's Memorandum of Law in Support

of Motion to Intervene and Stay Litigation Pending Arbitration ("YSL Beauté Mem.") at 7, 19 &

n.8.  YSL Beauté is wrong as to both the governing law and the facts.

EA is not a party to the pending arbitration, nor a signatory to the arbitration agreement,

between ODLR and YSL Beauté.  Thus, the mandatory stay provisions of FAA § 3 are

inapplicable, and a stay is warranted only in "rare circumstances," where the party seeking the

stay can meet its heavy burden of demonstrating "compelling reasons" that would justify such

relief.  *See, e.g., Nederslandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440,

441 (2d Cir. 1964); *American Shipping Line, Inc. v. Massan Shipping Industries, Inc.*, 885

F. Supp. 499, 502 (S.D.N.Y. 1995) ("Non-parties to an arbitration do not have this right [to a § 3

stay]").

YSL Beauté has not met its heavy burden of establishing compelling reasons to warrant a

stay.  Indeed, the very factual premise on which YSL Beauté's motion is based – that the issues

in this action are "subsumed" within the scope of the arbitration – is demonstrably wrong.  The

arbitration concerns a host of longstanding contractual issues arising under a trademark license

between ODLR (the Licensor) and YSL Beauté (the Licensee).  The core issue to be resolved in

the arbitration is whether YSL Beauté breached the license by failing to use its "best efforts" to

promote the sale of the licensed products and by violating other obligations set forth in the

license.  Although one of the issues in the arbitration is YSL Beauté's contractual liability for

exporting unauthorized "Oscar" fragrance products from its factory in France to EA, YSL Beauté

has represented that EA *alone* was responsible for the infringing packaging, labeling, and sale of

those products in the United States.  That wrongful conduct by EA – which is the focus of this

litigation – is not at issue in the arbitration, because EA is not a party to the license and because,

contrary to YSL Beauté's suggestion in its motion, YSL Beauté has *refused* to answer in the arbitration for any damages or other remedies to which ODLR is entitled on account of EA's conduct.  In short, YSL Beauté's motion is designed, not to vindicate any legitimate rights of YSL Beauté, but to preclude ODLR from obtaining *any* relief in *any* forum as a result of the conduct of YSL Beauté's "longstanding customer," EA.  YSL Beauté Mem. at 14.

YSL Beauté understands full well that this action and the arbitration involve separate conduct, different parties, and distinct relief.  In a futile and cynical attempt to avoid that fatal problem, YSL Beauté, before filing its motion, amended its arbitration claims to assert, for the first time, that it is the owner of "all right, title and interest in" two of the Oscar de la Renta trademark registrations cited in ODLR's Complaint in this action, and that ODLR's filing of the Complaint constitutes a "breach" of the License Agreement with YSL Beauté and "tortious interference" with YSL Beauté's business relationship with EA.  Declaration of Louis S. Ederer in Support of YSL Beauté's Motion to Intervene and Motion to Stay Litigation Pending Arbitration ("Ederer Decl.") Exhibit 2 at ¶¶ 10, 51 & 55.  Relying on that new claim in the arbitration, YSL Beauté contends that this Court should stay this proceeding, so that the purported "ownership" issue can be resolved in the arbitration.

YSL Beauté's ownership claim with regard to those two trademark registrations is spurious:  although the registrations are nominally held in YSL Beauté's name, the license explicitly recognizes both ODLR's beneficial ownership of, and its right to enforce, those registrations.  But even if one were to accept YSL Beauté's assertion that the ownership of those two registrations is an arbitrable issue, that would not justify staying this action, because ODLR also is the *undisputed* owner of 16 other registered trademarks cited in the Complaint, as well as all common-law rights in the Oscar de la Renta trademarks and trade dress.  ODLR has the full

right to assert any and all of those rights against EA, regardless of the outcome in arbitration of any issue raised by YSL Beauté with regard to the two registrations nominally held by it.  The arbitration thus will not, and cannot, resolve, moot, or meaningfully narrow ODLR's claims in this litigation.

YSL Beauté also repeatedly accuses ODLR of breaching an "undertaking" not to file this action against EA.  YSL Beauté Mem. at 2, 6, 10.  The relevance of this accusation to YSL Beauté's motion is unclear, but it is, in any event, an egregious distortion of the facts.  ODLR advised YSL Beauté that it would agree not to pursue a remedy against EA *if, and only if,* YSL Beauté agreed to answer to ODLR for any liability on EA's part.  YSL Beauté, however, *refused* to do so.

Finally, YSL Beauté is wrong in asserting that a stay will not prejudice ODLR.  YSL Beauté Mem. at 17.  In fact, a stay will substantially delay the litigation of facts and issues relating to EA's wrongful actions that, because EA is not a party to the arbitration, can only be litigated in this action.  Under settled law, a stay therefore is inappropriate in this action, and YSL Beauté's application for one should be denied.  On that basis, YSL Beauté's application to intervene – the sole purpose of which was to seek a stay – should be denied as moot.

## STATEMENT OF FACTS

### A.    The Famous Oscar De La Renta Brand

Oscar de la Renta, the founder and owner of ODLR, is a world-renowned fashion designer. Mr. de la Renta and his company ODLR have built a diverse and highly successful business in shoes, luxury apparel, jewelry, eyewear, home goods, bridal gowns, furs, handbags and other accessories, sportswear and various other product lines.  ODLR brand goods are distributed in 60 countries around the world.  In short, "Oscar de la Renta" is an international luxury brand of considerable strength, value and vibrancy.  *See* Complaint ¶¶ 7, 8, 38.

As pleaded in the Complaint, the "Oscar de la Renta" name and derivative names such as "Oscar" have been registered by ODLR as trademarks in the United States and in dozens of other countries around the world, in connection with all of the above-listed goods.  Complaint ¶ 9. The U.S. registrations identified in the Complaint include Registration Nos. 0922367, 1334456, 1950895, 1957411, 2119455, 2132134, 2510354, 2553215, 2702388, 2928221, 3046554, 3108953, 3283357, 3303388, 3307716, and 3352817.  As also pleaded, ODLR also owns all common law trademark and trade name rights associated with the ODLR trademarks as well as all rights in all trade dress used in conjunction with ODLR-branded products.  Complaint ¶ 10.

**B.**    **The Fragrance License**

In 1976, Oscar de la Renta, launched his signature perfume "Oscar."  Production, marketing, and distribution of "Oscar" and subsequent new fragrances launched under the Oscar de la Renta brand have been handled by a series of companies operating under a "best efforts" License Agreement with ODLR.  YSL Beauté has been the Licensee for approximately the last 10 years.

On August 3, 1976, ODLR filed applications with the United States Patent and Trademark Office ("USPTO") to register the marks "Oscar" and "Oscar de la Renta" in connection with perfumes.  The USPTO registered the mark "Oscar" on January 10, 1978 (Registration No. 1081451) and the mark "Oscar de la Renta" on February 14, 1978 (Registration No. 1085216).  On or about May 1, 1979, ODLR assigned these two registrations to the Licensee (then called Milton Stern Parfums, Inc.), to facilitate administration and maintenance of the registrations.

The original License Agreement (attached as Exhibit A to the accompanying Declaration of Peter M. Brody, dated August 4, 2008 ("Brody Decl.")) was executed on April 1, 1976.  That agreement was later replaced by a new agreement (the "License Agreement," attached as Exhibit

B to the Brody Decl.).[1]  Although the License Agreement states that it is "made as of August 18, 1977," it was actually executed on November 27, 1981.  That License Agreement remains in effect today (ODLR has agreed not to terminate it pending completion of the arbitration).

Section 1 of the License Agreement provides that "Licensee shall be the sole licensee and enjoy the rights of exclusive user of the Licensed Mark in the Territory on the Licensed Products," and that Oscar de la Renta "hereby consents to such license and to the use by Licensee of his name as Licensed Mark as aforesaid."   The "Licensed Mark" is defined as follows:

> [Licensed Mark] shall include the full name Oscar de la Renta or the initials ODLR in plain or any stylized type or in any script, written or signature form, or the separable components Oscar, de la Renta, or Renta, as well as such other words or symbols with which the name Oscar de la Renta shall be or become associated in the public mind.

"Licensed Products," in turn, are defined as "perfumery, fragrances, essential oils, toiletries, cosmetics, hair lotions, and soaps, it being intended to include perfumery, beauty and toiletry preparations of all kinds."  License Agreement, at 1.

The License Agreement stipulates that the Licensed Products "will be of reasonably high standards as to product quality and merchantability as reasonably approved by ODLR from time to time" and that "ODLR shall have the right to approve of Licensed Products before any commercial use thereof."  License Agreement § 4.  Similarly, the License Agreement requires the Licensee "to submit to ODLR for approval and prior to any commercial use thereof by Licensee all proposed uses of bottles, containers, packaging, labels and advertising materials

---

[1] License Agreement, at 1.  In fact, the 1976 Agreement was replaced with a pair of license agreements.  One agreement covered the territory consisting of the United States, Canada, and France, while the other agreement covered the rest of the world.  The Licensee in the latter agreement was Parfums Stern Ltd., a foreign-based affiliate of Parfums Stern Inc.  *See* License Agreement § 23.

bearing or containing Licensed Mark, which approval shall not be unreasonably withheld or delayed."  License Agreement § 5.

With respect to the registration of trademarks in connection with the Licensed Products, ODLR was primarily responsible for securing such registrations in each country.  With respect to the United States, however, the allocation of responsibility was slightly different.  Section 2(d) generally provides that "ODLR, at its expense will apply for and register the Licensed Mark with respect to the Licensed Products."  Section 2(d) also provides, however, that the registrations that had been obtained originally by ODLR in 1976 and then assigned to Milton Stern Parfums, Inc. in 1979 "shall stand of record in the name of Licensee."

Although these two U.S. registrations were to "stand of record in the name of Licensee," the License Agreement makes plain that ODLR remains the true owner of the Licensed Marks without regard to the nominal owner listed on those registrations.  Indeed, Section 2(b) provides that the Licensee must use the registered marks per ODLR's directives, and further, that the registrations would automatically "revert" to ODLR upon termination of the License Agreement. In order to ensure that reversion, Section 2(b) further provided for the Licensee to execute:

> an irrevocable assignment thereof within thirty (30) days of the date of this agreement (in the form of Exhibit "2" hereto), together with an irrevocable power of attorney . . . a copy of which power of attorney is attached hereto as Exhibit "3", which executed assignment and power of attorney shall be forwarded to ODLR's attorney . . . who shall hold the same in escrow during the term of this agreement . . . .

Executed copies of Exhibits 2 and 3 are attached to the copy of the License Agreement submitted herewith.  *See* Brody Decl. Exhibit B at pages 27-28 and 29-30, respectively.[2]

---

[2]  Those Exhibits were omitted – without explanation – from the copy of the License Agreement submitted by YSL Beauté as Exhibit 6 to the Ederer Decl.

The License Agreement contains other important restrictions on the Licensee with regard to these U.S. trademark registrations. Among other things, Section 2(b) stipulates that the Licensee "shall not transfer or assign the trademarks Oscar and Oscar de la Renta or the Registration Nos. 1081451 and 1085216 thereof except to transfer and assign the same to ODLR or its assigns as provided in this paragraph 2(b)." Section 6 states that "Licensee shall have no right to sub-license in the United States." Section 15 of the License Agreement goes still further, providing as follows:

> Licensee agrees that it will not, during the term of this agreement or thereafter, attack ODLR's title in and to the Licensed Mark or the validity thereof. Licensee shall, whether during, or after the term of this agreement, execute any documents reasonably required by ODLR to establish or confirm its rights in Licensed Mark either as proprietor or licensor thereof.

Finally, Section 19 affirms that the essential relationship between the parties is that "that of trademark licensor and trademark licensee."

With respect to infringement, Section 2(d) provides that ODLR "at its expense, from time to time on notice from Licensee, shall renew, protect and *enforce* the registrations thus obtained" (emphasis added). In addition, Section 3(a) of the License Agreement provides that, if the Licensee reasonably believes that a third party is infringing or diluting the Licensed Mark in the United States, "Licensee shall inform ODLR thereof in writing and request that ODLR as the beneficial trademark owner bring suit or take such other action in the name of Licensee, as Licensee shall direct."[3] Nowhere, however, does the License Agreement prohibit ODLR from taking enforcement action on its own, if the Licensee has not requested such action (or, as is the

---

[3] Section 3(a) includes a dispute-resolution mechanism in the event the parties disagree over whether the requested action "has a reasonable chance for success" and provides that, under certain circumstances, the Licensee can take action itself if ODLR declines to do so. Section 3(a) also details how costs for any legal action, as well as any damages recovery, are to be allocated between the Licensee and ODLR. Section 3(b) contains somewhat similar provisions applicable in the event that Licensee believes that third party infringement is occurring in Canada and France, except that suits by ODLR there would be brought in ODLR's own name.

case here, where the Licensee actively opposes it).  To the contrary, as noted, Section 2(d) of the

License Agreement explicitly recognizes ODLR's right and obligation to "renew, protect and

*enforce*" the Licensed Mark (emphasis added).[4]

### C.    ODLR's Discovery Of Unauthorized Products

In late November 2007, ODLR discovered an unauthorized "Oscar" fragrance product for

sale at Wal-Mart stores.  The product, a 4 ml (0.13 fluid oz.) bottle labeled *parfum* bore a

resemblance to a miniature flask that ODLR had approved some years before for use solely as a

promotional item or as the gift in "free gift with purchase" sets.  That promotional item,

however, had been distributed in ODLR-approved packaging that bore the licensed trademarks

and the marking "SAMPLE – NOT FOR SALE" or "GIFT – NOT FOR SALE."

Not only was the 4 ml *parfum* unauthorized by ODLR for commercial sale, but the

product also bore an outdated version of the ODLR mark, contained a counterfeit fragrance box

mimicking ODLR's trade dress, and was packaged in a cheap plastic "clamshell" designed to

hang on a peg-board rack.  In addition, the cardboard backing of the clamshell bore the following

source identifier:

© **EA Fragrances Co., Dist.**

**New York, NY 10003**

ODLR was aware of no authorization for an entity known as "EA Fragrances Co." to

hold itself out as a "Distributor," let alone as the holder of a copyright in any trade dress used

with any ODLR fragrance products.  EA, however, apparently was acting as a sublicensee to

---

[4]  In 1987, the then-Licensee, Parfums Stern, Inc., was acquired by Avon Products.  In or about July 1990, Avon sold Parfums Stern to Sanofi Beauté, Inc.  On December 8, 1994, ODLR and Sanofi Beauté executed a letter agreement supplementing the License Agreement ( "1994 Letter Agreement," attached as Exhibit C to the Brody Decl.).

YSL Beauté, even though Section 6 of the License Agreement expressly states that "Licensee shall have no right to sub-license in the United States."

On further investigation, ODLR discovered similar 4 ml (0.13 fluid oz.) bottles of "Oscar" *parfum* and *eau de toilette* for sale through various internet merchants.[5]  Those bottles similarly were approved only for distribution as gifts or in boxes which bore the marking "SAMPLE – NOT FOR SALE" in English and French.  In many instances, that marking had been covered with an opaque sticker or, more crudely, simply scratched off.

### D.    The Response To ODLR'S Complaints About Unapproved Products

On January 18, 2008, ODLR wrote to EA regarding the unapproved products that ODLR had discovered.  ODLR stated that "ODLR has not approved the Products, their packaging, or the particular form of the Marks appearing on that packaging for sale or distribution by YSL Beauté or any other entity or person, nor has ODLR authorized the sale of any licensed fragrance products in discount retail outlets like Walmart."  ODLR requested, *inter alia*, that EA cease distribution and sale of those infringing goods.  ODLR sent a copy of this letter to YSL Beauté.

On January 28, 2008, EA responded to this letter, advising ODLR that it had purchased the products in question from YSL Beauté and suggesting that ODLR address its concerns to YSL Beauté.

In a letter dated January 30, 2008, YSL Beauté, in turn, acknowledged that EA was "a customer of YSL for licensed Oscar De La Renta brand fragrances."  Brody Decl. Exhibit D.  YSL Beauté also voiced objection to ODLR's having written "directly" to EA and stated that "if ODLR has legitimate concerns about any licensed products being sold by YSL's customers, then we would expect ODLR to approach YSL Beauté with those concerns."  *Id.*  YSL Beauté stated

---

[5]  These websites include http://www.fragrancenet.com, http://palmbeachjewelry.com, and http://www.chadwicks.com/, the latter of which is owned by the same ultimate parent company, PPR S.A., that owned YSL Beauté until this month.

that "YSL Beauté will not permit ODLR to interfere with existing relationships with important customers, and is prepared to take whatever action is necessary to protect itself, EA, and any other valued customer ODLR may contact." *Id.*

Based on YSL Beauté's statement that it was "prepared to take whatever action is necessary to protect . . . EA," ODLR responded the following day as follows:

> We understand from your January 30 letter that YSL Beauté assumes full responsibility for any and all remedies to which ODLR may be entitled as a result of the unlawful actions of EA or any other "valued customer" of YSL Beauté. Such remedies include those applicable to any willful infringement of the Marks occurring after notice to EA and YSL Beauté via my January 18 letter. Again, if we misunderstand you, please so advise immediately.

> With regard to your accusation of "interference" by ODLR in YSL Beauté's customer relationships, let us be clear: ODLR has no intention of interfering in YSL Beauté's lawful relationships with its customers and has never done so. ODLR, however, is the exclusive owner of the Marks. As such, ODLR is fully entitled – and, indeed, obliged under Section 3 of the License – to take all necessary and appropriate actions to enforce its rights in the Marks, including with respect to infringing goods and uses.

Brody Decl. Exhibit E.

On February 5, 2008, YSL Beauté wrote again to ODLR. YSL Beauté: (i) admitted that it had supplied EA with the specific products in question, but denied that it "ever authorized or approved" the packaging; (ii) stated that it "has discussed your concerns with EA, and although these discussion are ongoing, EA has preliminarily indicated that it will not make future shipments of the product in question with the complained-of packaging insert, or with any packaging insert that contains an Oscar De La Renta mark"; and (iii) while not questioning ODLR's ownership of the mark, reiterated its request that "if you have any further issues concerning the activities of EA or any of its customers with respect to these products, that you contact us directly, as these are matters to be taken up directly between YSL Beauté and ODLR,

not with any of YSL Beauté's customers." Brody Decl. Exhibit F.  YSL Beauté did not disagree with ODLR's understanding "that YSL Beauté assumes full responsibility for any and all remedies to which ODLR may be entitled as a result of the unlawful actions of EA."

In a letter dated February 8, 2008, ODLR replied that YSL Beauté's February 5 letter was "unsatisfactory," because YSL Beauté had not clearly agreed to cease sales of the unapproved products.  Brody Decl. Exhibit G.  ODLR asked for assurance that such sales would stop.  In addition, ODLR reiterated that "*[i]n reliance on [YSL Beauté's] statement*, ODLR will look solely to YSL Beauté for any and all remedies to which ODLR may be entitled as a result of any unlawful actions of EA and will not communicate further with EA regarding this matter." (emphasis added).[6]

On February 28, 2008, YSL Beauté refused ODLR's request that it stop sales of the unapproved products, replying that "YSL Beauté sees no reason to do this and will not do so." Brody Decl. Exhibit H.  YSL Beauté added that it "rejects the notion that these sales are a breach of the License Agreement." *Id.*  YSL Beauté again did not challenge ODLR's ownership of the trademarks in question.  Nor did YSL Beauté dispute ODLR's understanding that YSL Beauté would assume liability for EA's actions.

### E.    Sales Of Unauthorized Products In Unapproved Packaging Continue

The unapproved products continued to appear in retail outlets through the spring of this year.  In May, ODLR noticed that EA had begun using a new cardboard insert in the package.  In place of the "Oscar de la Renta" signature on the front of the insert appears the legend: "Designer Fragrance Collectible."  On the reverse side is the following statement in small type:

**THIS GENUINE OSCAR PRODUCT HAS BEEN REPACKAGED IN THE U.S. BY EA FRAGRANCES CO.**

---

[6]  In purporting to quote this statement, YSL Beauté repeatedly omits the critical first clause.  YSL Beauté Mem. at 2, 6, 8, 10 & 19, n.7.

NEW YORK, NY 10003, A COMPANY NOT AFFILIATED WITH OSCAR DE LA RENTA, LTD.

OSCAR DE LA RENTA, LTD. IS THE OWNER OF THE OSCAR AND OSCAR DE LA RENTA REGISTERED TRADEMARKS.

MADE IN FRANCE

Brody Decl. Exhibit I. From ODLR's standpoint, this modified insert did nothing to cure the harm to its trademark – indeed, it arguably worsened the confusion that the product and its package would likely cause. The fact that this modified packaging appeared in retail outlets further indicated that YSL Beauté and EA had no intention of discontinuing sales of the unapproved products.

### F.    YSL Beauté Refuses To Accept Liability For EA's Unlawful Conduct

YSL Beauté's role in supplying unauthorized "Oscar" fragrance products to EA was only one of many issues that had arisen between ODLR and YSL Beauté. In fact, the entire license relationship was deeply troubled. For a number of years, ODLR had grown increasingly dissatisfied with YSL Beauté's investment in promoting the fragrance brand. Once a top-selling and highly prestigious women's fragrance line, the ODLR brand had been severely damaged by YSL Beauté's mishandling over a period of years. ODLR repeatedly complained to YSL Beauté about its failure to use "best efforts" to promote the ODLR fragrance brand and YSL Beauté's other deficiencies under the License Agreement.[7] In response, YSL Beauté typically would acknowledge that the brand had not been treated well, assure ODLR that it would redouble its efforts, then do nothing differently.

---

[7] YSL Beauté's suggestion that ODLR recently fabricated its concerns as part of a "campaign" to "get out from under" the License Agreement (YSL Beauté Mem. at 1) is ludicrous, and demonstrably so. A long history of written and oral complaints by ODLR preceded its issuance of notices of default this past year. Specific deficiencies that ODLR repeatedly brought to YSL Beauté's attention included (i) failing to adequately advertise and promote the ODLR fragrance brand, in violation of Section 1 of the License Agreement; (ii) failing to introduce new fragrance products in the marketplace, in violation of Section 1 of the License Agreement and Section 2.3 of the 1994 Letter Agreement; (iii) cheapening the brand by disproportionately distributing it through mass-retail channels at a discount price, in violation of Section 1 of the License Agreement and Section 2.4 of the 1994 Letter Agreement; (iv) failure to use best efforts to develop and market Licensed Products other than fragrances, in violation of Section 1 of the License Agreement; (v) failure to use best efforts to exploit the entire licensed territory, in violation of Section 1 of the License; and (vi) inadequate brand management, in violation of Section 1 of the License Agreement and Section 2.5 of the 1994 Letter Agreement.

Beginning in January 2008, ODLR issued a series of formal notices of default to YSL Beauté.[8]  YSL Beauté made no effort to cure any of the defaults.  On June 10, 2008, the final day of the cure period, YSL Beauté filed a demand for arbitration with the AAA.  In its demand, YSL Beauté stated a single claim for relief, namely, a declaration that ODLR was not entitled to terminate the License Agreement despite YSL Beauté's multiple breaches.  Brody Decl. Exhibit L.

The following day, ODLR advised YSL Beauté by letter that it intended to serve a counterclaim in the arbitration for monetary and declaratory relief due to YSL Beauté's numerous breaches of the License Agreement.  With respect to EA's conduct, ODLR stated as follows:

> ODLR also is entitled to relief resulting from infringement of its trademark rights by Elizabeth Arden, Inc. ("EA") or its affiliates. According to your papers, YSL Beauté did not authorize those acts of infringement and was unaware of them prior to notification by ODLR.  Unless you advise me to the contrary by close of business today, we will assume that YSL Beauté will not answer, in the arbitration or otherwise, for any liability on the part of EA for those acts of infringement.  In that event, given that EA is not a party to the License and its arbitration provision, and cannot be compelled to join the arbitration, ODLR intends separately to seek a remedy for EA's infringement of ODLR's trademark rights.

Brody Decl. Exhibit M.

ODLR also advised YSL Beauté that it did not consider the new packaging of the unapproved product sold by EA to redress EA's violation of ODLR's trademark rights:

---

[8]  ODLR issued three notices of default.  One, dated March 13, 2008, recited the defaults described in the preceding footnote.  Brody Decl. Exhibit K.  Another, dated January 18, 2008, notified YSL Beauté that it was in breach of its obligation, under Section 10 of the License Agreement, to produce for ODLR's inspection, on reasonable request, all "records, documents and material in the possession or under the control of Licensee, with respect to the subject matter of this agreement."  Brody Decl. Exhibit J.  A third notice, dated January 31, 2008, notified YSL Beauté that its sale of unapproved products to EA was in breach of Section 5 of the License Agreement and Section 2.4 of the 1994 Letter Agreement.  Brody Decl. Exhibit E.

> The current packaging material is not authorized by, or acceptable
> to, ODLR, and moreover, is likely to cause consumer confusion
> and to cause dilution of ODLR's mark. Furthermore, as we have
> repeatedly stated, ODLR has never authorized the separate sale of
> a 4 ml fragrance product in any packaging, nor has ODLR agreed
> to the distribution of its products in mass retail outlets, including,
> among others, Wal-Mart.

*Id.*

In a response dated June 13, 2008, YSL Beauté reiterated that, with regard to the original packaging of the unapproved product, "YSL Beauté had not approved of EA's conduct." Brody Decl. Exhibit N. While not disputing that ODLR was entitled to seek redress for that conduct, YSL Beauté noted that ODLR previously had "undertaken" to look solely to YSL Beauté for any relief relating to the sale of the unauthorized products by EA and stated that "we fail to see why your prior undertaking should change." Conspicuously absent from YSL Beauté's letter, however, was any confirmation of YSL Beauté's *agreement* to answer for any liability on the part of EA, which was the express condition of ODLR's supposed "undertaking."

To preserve its rights against EA, which was not a party in the arbitration, ODLR filed this action on June 27, 2008. The Complaint states claims for trademark infringement, false designation of origin, dilution, and unfair competition, under the Lanham Act, 15 U.S.C. § 1114 and § 1125(a), (c), and dilution and unfair competition under New York law.

ODLR did not immediately serve the Complaint on EA, because it wished to afford YSL Beauté the opportunity to clarify whether it would agree to be liable for EA's conduct, in the arbitration or otherwise. Therefore, concurrently with the filing of this action against EA, ODLR wrote to YSL Beauté, advising it of the lawsuit, enclosing the Complaint, noting YSL Beauté's ambiguous response to ODLR's June 11 letter, and stating as follows:

> Accordingly, unless ODLR receives, by close of business
> June 30, 2008, adequate assurances that (1) YSL Beauté will be
> responsible for any damages demonstrated by ODLR to have been

caused by EA's unlawful distribution of the 4 ml fragrance products, EA's packaging thereof, and any other unlawful actions by EA that have damaged ODLR, (2) such claims for damages shall be within the scope of the arbitration now pending between the parties, and (3) EA will respect and be bound by any injunction awarded, in arbitration or otherwise, against sale of the 4 ml fragrance products or use of EA's packaging thereof or both, ODLR will be compelled to take appropriate action to secure complete relief against EA in the United States District Court for the Southern District of New York.  *In the event the requested assurances are provided, ODLR will promptly dismiss the complaint without prejudice.  Otherwise, ODLR will proceed with the action*.

Brody Decl. Exhibit O (emphasis added).

On June 30, 2008, YSL Beauté, through its counsel, contacted ODLR by telephone to advise that YSL Beauté would "not accede" to the requests stated in ODLR's June 27, 2008 letter.  Brody Decl. ¶ 4.  YSL Beauté did not provide any written response to ODLR's letter.  Accordingly, ODLR proceeded with service of its Complaint against EA.

### G.     YSL Beauté Amends Its Arbitration Claims

On July 1, 2008, after having had a chance to review the Complaint against EA, YSL Beauté amended its demand in the arbitration to add claims for unspecified money damages.  Brody Decl. Exhibit P.  In its amended claims, YSL Beauté alleged that ODLR's filing of this action against EA was in breach of YSL Beauté's rights as the owner of "all right, title and interest in" the Licensed Mark under Sections 1 and 3 of the License Agreement (contrary to the plain terms of that contract, and EA's own admission, on the modified packaging of the unapproved product, that "OSCAR DE LA RENTA, LTD. IS THE OWNER OF THE OSCAR AND OSCAR DE LA RENTA REGISTERED TRADEMARKS").  *Id.* at ¶¶ 10 & 51.  YSL Beauté also claimed that this lawsuit constituted "tortious interference" with YSL Beauté's business relationship with EA.  *Id.* at ¶ 55.

On July 7, 2008, ODLR served its answer and counterclaims in the arbitration.  ODLR denied all claims by YSL Beauté and, in its counterclaims, requested an award of substantial

damages of at least $50 million for YSL Beauté's breaches of the License Agreement and a declaration that ODLR is entitled to terminate the License Agreement.  Brody Decl. Exhibit Q.

## ARGUMENT

### YSL BEAUTÉ HAS NOT MET ITS BURDEN OF ESTABLISHING COMPELLING REASONS TO WARRANT A STAY OF THIS ACTION

YSL Beauté's motion for a stay of this action pending arbitration is based on an inapplicable legal standard and on the incorrect premise that the arbitration between ODLR and YSL Beauté will resolve the claims asserted by ODLR in this trademark infringement action against EA.  Properly analyzed under the correct standard, YSL Beauté's position lacks any merit.

### A.    The Correct Legal Standard

YSL Beauté bases its motion for a stay on Section 3 of the FAA and the two-prong test under that provision, which asks only (i) whether an agreement to arbitrate exists and (ii) whether the dispute in litigation is within the scope of that agreement.  YSL Beauté  Mem. at 19-21.  Section 3, however, is inapplicable here.  Section 3, and its two-prong test cited by YSL Beauté, are applicable only where all parties joined in the litigation are also parties to the arbitration agreement.  *Nederslandse,* 339 F.2d at 441; *Wright v. SFX Entertainment, Inc.*, No. 00 Civ. 5354, 2001 U.S. Dist. LEXIS 1000, at *19 (S.D.N.Y. Feb. 8, 2001) (Section 3 stay granted as to claims against defendants who were parties to arbitration agreement, but finding that another defendant "is not a party to the Agreement and is not entitled to a stay under Section 3 of the FAA."  (citation omitted)); *American Shipping Line*, 885 F. Supp. at 501.[9]

---

[9]  Similarly, the Third Circuit has held that "[j]udicial efficiency does not, by itself, allow a federal court to refuse to exercise its jurisdiction in favor of proceedings in an alternate forum" and that the task of the district court is to determine "whether there exist 'exceptional' circumstances, the 'clearest of justifications' that can suffice under *Colorado River*."  *CTF Holdings, Inc. v. Marriott International, Inc.*, 381 F.3d 131 (3d Cir. 2004) (reversing stay in

Here, non-party YSL Beauté seeks to stay ODLR's action against EA – a non-signatory to the License Agreement between ODLR and YSL Beauté – which cannot be compelled to arbitrate. Under these circumstances, the courts have held that a stay in favor of a pending arbitration should only be granted in those "rare circumstances" in which the movant can establish "compelling reasons" to justify the stay. *Nederslandse*, 339 F.2d at 441; *American Shipping Line,* 885 F. Supp. at 502. Among other things, the movant must establish that the arbitration will resolve the issues in the litigation, *American Shipping Line,* 885 F. Supp. at 502-503, and that a stay would not work "undue hardship" on the plaintiff. *Nederslandse,* 339 F.2d at 441; *American Shipping Line*, 885 F. Supp. at 503 ("Even if there were compelling reasons to grant a stay, the court would not grant it because the moving defendants have not met their burden of showing that the plaintiff would not face undue hardship from the delay in the proceedings."). YSL Beauté has not met its "heavy burden" to demonstrate "compelling reasons" to justify a stay of this action, or that ODLR would not suffer "undue hardship."

### B. The Arbitration Involves Distinct Issues And Will Not Resolve ODLR's Claims Against EA

YSL Beauté's principal argument in favor of a stay is that the issues raised by ODLR in this lawsuit are "subsumed" within the scope of the arbitration between ODLR and YSL Beauté and that the outcome of the arbitration will be dispositive as to ODLR's claims against EA. YSL Beauté Mem. at 2, 7, 8, 10, 18, 19 & 20. That argument is plainly without merit.

The issues in this lawsuit include (i) whether, and to what extent, EA was responsible for the packaging, labeling, and sale of unapproved "Oscar" fragrance products; (ii) to whom EA sold the products; (iii) whether, and to what extent, the packaging and labeling of the products

---

favor of arbitration where movant failed to establish that no prejudice would result from a delay of the federal action).

caused, or is likely to cause, confusion or dilution; and (iii) whether, and to what extent, ODLR suffered injury as a result of EA's conduct. None of those issues will be addressed in the arbitration; indeed, in its correspondence, YSL Beauté has repeatedly represented that it has no knowledge about those issues and that they are not germane to its dispute with ODLR. Feb. 5, 2008 letter (Brody Decl. Exhibit F); Feb. 28, 2008 letter (Brody Decl. Exhibit H); June 10, 2008 letter (Brody Decl. Exhibit L); and June 13, 2008 letter (Brody Decl. Exhibit N).

While ODLR has asserted a claim in arbitration that YSL Beauté breached the License Agreement by selling unauthorized product to EA, and by failing to take action to prevent unauthorized sales by EA, those claims relate solely to YSL Beauté's performance of its contractual obligations under the License Agreement – not the independent liability of EA for its separate conduct. And since EA is not a party to the arbitration, that proceeding cannot result in a remedy for EA's wrongdoing. That remedy can only be provided in this action. *See Braun Media Services, Inc. v. Taylor*, No. 1:06-CV-02002, 2006 U.S. Dist LEXIS 86828, at *9 (M.D. Pa. Nov. 30, 2006) (where "the parties and the range of issues differ in the arbitration and the [lawsuit]," a stay in favor of arbitration should be denied).

That YSL Beauté has amended its arbitration papers to include its newly-minted claim that it is the owner of "all right, title and interest in" several of ODLR's trademark registrations and that ODLR has breached the License Agreement by filing this lawsuit against EA (Ederer Decl. Exhibit 2 at ¶¶ 10 & 51) does not change the analysis. To begin with, the claim is without merit. The License Agreement explicitly states that ODLR is the "beneficial owner" of the registered trademarks at issue, with the full right, and *obligation*, to "renew, protect and enforce the registrations." License Agreement §§ 2(d) & 3(a) (Brody Decl. Exhibit B). YSL Beauté is merely the nominal holder of the registrations for so long as the License Agreement is in effect:

YSL Beauté cannot alienate those registrations, and upon termination of the License Agreement, the registrations automatically revert to ODLR.  License Agreement § 2(b).  If any breach has occurred in connection with this lawsuit, it is YSL Beauté, not ODLR, that has committed it, by violating its agreement "that it will not, during the term of this agreement or thereafter, attack ODLR's title in and to the Licensed Mark or the validity thereof."  License Agreement § 15.

Even if YSL Beauté's contentions about the ownership of several trademark registrations were correct, a stay would not be warranted.  ODLR's claims against EA are based on a host of trademark registrations and other intellectual property rights, not just the ones of which YSL Beauté claims to be the "rightful owner."  Even if ODLR had no right to enforce the several registrations nominally held by YSL Beauté – and that is not the case – YSL Beauté does not, and could not, dispute ODLR's right to enforce all the other registrations and rights identified in the Complaint.  Likewise, even if one were to indulge the notion that ODLR's assertion of rights in the registrations nominally held by YSL Beauté would be a breach of the License Agreement, YSL Beauté does not, and could not, contend that ODLR breached the License Agreement by asserting any of the other many registrations and rights cited in the Complaint.  Accordingly, even under the scenario posited by YSL Beauté, YSL Beauté cannot meet its burden of establishing that the arbitration will result in a determination of the claims in this lawsuit. *American Shipping Line*, 885 F. Supp. at 502-503 (even where lawsuit and arbitration share issues in common, motion for a stay should be denied where it is not clear that the arbitration will result in a final determination of all issues in the lawsuit); *see also, e.g.*, *E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, No. 97 Civ. 7102, 1998 U.S. Dist LEXIS 8678 (S.D.N.Y. June 12, 1998) (application for stay denied where it was uncertain that arbitrator's

determinations concerning trademark license would necessarily result in a determination of the infringement claims contained in a lawsuit against non-signatories).[10]

### C.    A Stay Would Result In Undue Hardship To ODLR

Because YSL Beauté has not met its heavy burden to justify a stay, its motion should be denied.  Moreover, because the arbitration will not resolve the claims asserted by ODLR against EA in this lawsuit, a stay pending arbitration would cause pointless delay, and "undue hardship" to ODLR, which would be precluded from enforcing its rights as against EA in the interim.  *See*, *e.g.*, *American Shipping Line*, 885 F. Supp. at 503.  *See also CTF Holdings,* 381 F.3d at 139 (where delay can result in prejudice to the plaintiff, federal action should not be stayed pending arbitration).[11]  Indeed, given the circumstances at issue here, any stay of this proceeding would be especially prejudicial to ODLR.  YSL Beauté has expressly stated that it will not take any action against its customer, EA, to stop its infringement, and also has expressly stated that it will not answer for the conduct of EA in the arbitration proceeding.  Thus, by seeking to stop this action in its tracks, YSL Beauté in effect is attempting to prevent ODLR from enforcing its rights against EA in *any* forum.  And, under YSL Beauté's construct, the infringing conduct of EA would be allowed to persist, to the further detriment of ODLR.  In short, the hardship to ODLR

---

[10]    Recognizing that it cannot meet its burden of demonstrating "compelling circumstances" as required under the Second Circuit standard, YSL Beauté instead places primary reliance on *Petrik v. Reliant Pharmaceuticals, Inc.,* No. 8:07-CV-1462-T-24 TBM, 2007 U.S. Dist. LEXIS 82037 (M.D. Fla. Nov. 5, 2007).  Because *Petrik* does not apply the stringent Second Circuit analysis, it should be disregarded.  In any event, even if *Petrik* were to be considered, it only serves to demonstrate that a stay is not warranted here.  In *Petrik* there was no question that the arbitration would resolve the issue of whether sub-licensing was permitted, which was the sole issue in the lawsuit against the non-signatory (Reliant).  *Id.* at *4.  Thus, the court concluded that a ruling in the arbitration as to the signatory (Abbott) would "necessarily" resolve the claims in the lawsuit against Reliant.  *Id.* at *5.  That is the polar opposite of the situation here, where there is no possibility that the arbitration can resolve the infringement claims asserted against EA.  Moreover, it is worth noting that in *Petrik*, Abbott had already agreed to indemnify Reliant and to answer for its infringement.  *Id.* at *4.  Here, YSL Beauté has expressly refused to do so, thus confirming that the arbitration proceeding cannot provide a remedy to ODLR.

[11]    Because EA is not a party to the arbitration proceeding, a stay also would prevent ODLR from proceeding with discovery of EA, which would result in further prejudice to ODLR.  *See, e.g., Wright,* 2001 U.S. Dist. LEXIS 1000, at *21 (stay denied, where it would deprive the plaintiff of its right to proceed with discovery of non-signatory).

from a granting of YSL Beauté's motion would be "undue," and for that reason as well it should be denied.

## <u>CONCLUSION</u>

For the reasons set forth above, and in the Brady Decl., ODLR respectfully requests that this Court deny YSL Beauté's motion, and permit this case to proceed.

Dated:  New York, New York
      August 4, 2008

Respectfully submitted,

ROPES & GRAY LLP

By: /s/ William I. Sussman
William I. Sussman
Lee S. Gayer
Carla E. Sereny
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
william.sussman@ropesgray.com
lee.gayer@ropesgray.com
carla.sereny@ropesgray.com

Peter M. Brody
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005
(202) 508-4600
peter.brody@ropesgray.com

*Attorneys for Plaintiff*