UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OSCAR DE LA RENTA, LTD.,

        Plaintiff,

    v.

ELIZABETH ARDEN, INC., d/b/a
"EA FRAGRANCES CO.",

        Defendant.

Civil Action No. 08 CIV 5785 (DLC)

DECLARATION

---

I, Peter M. Brody, declare as follows:

(1)    I am a member of Ropes & Gray LLP, counsel to plaintiff Oscar de la Renta Ltd. ("ODLR") in this action.  I am admitted *pro hac vice* in this action.

(2)    I submit this declaration in opposition to non-party YSL Beauté, Inc.'s Motion to Intervene and Motion to Stay Litigation Pending Arbitration.

(3)    True and correct copies of the following documents, in the order referred to in the accompanying Memorandum in Opposition to Non-Party YSL Beauté, Inc.'s Motion to Intervene and Motion to Stay Litigation Pending Arbitration, are annexed hereto as follows:

(a)    A license agreement, dated April 1, 1976, between ODLR and Milton Stern Parfums, Inc. is attached hereto as Exhibit A.

(b)    A license agreement, dated August 18, 1977, between Parfums Stern Inc. and ODLR is attached hereto as Exhibit B.  This exhibit includes a copy of an Assignment dated November 27, 1981, executed by Parfums Stern Inc, which was annexed as "Exhibit '2'" to the original document, and which is found at pages B-27 to B-28.  Exhibit B also includes a copy of

a Power of Attorney dated November 27, 1982, executed by Parfums Stern Inc., which was annexed as "Exhibit '3'" to the original document, and which is found at pages B-29 to B-30.

(c)     A letter agreement dated December 8, 1994, between ODLR, Sanofi Beauté, Inc. and Parfums Stern S.A. is attached hereto as Exhibit C.

(d)     A January 30, 2008 letter from Louis S. Ederer, Esq. to Peter M. Brody, Esq. is attached hereto as Exhibit D.

(e)     A January 31, 2008 letter from Peter M. Brody, Esq. to Louis S. Ederer, Esq. is attached hereto as Exhibit E.

(f)     A February 5, 2008 letter from Louis S. Ederer, Esq. to Peter M. Brody, Esq. is attached hereto as Exhibit F.

(g)     A February 8, 2008 letter from Peter M. Brody, Esq. to Louis S. Ederer, Esq. is attached hereto as Exhibit G.

(h)     A February 28, 2008 letter from Louis S. Ederer, Esq. to Peter M. Brody, Esq. is attached hereto as Exhibit H.

(i)     Photographs of unapproved packaging used by Elizabeth Arden, Inc., d/b/a/ "EA Fragrances Co." ("EA") are attached as Exhibit I at pages I-1 to I-2.  Those products are pictured alongside authentic products, carrying ODLR's approved trade dress, in Exhibit I at pages I-3 to I-5.

(j)     A January 18, 2008 letter from Peter M. Brody, Esq. to Louis S. Ederer, Esq., is attached hereto as Exhibit J.

(k)     A March 13, 2008 letter from Peter M. Brody, Esq. to Louis S. Ederer, Esq., is attached hereto as Exhibit K.

(l)  A June 10, 2008 letter from Louis S. Ederer, Esq. to Peter M. Brody, Esq. is attached hereto as Exhibit L.

(m)  A June 11, 2008 letter from Peter M. Brody, Esq. to Louis S. Ederer, Esq. is attached hereto as Exhibit M.

(n)  A June 13, 2008 letter from Louis S. Ederer, Esq. to Peter M. Brody, Esq. is attached hereto as Exhibit N.

(o)  A June 27, 2008 letter from Peter M. Brody, Esq. to Louis S. Ederer, Esq. is attached hereto as Exhibit O.

(p)  A July 1, 2008 supplemental Statement of Claim filed by YSL Beauté, Inc. in the arbitration between YSL Beauté and Oscar de la Renta, Ltd. before the American Arbitration Association (case no. 13 133 01389 08), is attached hereto as Exhibit P.

(q)  A July 7, 2008 Answering Statement and Counterclaim Request filed by ODLR in the arbitration between YSL Beauté and Oscar de la Renta, Ltd. before the American Arbitration Association (case no. 13 133 01389 08), is attached hereto as Exhibit Q.

(4)  On June 30, 2008, I received a telephone call from YSL Beauté's counsel, Louis S. Ederer, Esq. of Arnold & Porter LLP.  Mr. Ederer advised me that YSL Beauté would "not accede" to ODLR's requests set forth in my letter to Mr. Ederer dated June 27, 2008 regarding ODLR's claims against EA.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of August, 2008.

_____ */s/ Peter M. Brody*_____
Peter M. Brody

# EXHIBIT A

AGREEMENT made the _1°_ of _April_, 1976,
between OSCAR DE LA RENTA, residing at _2 East 70th Street U_
OSCAR DE LA RENTA, LTD., a New York corporation having a
place of business at 550 Seventh Avenue, New York, New York
10018 (hereinafter "ODLR"), and MILTON STERN PARFUMS, INC.
a New York corporation having a place of business at 40 West
57th Street, New York, New York 10019 (hereinafter "LICENSEE").

W I T N E S S E T H :

WHEREAS, OSCAR DE LA RENTA is a shareholder of ODLR
and has acquired a wide reputation, symbolized by his name,
as a designer, creator and innovator in the fashion and fashion-
related fields; and ODLR presently has the exclusive rights to
his talents and creative energies and has moreover obtained
and presently owns the exclusive rights to his name as a trade-
mark or otherwise for the particular goods to which this agree-
ment relates; and

WHEREAS, the parties desire that LICENSEE shall be
the sole and exclusive licensed user of the name and trademark
OSCAR DE LA RENTA as more fully defined in paragraph 1 below
(hereinafter "Licensed Mark") in respect of the Licensed Produc
(as defined in paragraph 1), and trademark registrations are
being or will be obtained in the name of ODLR for Licensed Mark
in respect of such goods in the United States and elsewhere.

NOW, THEREFORE, in consideration of the mutual pro-
mises of the parties, it is agreed as follows:

1.  ODLR hereby grants LICENSEE the right for any
and all countries or geographical areas of the world to use
and make use of Licensed Mark (which shall include the full



name OSCAR DE LA RENTA or the initials ODLR in plain or any
stylized type or in any script, written or signature form,
or the separable components OSCAR, DE LA RENTA, or RENTA, as
well as such other words or symbols with which the name Oscar
de la Renta shall be or become associated in the public mind
unless ownership of or the exclusive right to use such other
words or symbols shall be in another licensee of ODLR) as
exclusive licensee and/or authorized user upon or in relation
to perfumery, fragrances, essential oils, toiletries, cosmetics,
hair lotions, and soaps, it being intended to include perfumery,
beauty and toiletry preparations of all kinds (hereinafter
"Licensed Products," shall mean any of the aforesaid products
bearing Licensed Mark), provided that such goods shall be made
by or for LICENSEE in accordance with reasonably high standards
as to product quality and merchantability as reasonably approved
by ODLR from time to time and as hereinafter set forth.  Oscar
de la Renta hereby consents to such license and to the use by
LICENSEE of his name as Licensed Mark as aforesaid.  While
this agreement remains in force, LICENSEE shall be the sole
licensee and enjoy the rights of exclusive user of the Licensed
Mark on the Licensed Products.  LICENSEE shall use its best
efforts to exploit and publicize Licensed Mark and to promote
the sale of Licensed Products in each country in which it is
actively selling Licensed Products.

2.  The Licensed Mark shall stand of record in the
name of ODLR, and all use of Licensed Mark by or for or on
behalf of LICENSEE shall inure to the benefit of ODLR.  LICENSEE
shall determine in its reasonable business judgment those coun-
tries where it desires to apply for and/or register the Licensed
Mark.  LICENSEE agrees that in such countries (except the

-2-

United States) it will file and prosecute applications to register Licensed Mark therein as agent for and in the name of ODLR, and to take all reasonable steps to renew, protect and enforce any registrations of Licensed Mark thus obtained, including but not limited to applying for and recording LICENSEE or its designee as registered user or the equivalent in any country where in the opinion of LICENSEE's legal counsel it shall be necessary to do so.  ODLR agrees that it will execute and furnish such proper powers of attorney or other documents as LICENSEE or LICENSEE's legal counsel shall request and as approved by ODLR's legal counsel, which approval shall not be unreasonably withheld or delayed, in order to accomplish the foregoing.  The costs to be incurred as a result of the provisions of this paragraph shall be borne by LICENSEE in all countries, except in the United States.  ODLR, at its expense will apply for and register the Licensed Mark with respect to the Licensed Products in the United States and, at its expense, from time to time on notice from LICENSEE, shall renew, protect and enforce the registration(s) thus obtained.

3.  (a)  If LICENSEE shall reasonably believe that a third party's use and/or application or registration of words or symbols, as a trademark or otherwise in the United States, whether in relation to goods or in advertising or publicity matter, is so close to Licensed Mark in respect to Licensed Products as to cause confusion therewith or result in a dilution of the distinctiveness thereof, then LICENSEE shall inform ODLR thereof in writing and request that ODLR as the trademark owner bring suit or take such other action in its name, as LICENSEE shall direct, before any court or Patent Office to halt or suppress such objectionable use, application or registration, whether or not LICENSEE is joined therein as party

-3-

plaintiff or opposer.   Within five (5) days of receipt of
LICENSEE's notice and request as aforesaid, ODLR shall notify
LICENSEE in writing of its decision as to whether or not it
will take the action requested by LICENSEE.   If LICENSEE and
ODLR disagree as to LICENSEE's request, then the question of
whether the proposed action has a reasonable chance for
success in terms of preserving the distinctiveness of Licensed
Mark so as to prevent confusion therewith and/or dilution thereof,
shall be submitted to the law firm of Kenyon & Kenyon Reilly
Carr & Chapin, 59 Maiden Lane, New York, New York, or if that
firm is unavailable, the law firm of Fish & Neave, 277 Park
Avenue, New York, New York, or if neither such firm is avail-
able such other law firm in New York, New York, as shall be
agreed upon by LICENSEE and ODLR (hereinafter such firm to
which the matter is submitted shall be referred to as the
"Outside Firm").  The decision of the Outside Firm shall be
final and binding on ODLR and LICENSEE.  If the Outside Firm
renders a decision that the proposed action has a reasonable
chance of success, then the same shall be deemed a "Significant
Infringement" and the following procedure shall be followed:

(i)  ODLR may, but shall not be obligated to,
institute judicial or administrative action to halt, suppress or
otherwise dispose of any third party's Significant Infringement
within 30 days of the receipt of a request to do so by a notice
from LICENSEE or within 15 days of the decision of the Outside
Firm, if the matter was submitted to the Outside Firm.  ODLR
agrees to actively prosecute such action in good faith and
with reasonable dispatch.

-4-

(ii)  If ODLR shall fail to actively pursue a Significant Infringement as aforesaid within the applicable 30 or 15-day period, as the case may be, LICENSEE shall have the right, but not the obligation, to elect in its name and/or ODLR's name to institute judicial or administrative action toward halting, suppressing or otherwise disposing of the Significant Infringement. LICENSEE agrees to actively prosecute any such action in good faith and with reasonable dispatch.

(iii)  Notwithstanding the foregoing provisions, LICENSEE shall have the right, but not the obligation, to take any action or to commence any suit against a third party if it reasonably believes that the third party has engaged in a Significant Infringement, prior to the submission of that question to the Outside Firm. If the Outside Firm renders a decision that a Significant Infringement occurred, then ODLR shall have the right, but not the obligation, to take over control of the action commenced by LICENSEE. In such case, ODLR agrees to actively prosecute such action in good faith and with reasonable dispatch. In addition, ODLR shall reimburse LICENSEE for all reasonable legal costs theretofore incurred by it to suppress, halt or dispose of such Significant Infringement.

(iv)  The party undertaking the suit or action involving the Significant Infringement shall have the right to take charge thereof, including choice of counsel and tribunal. The party undertaking the suit or action shall not

-5-

make any settlement without the consent of the other party, which consent shall not be unreasonably withheld or delayed. The costs incurred by LICENSEE or ODLR as a result of the provisions of this paragraph 3(a) shall be borne by ODLR, except ODLR shall not be obligated to pay any costs of LICENSEE if the matter is submitted to the Outside Firm and the Outside Firm renders a decision that the infringement is not a Significant Infringement. Nothing in this paragraph 3(a) shall prevent ODLR from authorizing LICENSEE to act on its behalf to undertake suit or other action against a third party. In such case, LICENSEE shall have full control over such action and all costs incurred by it shall be borne by ODLR. The party not in control of the action shall have the right, but not the obligation, to participate in any action brought under the provisions of this paragraph 3(a), at its own expense through counsel of its own choice.

(v)  If in any such suit or action prosecuted under this paragraph 3(a), money damages are awarded to ODLR or LICENSEE, ODLR shall be entitled to 50% of such total award (including any legal fees, if any, which are a part of such award) up to the total legal costs incurred by ODLR to prosecute such suit or action.  LICENSEE shall be entitled to retain the balance of any such award.

(b)  If LICENSEE shall reasonably believe that a third party's use and/or application or registration of words or symbols as a trademark or otherwise in any country of the world other than the United States, whether in relation to goods or in advertising or publicity matter, is so close to Licensed Mark in respect of Licensed Products as to cause confusion therewith or result in a dilution of the distinctiveness thereof, then LICENSEE shall be entitled to require ODLR as the trademark

-6-

owner to bring suit or take such other action in its name
as LICENSEE shall direct before any court or Patent Office
to halt or suppress such objectionable use, whether or not
LICENSEE be joined therein as party plaintiff or opposer.
LICENSEE shall have full charge of and control over any such
action, and any settlement thereof, including choice of counsel
and tribunal.  ODLR agrees to contribute toward the costs
incurred as a result of the provisions of this paragraph 3(b),
an amount equal to 25% of the legal costs incurred by LICENSEE
in prosecuting such action (hereinafter the amount due to
LICENSEE is referred to as the "ODLR Contribution").  LICENSEE
shall bear  all costs in excess of the ODLR Contribution.
ODLR shall not be required to immediately reimburse LICENSEE
for the ODLR Contribution, but LICENSEE shall offset the ODLR
Contribution against future royalties payable by it to ODLR
under paragraph 7 in respect of the net sales of the Licensed
Products in the country in which such action arose, until the
ODLR Contribution has been fully recovered by it.  Notwithstand-
ing the foregoing, if in any such suit or action prosecuted
by LICENSEE under this paragraph 3(b), money damages are
awarded to ODLR or LICENSEE, ODLR shall be entitled to 12-1/2%
of such total award (including legal fees, if any, which are
a part  of such award) up to an amount equal to the ODLR
Contribution.  LICENSEE shall be entitled to retain the
balance of any such award.

(c)  ODLR agrees that it will execute and
furnish such powers of attorney or other documents as LICENSEE
or LICENSEE's legal counsel shall request in order to accom-
plish the intent of paragraphs 3(a) and 3(b) above subject to
approval of ODLR's legal counsel, which approval shall not be

-7-

unreasonably withheld or delayed, and to cooperate fully with LICENSEE in any such actions. The provisions of this paragraph 3 shall not prohibit or restrict LICENSEE from taking any other or additional legal proceedings at its own expense against third parties to protect or enforce its rights and interests hereunder.

4.  LICENSEE undertakes that Licensed Products will be made by or for it in accordance with the reasonably high standards as to product quality and merchantability as reasonably approved by ODLR from time to time. To such end, ODLR shall have the right to approve of Licensed Products before any commercial use thereof, which approval shall not be unreasonably withheld or delayed, and at all reasonable times thereafter to receive production samples of Licensed Products and/or to inspect the manufacturing procedures on the premises where Licensed Products are or will be made.

5.  LICENSEE agrees to submit to ODLR for approval and prior to any commercial use thereof by LICENSEE all proposed uses of bottles, containers, packaging, labels and advertising materials bearing or containing Licensed Mark, which approval shall not be unreasonably withheld or delayed. Within 30 days of any such submission (or 10 days if accelerated approval is requested and the item is marked in red "10 DAY ITEM") ODLR shall grant LICENSEE its permission or state in writing the reason for its refusal of permission. If LICENSEE shall not receive permission within such 30 -day period (or within 10 days for "10 DAY ITEM") then LICENSEE shall be entitled to proceed as if approval of ODLR had been furnished. LICENSEE shall not be required to resubmit materials for ODLR's approval in any case where LICENSEE shall have made non-material changes or variations.

-8-

6.   LICENSEE is authorized to constitute and appoint any third party(ies) of its choice to be sub-licensee(s) of Licensed Mark in respect of any items of Licensed Products for any particular geographical area, and upon such terms as LICENSEE in its sole discretion shall determine, except LICENSEE shall have no right to sub-license in the United States.   LICENSEE will notify ODLR of the grant of any sub-license within 15 days of such grant.   ODLR agrees that at LICENSEE's request, it will enter into such other and further separate agreements with sub-licensee(s) of LICENSEE with respect to the Licensed Products, in such form as may be requested and proposed by LICENSEE's legal counsel and approved by ODLR's legal counsel, which approval shall not be unreasonable withheld or delayed, so as to grant its licensing authority directly to sub-licensee(s). It shall be LICENSEE's obligation as agent for ODLR to supervise the use of Licensed Mark by sub-licensee(s) and to require that such use be in accordance with the same reasonably high quality standards as approved by ODLR for Licensed Products as made by or for LICENSEE.

7.   (a)  In return for the rights herein granted, LICENSEE shall pay ODLR a royalty, computed on a yearly basis (as hereinafter indicated) on its net sales of Licensed Products. The term "net sales" whenever used in this agreement means gross amounts received by LICENSEE for shipments less cash and trade discounts, returns, allowances and taxes directly applicable to the sales (such as sales, use, ad valorem or other similar taxes but not taxes based on LICENSEE's income).   There shall also be excluded from net sales shipping costs, insurance costs, tariffs and duties to the extent stated separately on any invoice covering sales of Licensed Products as to which ODLR is entitled to be paid a royalty under this agreement.   In computing

-9-

LICENSEE's net sales there shall be included (i) net sales
of Licensed Products of any sub-licensee or distributor in which
LICENSEE shall have any equity ownership (direct, indirect or
beneficial) and (ii) any royalties or other revenues received
by LICENSEE in respect of Licensed Products from any sub-licensee
or distributor in which LICENSEE does not have any equity owner-
ship (direct, indirect or beneficial).  In computing LICENSEE's
net sales there shall be excluded net sales of Licensed Products
by LICENSEE to or any royalties or other revenues received from an
sub-licensee    or distributor in which LICENSEE shall have any
equity ownership (direct, indirect or beneficial).

        (b)  The royalties payable to ODLR shall be on
an annual net sales basis equal to the following:

     5% of the first $2,500,000 (or other currency equivalent)
        of net sales of Licensed Products;

     4% of the next $2,500,000 (or other currency equivalent)
        of net sales of Licensed Products;

     3% of the net sales over the first $5,000,000 (or other
        currency equivalent)

LICENSEE agrees to pay ODLR as a  non-returnable advance against
earned royalties, the following guaranteed minimum royalties:

     (i)  During the period commencing  on execution
of this agreement and ending December 31, 1977, the
sum of $25,000 payable $10,000 on the signing hereof
and the balance of $15,000 on December 31, 1977, or
at the end of one year from LICENSEE's initial shipment
of Licensed Products into United States commerce, which-
ever event shall first occur.

     (ii)  During the year ending December 31, 1978,
the sum of $50,000 payable in equal quarterly install-
ments of $12,500 on the 15th day of February, May, August
and November in such year.

(iii)  During the years ending December 31, 1979 and December 31, 1980, the sum of $75,000 payable in equal quarterly installments of $18,750 on the 15th day of February, May, August and November in each such year.

(iv)  During the year ending December 31, 1981 and each anniversary thereafter until December 31, 1985 the sum of $100,000 payable in equal quarterly installments of $25,000 on the 15th day of February, May, August and November in each such year.

(v)  During the year ending December 31, 1986 the sum of $125,000 payable in equal quarterly installments of $31,250 on the 15th day of February, May, August and November of such year.

(vi)  During the years ending December 31, 1987 and each anniversary thereafter until December 31, 1990, the sum of $125,000 plus the cost of living adjustment increases as determined under paragraph 7(c).  Such sum shall be paid in equal quarterly installments on the 15th day of February, May, August and November in each said year.

(vii)  During the years ending December 31, 1991 and each anniversary thereafter the greater of (1) $150,000 or (2) $125,000 plus the cost of living adjustment increase as determined under paragraph 7(c).  Such sum shall be payable in equal quarterly installments on the 15th day of February, May, August and November in each said year.

Whenever in any contract year (and for the purposes of this agreement a contract year shall be the period from the date hereof until December 31, 1977 and each calendar year thereafter)

-11-

the total royalties payments made by LICENSEE to ODLR are at least equal to the guaranteed minimum royalties for that contract year, LICENSEE's obligation to pay further quarterly advance royalty payments in that contract year shall cease.

(c)  In the event the Consumer Price Index (as hereinafter defined) for the 12 months ended December 31, 1986 (hereinafter said year is defined as the "Base Year") shall be less than the Consumer Price Index for any succeeding contract year ended December 31, during the term of this agreement, then, subject to clauses (vi) and (vii) of paragraph 7(b), LICENSEE shall pay ODLR, as additional guaranteed minimum royalties, payable quarterly as hereinbefore indicated, an amount equal to $125,000 multiplied by the percentage of increase by which the Consumer Price Index in such succeeding contract year(s) exceeds the Consumer Price Index for the Base Year. For the purpose of this paragraph, the term "Consumer Price Index" means the Consumer Price Index-U.S. City Averages For Urban Wage Earners and Clerical Workers (All Items) of the United States Bureau of Labor Statistics.  The Consumer Price Index for any contract year shall be determined by averaging the monthly all items indices for that contract year.  If the manner in which such Consumer Price Index is determined by the Bureau of Labor Statistics shall be substantially revised, an adjustment shall be made in such revised index which would prod results equivalent, as nearly as possible, to those which would have obtained if the Consumer Price Index had not been so revised. If the Consumer Price Index shall become unavailable to the public because publication is discontinued, or otherwise, ODLR and LICENSEE will substitute therefor a comparable index based upon changes in the cost of living or purchasing powers of the

-12-

consumer dollars published by any other governmental agency or, if no such index shall be available, then a comparable index published by a major bank or other financial institution or by a university or a recognized financial publication.

(d)   Whenever in any quarter of any year ending December 31, the amount of royalties earned by ODLR exceeds the amount of the advance payment for such quarter as specified in paragraph 7(b), the excess shall be paid by LICENSEE to ODLR within 30 days of the end of such quarter, except that LICENSEE shall be entitled to reduce the earned royalty payment for such quarter in an amount not to exceed the amount by which the advance royalties paid by LICENSEE in any preceding quarter or quarters on a cumulative basis during such year exceeds the total royalties actually earned on a cumulative basis for that quarter and all preceding quarter of that year.  If in any contract year, LICENSEE shall have paid royalties to ODLR under paragraphs 7(b) and 7(d) in an amount which exceeds the greater of the (i) minimum guaranteed royalties for that contract year or (ii) royalties actually earned by ODLR for such contract year on a cumulative basis as computed under the provisions of this paragraph 7, then such excess payment shall be deducted by LICENSEE from the minimum guaranteed royalty payments and earned royalty payments for the subsequent year or years until repaid in LICENSEE shall provide ODLR with quarterly reports of its net sales of the Licensed Products within 30 days after each quarter during the term of this agreement.

(e)   If LICENSEE shall receive any lump sump initi; payment (as contrasted to payments related to shipments and sales) from any distributor or sub-licensee as and for LICENSEE's grant ( the distributorship franchise or the sub-license right with respect to the Licensed Products (but excluding any such

-13-

other payments from any distributor or sub-licensee in which
LICENSEE or MILTON STERN shall have any equity interest,
direct, indirect or beneficial), then LICENSEE shall pay
over 25% of any such payment within 30 days of LICENSEE's
receipt thereof, in the currency in which such payment shall
have been received.

        (f)  All royalties payable under this agreement
shall be paid in U.S. dollars, except as provided in paragraph
7(e) and except that any royalties in countries from which
royalties or other sums cannot be transferred, or converted
U.S. dollars, shall be payable to ODLR in local currency to
ODLR's designee in the country concerned, subject to such govern-
ment restrictions on transfer as then may be in force.  The
amounts of net sales effected in currencies other than U.S.
dollars shall be converted, for the purpose of royalty calcula-
tion, into U.S. dollars at the official bank rate of exchange
at the time LICENSEE shall make such payment.  All royalty pay-
ments shall be subject to withholding or comparable taxes at
their source by the applicable governmental authorities, which
tax withholding shall inure to ODLR's benefit.

        8.  During the period commencing on the execution of
this agreement and ending December 31, 1977 LICENSEE shall spend
a sum sufficient to introduce Licensed Products to the trade and
public of the United States.  In such connection, LICENSEE will
also provide and pay for a press kit and other material reason-
ably necessary to fairly publicize Licensed Products for public
relations purposes, and LICENSEE will provide and pay for such
newspaper and/or magazine advertisements to promote Licensed
Products in those countries in which LICENSEE is selling License
Products as may be deemed by it to be reasonably necessary or
desirable.  During each contract year while this agreement shall

-14-

be in force, commencing January 1, 1978, LICENSEE shall
expend a sum on advertising equal to not less than 1-1/2%
of the gross sales of the Licensed Products during the preced-
ing contract year.

9. ODLR undertakes at LICENSEE's request to make
Mr. de la Renta available at reasonable intervals and for
reasonable periods (which shall involve a minimum of 4 basic
events during the initial launch period ending December 31,
1977 and 2 basic events yearly thereafter) for promotional
and publicity tie-ins serving to associate him and his various
fashion activities with Licensed Products. LICENSEE shall be
entitled to the use of Mr. de la Renta's name and likeness for
advertising and promotional purposes upon his approval first
being obtained, which approval shall not be unreasonably with-
held or delayed. ODLR shall make every reasonable effort, at
the reasonable request of LICENSEE, to arrange Mr. de la Renta's
cooperation for publicity photographs, radio and TV interviews,
and at his sole discretion such additional events as personal
appearances, fashion shows, and dinners. LICENSEE shall reimbur
Oscar de la Renta for his first-class travel, lodging, food
and other related expenses outside New York City incurred by
him in connection with any events attended by him to satisfy
his obligations under this paragraph.

10. LICENSEE shall maintain appropriate books of
account at its head office in which accurate entries shall be
made concerning all transactions within the scope of this
agreement, and ODLR shall have the right upon reasonable advance
notice and during reasonable business hours, through any
accountant or other authorized representative of its choice, and

-15-

at the expense of ODLR, to examine and take extracts from
such books of account and all other records, documents and
material in the possession or under the control of LICENSEE,
with respect to the subject matter of this agreement. All
such books of account shall be kept available by LICENSEE
for at least 2 years after the close of each reporting year.

11.  LICENSEE hereby indemnifies and agrees to
hold ODLR harmless from and against any claim , suit , loss
and damage (including reasonable attorneys' fees) arising
out of alleged defects in the material or workmanship of any
Licensed Products produced by LICENSEE hereunder.  ODLR shall
give to LICENSEE immediate notice of any such claim or
suit and afford LICENSEE the opportunity to defend or settle
the same, at its own expense, through counsel of its own
choice. LICENSEE shall not be liable to indemnify ODLR for
any settlement of any such claims or suit effected without
LICENSEE's consent.

12.  LICENSEE shall procure and maintain at its
own expense in full force and effect at all times during
which Licensed Products are being sold, with responsible insuranc
carrier(s) acceptable to ODLR, at least a $1,000,000 products
liability insurance coverage with respect to Licensed Products.
Such insurance shall be for the benefit of ODLR and LICENSEE
and shall provide for at least ten days' prior written notice
to ODLR and LICENSEE of the cancellation or substantial modifica-
tion thereof.  Such insurance may be obtained for ODLR by
LICENSEE in conjunction with a policy of product liability insur.
which covers products other than Licensed Products.  LICENSEE sh:
from time to time upon reasonable request by ODLR, promptly
furnish or cause to be furnished to ODLR evidence in form
or substance satisfactory to ODLR, of the maintenance of the
insurance as above required, including but not limited to,
originals or copies of policies, certificates of insurance (with
applicable riders and endorsements) and proof of premium payment

13. LICENSEE may elect, at its cost, to insure the life of Mr. Oscar de la Renta in an amount not to exceed $2,000,000, with LICENSEE as the beneficiary, with such insurance carrier and under such insurance plan as LICENSEE in its sole discretion may determine. Upon the termination of this agreement, LICENSEE shall cancel such insurance policy or at ODLR's request sell such policy to ODLR or its designee at the cash surrender value thereof. Should LICENSEE exercise such election, Mr. de la Renta agrees to make himself available for such medical and other examinations and to complete such applications as may be required by LICENSEE's insurance carrier to obtain such insurance.

14. If LICENSEE is adjudicated a bankrupt, or if a petition in bankruptcy is filed against LICENSEE and not dismissed or vacated within 30 days of such filing; or if LICENSEE makes any assignment for the benefit of creditors; or if LICENSEE takes the benefit of any insolvency law; or if LICENSEE defaults on any obligation which is secured by a security interest, in whole or in part, in Licensed Products and such default is not cured within a 30-day period; or if a receiver is appointed for LICENSEE or a substantial part of its business or assets, this agreement shall terminate upon 3 months' written notice by ODLR to LICENSEE.

15. LICENSEE agrees that it will not, during the term of this agreement or thereafter, attack ODLR's title in and to the Licensed Mark or the validity thereof. LICENSEE shall, whether during or after the term of this agreement, execute any documents reasonably required by ODLR to establish or confirm its rights in Licensed Mark either as proprietor or licensor thereof.

-17-

16. Except as provided in paragraph 6, LICENSEE may not assign any of its rights or delegate any of its duties under this agreement without the written consent of ODLR which consent will not be unreasonably withheld or delayed; except that at any time, and at its sole discretion, upon written notice of ODLR, LICENSEE is authorized to assign this agreement and its right, title and interest hereunder in whole or in part to (a) any corporation of which MILTON STERN and his Related Transferees (as defined in paragraph 17(b)), in the aggregate, beneficially own more than 50% of the voting stock, (b) any corporation which is controlled by or under common control with the LICENSEE, or (c) subject to paragraph 17, any corporation which shall have assumed all of the obligations hereunder of LICENSEE and shall have acquired by merger, consolidation or purchase all or substantially all of the assets of LICENSEE. No assignment of this agreement by LICENSEE of LICENSEE's interest hereunder shall relieve LICENSEE of any of its obligations hereunder until termination thereof in accordance with the terms of this agreement, except in the case of an assignment pursuant to clause (c) of this paragraph.

17. (a) "Sellout transaction," whenever used in this agreement shall mean any of the following transactions: (i) a sale of all or substantially all of the assets of LICENSEE; (ii) a merger, consolidation or like transaction of LICENSEE into or with one or more corporations, as a result of which MILTON STERN and his Related Transferees immediately after such transaction beneficially own less than 50% of the voting stock of LICENSEE or the surviving entity, as the case may be; (iii) a complete liquidation of LICENSEE unless the business of LICENSEE is continued by distributees in liquidation and such

-18-

distributees are controlled by MILTON STERN and his Related Transferees; (iv) a plan pursuant to which MILTON STERN and his Related Transferees exchange some or all of their stock in LICENSEE or pursuant to which LICENSEE issues additional shares and, as a result of such plan, MILTON STERN and his Related Transferees immediately after such transaction beneficially own less than 50% of the outstanding voting stock of LICENSEE or the resultant entity, as the case may be; or (v) MILTON STERN and his Related Transferees, sell, transfer, or otherwise dispose of (or cause the sale, transfer or other disposition of) some or all of their stock in LICENSEE so that immediately after such transfers MILTON STERN and his Related Transferees beneficially own less than 50% of the outstanding voting stock of LICENSEE.

(b) "Related Transferee", whenever used in this agreement, shall consist of Milton Stern's wife, his adult lineal descendants, the adult spouses of his lineal descendants, any beneficiary under his last Will and Testament and trusts for the benefit of MILTON STERN or any of the foregoing or minor lineal descendants of any of the foregoing.

(c) Except as permitted under paragraph 16, during the term of 5 years from the term of this agreement, LICENSEE shall not be authorized to transfer this agreement or its right, title and interest hereunder by reason of a Sellout transaction. In addition, LICENSEE represents and warrants to ODLR that Milton Stern has entered into an agreement with LICENSEE to the effect that during such 5 years restrictive period neither he nor his Related Transferees will enter into a Sellout transaction. Notwithstanding the foregoing, nothing in this agreement shall restrict MILTON STERN from transferring his

-19-

ownership in LICENSEE to one or more of his Related Transferees,
subject to the terms of this agreement on transfers of owner-
ship. After the expiration of such 5-year restrictive period,
all of the restrictions set forth in this paragraph shall termina
provided, however, if at any time during the term of this agree-
ment, a Sellout transaction is effected by LICENSEE or MILTON
STERN, then the minimum royalties payable under paragraph 7 in su
contract year and thereafter shall be increased in each such con-
tract year by the sum of $50,000.

18. ODLR and Oscar de la Renta jointly and severally
represent as follows: (a) that Licensed Mark in respect of
Licensed Products in available and unanticipated for use and/or
registration in the United States, its territories and possession
other than as provided in this agreement, (b) that neither ODLR
nor Oscar de la Renta is aware of any prior users and/or appli-
cants or registrants of trademarks or trade names so similar
to Licensed Mark as to be likely to interfere with or prevent
the use of Licensed Mark by LICENSEE hereunder, it being under-
stood that neither party has made independent investigation there
and (c) neither of them have granted nor will grant any rights
to any third parties which conflict or may conflict with the
rights granted to LICENSEE hereunder with respect to Licensed
Products. ODLR and Oscar de la Renta hereby indemnify and agree
to hold LICENSEE harmless from and against any losses it may
suffer as a result of LICENSEE being unable to make free use of
Licensed Mark for Licensed Products in the United States, its
territories, and possessions. LICENSEE shall not be entitled
to indemnity if the Licensed Mark is unable to be registered in
any jurisdiction other than the United States. However, if
(other than by reason of LICENSEE's delay)
the Licensed Mark becomes unavailable in France, West Germany or
Italy, then the amount of the advance royalties then payable



-20-

shall be reduced in each year commencing January 1, 1979 by
$8,333 in respect of each such country where such Licensed
Mark shall thus become unavailable. LICENSEE shall take all
prompt and reasonable steps after the date hereof to register
the Licensed Mark in ODLR's name in France, West Germany or Italy

19. Nothing contained herein shall be construed
to place the parties in any relationship other than that of
trademark licensor and trademark licensee or to constitute either
party the agent, partner, or joint venturer of the other, except
to the limited extent hereinabove specifically provided.

20. This agreement is for an initial term ending
December 31, 1979. LICENSEE shall have the option, which
LICENSEE shall exercise by written notice to ODLR no later than
90 days prior to such end of term, of extending this agreement.
If LICENSEE shall so exercise its option, this agreement shall
thereupon be extended and continue in force without limit of
period, unless LICENSEE shall terminate the agreement by
giving ODLR 180 days written notice in advance of December 31,
1981 or any subsequent odd-year anniversary thereof. Upon this
agreement being thus terminated, all rights and obligations of
LICENSEE hereunder shall cease and LICENSEE shall thereupon halt
all further use of Licensed Mark or of any mark confusingly simil:
thereto, except that LICENSEE shall have a term of 6 months
thereafter within which to dispose of any stock of Licensed
Products that it may have on hand. ODLR shall be entitled to
receive royalties in accordance with paragraph 7 in respect of
the net sales of the stock of Licensed Products so disposed.
It is also agreed that any instrument pursuant to which LICENSEE
appoints or designates a sub-licensee in accordance with
paragraph 6, shall contain a provision that any and all rights of
said sub-licensee in and to the use of Licensed Mark shall cease
and terminate upon and co-extensively with any termination of

-21-

this agreement as to LICENSEE, subject, however, to a term of 6 months from termination within which such sub-licensee may dispose of any stock of Licensed Products that it may have on hand and to the requirement to continue previously stipulated royalty payments, if any, to LICENSEE on the stock of Licensed Products so disposed, in which royalty ODLR sh. be entitled to share in accordance with paragraph 7.

21.   (a)   The following events shall constitute Events of Default:

(i)   LICENSEE fails to pay any payment of royalty when due and such failure shall continue for a period of 30 days after written notice thereof by ODLR to LICENSEE; or

(ii)   LICENSEE shall violate or fail to perform any of its obligations under this agreement (other than a payment of royalties) and such violation or failure shall continue uncured for a period of 90 days after written notice thereof by ODLR to LICENSEE.

(b)   Upon the occurrence of any Event of Default and so long as the same shall be continuing, ODLR may, at its option, terminate this Agreement by written notice to such effect given to LICENSEE.   Termination of this agreement under the provisions of this paragraph 21 shall be without prejudice to any other rights which ODLR may have against LICENSEE.

22.   Any controversy or claim arising out of, in connection with, or relating to, this agreement or the breach or performance thereof, shall be determined by arbitration at the office of the American Arbitration Association in the City of New

-22-

York in accordance with the rules, then obtaining, of the American Arbitration Association.    ODLR and the LICENSEE shall share equally the full cost of such arbitration (except each shall bear its own attorneys' fees).  Any decision rendered by the arbitrators shall be final and binding, and judgment may be entered in any court having jurisdiction.  Neither LICENSEE nor ODLR shall be deemed to be in breach of this agreement unless LICENSEE or ODLR shall fail to comply with any award or decision by said arbitrator.

23.  Any written notice under this agreement shall be considered given when delivered personally or sent by telegraph, cable or telex, or mailed by registered mail, return receipt requested, to the parties at the following addresses (or at such address as a party may specify by notice to the other)

To ODLR:

      Oscar de la Renta, Ltd.
      550 Seventh Avenue
      New York, New York  10018

      International Licensing Associates
      101 Park Avenue
      New York, New York  10017

      Attention:  Mr. Leo Gore

and

      Frank A. Wortmann, Esq.
      Wortmann & Henry
      60 East 42nd Street
      New York, New York  10017

To LICENSEE:

      Milton Stern Parfums, Inc.
      40 West 57th Street
      New York, New York 10019

and

      Davis & Gilbert, Esqs.
      500 Fifth Avenue
      New York, New York  10036

24.  The failure of a party to insist upon strict adherence to any term of this agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this agreement.  Any waiver must be in writing and signed by the party or parties waiving.

25.  This agreement shall be binding upon and inure to the benefit of LICENSEE and ODLR and their respective successors and permitted assigns.  This agreement shall also be binding upon and inure to the benefit of Mr. Oscar de la Renta and his heirs.  This agreement contains a complete statement of all arrangements among the parties with respect to its subject matter, and cannot be changed or terminated orally.

26.  This agreement is made in New York and shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed as of the day and year first above written.

_____
OSCAR DE LA RENTA

OSCAR DE LA RENTA, LTD.

By _____
    Gerald Shaw, President

MILTON STERN PARFUMS, INC.

By _____
    Milton Stern, President

-24-

# <u>EXHIBIT B</u>

AGREEMENT made as of the 18th day of August, 1977, between OSCAR DE LA RENTA, residing at 2 East 70th Street, New York, New York, OSCAR DE LA RENTA, LTD., a New York corporation having a place of business at 550 Seventh Avenue, New York, New York 10018 (hereinafter "ODLR"), and PARFUMS STERN INC., a New York corporation having a place of business at 40 West 57th Street, New York, New York 10019 (hereinafter "Licensee").

## W I T N E S S E T H :

WHEREAS, Oscar de la Renta is a shareholder of ODLR and has acquired a wide reputation, symbolized by his name, as a designer, creator and innovator in the fashion and fashion-related fields; and ODLR presently has the exclusive rights to his talents and creative energies and has moreover obtained and presently owns, subject to the rights heretofore granted to Licensee under the agreement referred to in the next paragraph, the exclusive rights to his name as a trademark or otherwise for the particular goods to which this agreement relates; and

WHEREAS, by Agreement dated April 1, 1976 Milton Stern Parfums, Inc. acquired the sole and exclusive licensed use of the name and trademark Oscar de la Renta as more fully defined in paragraph 1 below (hereinafter "Licensed Mark") in respect of the Licensed Products (as defined in paragraph 1), for any and all countries and geographical areas of the world, which License Agreement was assigned to and assumed by Licensee pursuant to an Assignment and Assumption Agreement dated July 22, 1977; and

WHEREAS, the parties hereto desire to amend and restate the License Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises of the parties, it is agreed as follows:

1.    ODLR hereby grants Licensee the right in the United States, Canada and France (hereinafter the "Territory") to use and make use of Licensed Mark (which shall include the full name Oscar de la Renta or the initials ODLR in plain or any stylized type or in any script, written or signature form, or the separable components Oscar, de la Renta, or Renta, as well as such other words or symbols with which the name Oscar de la Renta shall be or become associated in the public mind unless ownership of or the exclusive right to use such other words or symbols shall be in another licensee of ODLR) as exclusive licensee and/or authorized user upon or in relation to perfumery, fragrances, essential oils, toiletries, cosmetics, hair lotions, and soaps, it being intended to include perfumery, beauty and toiletry preparations of all kinds (hereinafter "Licensed Products," shall mean any of the aforesaid products bearing Licensed Mark), provided that such goods shall be made in accordance with reasonably high standards as to product quality and merchantability as reasonably approved by ODLR from time to time and as hereinafter set forth. Oscar de la Renta hereby consents to such license and to the use by Licensee of his name as Licensed Mark as aforesaid. While this agreement remains in force, Licensee shall be the sole licensee and enjoy the rights of exclusive user of the Licensed Mark in the Territory on the Licensed Products. Licensee shall use its best efforts to exploit and publicize Licensed Mark and to promote the sale of Licensed Products in the countries comprising the Territory.

-2-

2.    (a)    In the United States the Licensed Mark shall stand of record in the name of Licensee. The parties acknowledge that to date the trademarks Oscar and Oscar de la Renta of Registration Nos. 1081451 and 1085216 are presently registered in the Patent and Trademark Office in Washington, D.C. in the name of Milton Stern Parfums, Inc. but contemporaneously with the execution and delivery hereof such trademarks, and the registrations thereof, together with the goodwill of the business as symbolized thereby, are being assigned to Licensee pursuant to an Assignment in the form of Exhibit "1" hereto.

(b)    For as long as the record ownership of Registration Nos. 1081451 and 1085216 shall remain in Licensee, it shall use the marks thereof under and in accordance with ODLR's quality controls and other provisions as to trademark use as set forth in this agreement. Upon termination of this agreement, all of ODLR's rights, title and interest in and to the trademarks Oscar and Oscar de la Renta and the Registration Nos. 1081451 and 1085216 thereof shall immediately revert to ODLR or its assigns together with the goodwill of the business as symbolized by the marks thereof, and Licensee shall thereupon forthwith furnish to ODLR or its assigns a separate assignment document in its favor in form and execution suitable for recordal at the Patent and Trademark Office in Washington, D.C. Licensee shall not transfer or assign the trademarks Oscar and Oscar de la Renta or the Registration Nos. 1081451 and 1085216 thereof except to transfer and assign the same to ODLR or its assigns as provided in this paragraph 2(b). To insure the reversion to ODLR or its assigns of the trademarks Oscar and Oscar de la Renta and Registration Nos. 1081451 and 1085216, as herein provided, Licensee shall executed an irrevocable assignment thereof within thirty (30) days of the date of this agreement (in the form of Exhibit "2" hereto), together with an irrevocable power of attorney, appointing ODLR, Oscar de la Renta and Gerald Shaw, or the survivors or survivor of them, ODLR's attorney in fact to execute any and all

-3-

documents deemed necessary to fully insure reversion to ODLR or its assigns of the said trademarks, a copy of which power of attorney is attached hereto as Exhibit "3", which executed assignment and power of attorney shall be forwarded to ODLR's attorney, Frank A. Wortmann, Esq., 60 East 42nd Street, New York, New York 10017, who shall hold the same in escrow during the term of this agreement unless ODLR or its assigns makes demands on Frank A. Wortmann to deliver the assignment and powers of attorney to it, in which event on ten (10) days written notice to Licensee, the same shall be delivered to ODLR or its assigns. In addition, Licensee shall also deliver to Frank A. Wortmann a certified copy of resolutions adopted by the Board of Directors of Licensee authorizing the granting of such power of attorney.

(c)    Licensee agrees that in Canada and France it will file and prosecute applications to register Licensed Mark therein as agent for and in the name of ODLR, and to take all reasonable steps to renew, protect and enforce any registrations of Licensed Mark thus obtained including but not limited to applying for and recording Licensee or its designee as registered user or the equivalent in any country where in the opinion of Licensee's legal counsel it shall be necessary to do so. ODLR agrees that it will execute and furnish such proper powers of attorney or other documents as Licensee or Licensee's legal counsel shall request and as approved by ODLR's legal counsel, which approval shall not be unreasonably withheld or delayed, in order to accomplish the foregoing. The parties acknowledge that to date the trademark Oscar de la Renta of Registration No. 960468 has been registered in the name of ODLR in France and that applications for registration of the trademarks OSCAR (Application Pending – Serial No. 408726) and Oscar de la Renta (Application Pending – Serial No. 403031) in the name of ODLR have been made in Canada.

(d)    The costs to be incurred as a result of the provisions of this paragraph 2 shall be borne by Licensee in Canada and France.  ODLR, at its expense will apply for and register the Licensed Mark with respect to the Licensed Products in the United States and, at its expense, from time to time on notice from Licensee, shall renew, protect and enforce the registrations thus obtained.

3.    (a)    If Licensee shall reasonably believe that a third party's use and/or application or registration of words or symbols, as a trademark or otherwise in the United States, whether in relation to goods or in advertising or publicity matter, is so close to Licensed Mark in respect to Licensed Products as to cause confusion therewith or result in a dilution of the distinctiveness thereof, then Licensee shall inform ODLR thereof in writing and request that ODLR as the beneficial trademark owner bring suit or take such other action in the name of Licensee, as Licensee shall direct, before any court or Patent Office to halt or suppress such objectionable use, application or registration, whether or not ODLR is joined therein as party plaintiff or opposer.  Within five (5) days of receipt of Licensee's notice and request as aforesaid, ODLR shall notify Licensee in writing of its decision as to whether or not it will take the action requested by Licensee. If Licensee and ODLR disagree as to Licensee's request, then the question of whether the proposed action has a reasonable chance for success in terms of preserving the distinctiveness of Licensed Mark so as to prevent confusion therewith and/or dilution thereof, shall be submtted to the law firm of Kenyon & Kenyon Reilly Carr & Chapin, 59 Maiden Lane, New York, New York, or if that firm is unavailable, the law firm of Fish & Neave, 277 Park Avenue, New York, New York, or if neither such firm is available such other law firm in New York, New York, as shall be agreed upon by Licensee and ODLR (hereinafter such firm to which the matter is submitted shall be referred to as the "Outside Firm").  The

-5-

decision of the Outside Firm shall be final and binding on ODLR and Licensee. If the Outside Firm renders a decision that the proposed action has a reasonable chance of success, then the same shall be deemed a "Significant Infringement" and the following procedure shall be followed:

(i)    ODLR may, but shall not be obligated to, institute judicial or administrative action to halt, suppress or otherwise dispose of any third party's Significant Infringement within 30 days of the receipt of a request to do so by a notice from Licensee or within 15 days of the decision of the Outside Firm, if the matter was submitted to the Outside Firm. ODLR agrees to actively prosecute such action in good faith and with reasonable dispatch.

(ii)    If ODLR shall fail to actively pursue a Significant Infringement as aforesaid within the applicable 30 or 15 day period, as the case may be, Licensee shall have the right, but not the obligation, to elect, in its name and/or ODLR's name, to institute judicial or administrative action toward halting, suppressing or otherwise disposing of the Significant Infringement. Licensee agrees to actively prosecute any such action in good faith and with reasonable dispatch.

(iii)    Notwithstanding the foregoing provisions, Licensee shall have the right, but not the obligation, to take any action or to commence any suit against a third party if it reasonably believes that the third party has engaged in a Significant Infringement, prior to the submission of that question to the Outside Firm. If the Outside Firm renders a decision that a Significant Infringement occurred, then ODLR shall have the right, but not the obligation, to take over control of the action commenced by Licensee. In such case, ODLR agrees to actively

-6-

prosecute such action in good faith and with reasonable dispatch. In addition, ODLR shall reimburse Licensee for all reasonable legal costs theretofore incurred by it to suppress, halt or dispose of such Significant Infringement.

(iv)   The party undertaking the suit or action involving the Significant Infringement shall have the right to take charge thereof, including choice of counsel and tribunal. The party undertaking the suit or action shall not make any settlement without the consent of the other party, which consent shall not be unreasonably withheld or delayed. The costs incurred by Licensee or ODLR as a result of the provisions of this paragraph 3(a) shall be borne by ODLR, except ODLR shall not be obligated to pay any costs of Licensee if the matter is submitted to the Outside Firm and the Outside Firm renders a decision that the infringement is not a Significant Infringement. Nothing in this paragraph 3(a) shall prevent ODLR from authorizing Licensee to act on its behalf to undertake suit or other action against a third party. In such case, Licensee shall have full control over such action and all costs incurred by it shall be borne by ODLR. The party not in control of the action shall have the right, but not the obligation, to participate in any action brought under the provisions of this paragraph 3(a), at its own expense through counsel of its own choice.

(v)   If in any such suit or action prosecuted under this paragraph 3(a), money damages are awarded to ODLR or Licensee, ODLR shall be entitled to 50% of such total award (including any legal fees, if any, which are a part of such award) up to the total legal costs

incurred by ODLR to prosecute such suit or action. Licensee shall be entitled to retain the balance of any such award.

(b)    If Licensee shall reasonably believe that a third party's use and/or application or registration of words or symbols as a trademark or otherwise in France or Canada, whether in relation to goods or in advertising or publicity matter, is so close to Licensed Mark in respect of Licensed Products as to cause confusion therewith or result in a dilution of the distinctiveness thereof, then Licensee shall be entitled to require ODLR as the trademark owner to bring suit or take such other action in its name as Licensee shall direct before any court or Patent Office to halt or suppress such objectionable use, whether or not Licensee be joined therein as party plaintiff or opposer. Licensee shall have full charge of and control over any such action, and any settlement thereof, including choice of counsel and tribunal. ODLR agrees to contribute toward the costs incurred as a result of the provisions of this paragraph 3(b), an amount equal to 25% of the legal costs incurred by Licensee in prosecuting such action (hereinafter the amount due to Licensee is referred to as the "ODLR Contribution"). Licensee shall bear all costs in excess of the ODLR Contribution. ODLR shall not be required to immediately reimburse Licensee for the ODLR Contribution, but Licensee shall offset the ODLR Contribution against future royalties payable by it to ODLR under paragraph 7 in respect of the net sales of the Licensed Products in the country in which such action arose, until the ODLR Contribution has been fully recovered by it. Notwithstanding the foregoing, if in any such suit or action prosecuted by Licensee under this paragraph 3(b), money damages are awarded to ODLR or Licensee, ODLR shall be entitled to 12-1/2% of such total award (including legal fees, if any, which are a part of such award) up to an amount equal to the ODLR Contribution. Licensee shall be entitled to retain the balance of any such award.

-8-

(c)   ODLR agrees that it will execute and furnish such powers of attorney or other documents as Licensee or Licensee's legal counsel shall request in order to accomplish the intent of paragraphs 3(a) and 3(b) above subject to approval of ODLR's legal counsel, which approval shall not be unreasonably withheld or delayed, and to cooperate fully with Licensee in any such actions.  The provisions of this paragraph 3 shall not prohibit or restrict Licensee from taking any other or additional legal proceedings at its own expense against third parties to protect or enforce its rights and interests hereunder.

4.    Licensee undertakes that Licensed Products it sells will be of reasonably high standards as to product quality and merchantibility as reasonably approved by ODLR from time to time.  To such end, ODLR shall have the right to approve of Licensed Products before any commercial use thereof, which approval shall not be unreasonably withheld or delayed, and at all reasonable times thereafter to receive samples of Licensed Products.  Licensee agrees that it will use its best efforts to require any party that manufactures the Licensed Products to permit ODLR to inspect the manufacturing procedures on the manufacturing premises.

5.    Licensee agrees to submit to ODLR for approval and prior to any commercial use thereof by Licensee all proposed uses of bottles, containers, packaging, labels and advertising materials bearing or containing Licensed Mark, which approval shall not be unreasonably withheld or delayed.  Within 30 days of any such submission (or 10 days if accelerated approval is requested and the item is marked in red "10 DAY ITEM") ODLR shall grant Licensee its permission or state in writing the reason for its refusal of permission.  If Licensee shall not receive permission within such 30-day period (or within 10 days for "10 DAY ITEM") then

-9-

Licensee shall be entitled to proceed as if approval of ODLR had been furnished. Licensee shall not be required to resubmit materials for ODLR's approval in any case where Licensee shall have made non-material changes or variations.

6. Licensee is authorized to constitute and appoint any third party(ies) of its choice to be sub-licensee(s) of Licensed Mark in respect of any items of Licensed Products for any particular geographical area within the Territory, and upon such terms as Licensee in its sole discretion shall determine, except Licensee shall have no right to sub-license in the United States. Licensee will notify ODLR of the grant of any sub-license within 15 days of such grant. ODLR agrees that at Licensee's request, it will enter into such other and further separate agreements with sublicensee(s) of Licensee with respect to the Licensed Products, in such form as may be requested and proposed by Licensee's legal counsel and approved by ODLR's legal counsel, which approval shall not be unreasonably withheld or delayed, so as to grant its licensing authority directly to sub-licensee(s). It shall be Licensee's obligation as agent for ODLR to supervise the use of Licensed Mark by sub-licensee(s) and to require that such use be in accordance with the same reasonably high quality standards as approved by ODLR for Licensed Products sold by Licensee. Any sub-license entered into shall require the sub-license, to the extent applicable, to abide by the terms and conditions of this Agreement and shall restrict sales of the sub-licensee to areas within the Territory.

7. (a) In return for the rights herein granted, Licensee shall pay ODLR a royalty, computed on a yearly basis (as hereinafter indicated) on its net sales of Licensed Products in the Territory. The term "net sales" whenever used in this agreement means gross amounts received by Licensee for shipments in the

Territory less cash and trade discounts, returns, allowances and taxes directly applicable to the sales (such as sales, use, ad valorem or other similar taxes but not taxes based on Licensee's income). There shall also be excluded from net sales shipping costs, insurance costs, tariffs and duties to the extent stated separately on any invoice covering sales of Licensed Products as to which ODLR is entitled to be paid a royalty under this agreement. In computing Licensee's net sales there shall be included (i) net sales of Licensed Products of any sub-licensee or distributor in the Territory in which Licensee shall have any equity ownership (direct, indirect or beneficial) and (ii) any royalties or other revenues received by Licensee in respect of Licensed Products from any sub-licensee or distributor in the Territory in which Licensee does not have any equity ownership (direct, indirect or beneficial). In computing Licensee's net sales there shall be excluded net sales of Licensed Products by Licensee to or any royalties or other revenues received from any sub-licensee or distributor in the Territory in which Licensee shall have any equity ownership (direct, indirect or beneficial).

      (b)   The royalties payable to ODLR shall be on an annual net sales basis equal to the following:

> 5% of the first $2,500,000 (or other currency equivalent) of net sales of Licensed Products in the Territory;

> 4% of the next $2,500,000 (or other currency equivalent) of net sales of Licensed Products in the Territory;

> 3% of the net sales of Licensed Products in the Territory over the first $5,000,000 (or other currency equivalent).

Licensee agrees to pay ODLR as a non-returnable advance against earned royalties, the following guaranteed minimum royalties:

-11-

(i)    During the year ending December 31, 1981 and each anniversary thereafter until December 31, 1985, the sum of $100,000 payable in equal quarterly installments of $25,000 on the 15th day of February, May, August and November in each such year.

(ii)   During the year ending December 31, 1986, the sum of $125,000 payable in equal quarterly installments of $31,250 on the 15th day of February, May, August and November of such year.

(iii)  During the years ending December 31, 1987 and each anniversary thereafter until December 31, 1990, the sum of $125,000 plus the cost of living adjustment increase as determined under paragraph 7(c). Such sum shall be paid in equal quarterly installments on the 15th day of February, May, August and November in each said year.

(iv)   During the years ending December 31, 1991 and each anniversary thereafter, the greater of (1) $150,000 or (2) $125,000 plus the cost of living adjustment increase as determined under paragraph 7(c). Such sum shall be payable in equal quarterly installments on the 15th day of February, May, August and November in each said year.

Whenever in any contract year (and for the purposes of this agreement a contract year shall be the same as a calendar year) the total royalties payments made by Licensee to ODLR are at least equal to the guaranteed minimum royalties for that contract year, Licensee's obligation to pay further quarterly advance royalty payments in that contract year shall cease.

(c)  In the event the Consumer Price Index (as hereinafter defined) for the 12 months ended December 31, 1986 (hereinafter said year is defined as the "Base Year") shall be less than the Consumer Price Index for any succeeding contract year ended December 31, during the term of this agreement, then, subject to clauses (iii) and (iv) of paragraph 7(b), Licensee shall pay ODLR, as additional guaranteed minimum royalties, payable quarterly as hereinbefore indicated, an amount equal to $125,000 multiplied by the percentage of increase by which the Consumer Price Index in such succeeding contract year(s) exceeds the Consumer Price Index for the Base Year. For the purpose of this paragraph, the term "Consumer Price Index" means the Consumer Price Index - U.S. City Averages for Urban Wage Earners and Clerical Workers (All Items) of the United States Bureau of Labor Statistics. The Consumer Price Index for any contract year shall be determined by averaging the monthly all items indices for that contract year. If the manner in which such Consumer Price Index is determined by the Bureau of Labor Statistics shall be substantially revised, an adjustment shall be made in such revised index which would produce results equivalent, as nearly as possible, to those which would have obtained if the Consumer Price Index had not been so revised. If the Consumer Price Index shall become unavailable to the public because publication is discontinued, or otherwise, ODLR and Licensee will substitute therefore a comparable index based upon changes in the cost of living or purchasing powers of the consumer dollars published by any other governmental agency or, if no such index shall be available, then a comparable index published by a major bank or other financial institution or by a university or a recognized financial publication.

(d)  Whenever in any quarter of any year ending December 31, the amount of royalties earned by ODLR exceeds the amount of the advance

payment for such quarter as specified in paragraph 7(b), the excess shall be paid by Licensee to ODLR within 30 days of the end of such quarter, except that Licensee shall be entitled to reduce the earned royalty payment for such quarter in an amount not to exceed the amount by which the advance royalties paid by Licensee in any preceding quarter or quarters on a cumulative basis during such year exceeds the total royalties actually earned on a cumulative basis for that quarter and all preceding quarters of that year. If in any contract year, Licensee shall have paid royalties to ODLR under paragraphs 7(b) and 7(d) in an amount which exceeds the greater of the (i) minimum guaranteed royalties for that contract year or (ii) royalties actually earned by ODLR for such contract year on a cumulative basis as computed under the provisions of this paragraph 7, then such excess payment shall be deducted by Licensee from the minimum guaranteed royalty payments and earned royalty payments for the subsequent year or years until repaid. Licensee shall provide ODLR with quarterly reports of its net sales of the Licensed Products in the Territory within 30 days after each quarter during the term of this agreement.

(e)    If Licensee shall receive any lump sum initial payment (as contrasted to payments related to shipments and sales) from any distributor or sub-licensee in the Territory as and for Licensee's grant of the distributorship franchise or the sub-license right with respect to the Licensed Products in the Territory (but excluding any such other payments from any distributor or sub-licensee in which Licensee or MILTON STERN shall have any equity interest, direct, indirect or beneficial), then Licensee shall pay over 25% of any such payment within 30 days of Licensee's receipt thereof, in the currency in which such payment shall have been received.

-14-

(f)  All royalties payable under this agreement shall be paid in U.S. dollars, except as provided in paragraph 7(e) and except that any royalties in countries from which royalties or other sums cannot be transferred, or converted into U.S. dollars, shall be payable to ODLR in local currency to ODLR's designee in the country concerned, subject to such government restrictions on transfer as then may be in force.  The amounts of net sales effected in currencies other than U.S. dollars shall be converted, for the purpose of royalty calculation, into U.S. dollars at the official bank rate of exchange at the time Licensee shall make such payment.  To the extent required by any governmental authority, royalty payments shall be made subject to withholding or comparable taxes at their source and subject to the laws of any such governmental authority, any tax so withheld shall inure to ODLR's benefit.

8.    During each contract year while this agreement shall be in force, commencing January 1, 1981, Licensee shall expend a sum on advertising equal to not less than 1-1/2% of the gross sales of the Licensed Products throughout the Territory during the preceding contract year.

9.    ODLR undertakes at Licensee's request to make Mr. de la Renta available at reasonable intervals and for reasonable periods (which shall involve one basic yearly event) for promotional and publicity tie-ins serving to associate him and his various fashion activities with Licensed Products.  Licensee shall be entitled to the use of Mr. de la Renta's name and likeness for advertising and promotional purposes upon his approval first being obtained, which approval shall not be unreasonably withheld or delayed.  ODLR shall make every reasonable effort, at the reasonable request of Licensee, to arrange for Mr. de la Renta's cooperation for publicity photographs, radio and TV interviews, and at his sole

discretion such additional events as personal appearances, fashion shows, and dinners. Licensee shall reimburse Oscar de la Renta for his first-class travel, lodging, food and other related expenses outside New York City incurred by him in connection with any events attended by him to satisfy his obligations under this paragraph.

10.    Licensee shall maintain appropriate books of account at its head office in which accurate entries shall be made concerning all transactions within the scope of this agreement, and ODLR shall have the right upon reasonable advance notice and during reasonable business hours, through any accountant or other authorized representative of its choice, and at the expense of ODLR, to examine and take extracts from such books of account and all other records, documents and material in the possession or under the control of Licensee, with respect to the subject matter of this agreement. All such books of account shall be kept available by Licensee for at least two (2) years after the close of each reporting year.

11.    Licensee hereby indemnifies and agrees to hold ODLR harmless from and against any claim, suit, loss and damage (including reasonable attorneys' fees) arising out of alleged defects in the material or workmanship of any Licensed Products sold by Licensee and its sub-licensees and distributors pursuant to the rights granted it hereunder. ODLR shall give to Licensee immediate notice of any such claim or suit and afford Licensee the opportunity to defend or settle the same, at its own expense, through counsel of its own choice. Licensee shall not be liable to indemnify ODLR for any settlement of any such claims or suit effected without Licensee's consent.

12.   Licensee shall procure and maintain at its own expense in full force and effect at all times during which Licensed Products are being sold, with responsible insurance carrier(s) acceptable to ODLR, at least a $1,000,000 products liability insurance coverage with respect to Licensed Products throughout the Territory. Such insurance shall be for the benefit of ODLR and Licensee and shall provide for at least ten days' prior written notice to ODLR and Licensee of the cancellation or substantial modification thereof. Such insurance may be obtained for ODLR by Licensee in conjunction with a policy of product liability insurance which covers products other than Licensed Products. Licensee shall from time to time upon reasonable request by ODLR, promptly furnish or cause to be furnished to ODLR evidence in form or substance satisfactory to ODLR, of the maintenance of the insurance as above required, including but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments.

13.   Licensee may elect, at its cost, to insure the life of Mr. Oscar de la Renta in an amount not to exeed $2,000,000 with Licensee as the beneficiary, with such insurance carrier and under such insurance plan as Licensee in its sole discretion may determine. Upon the termination of this agreement, Licensee shall cancel such insurance policy or at ODLR's request sell such policy to ODLR or its designee at the cash surrender value thereof. Should Licensee exercise such election, Mr. de la Renta agrees to make himself availabe for such medical and other examinations and to complete such applications as may be required by Licensee's insurance carrier to obtain such insurance.

14.   If Licensee is adjudicated a bankrupt, or if a petition in bank-ruptcy is filed against Licensee and not dismissed or vacated within 30 days of such

-17-

filing; or if Licensee makes any assignment for the benefit of creditors; or if Licensee takes the benefit of any insolvency law; or if Licensee defaults on any obligations which is secured by a security interest, in whole or in part, in Licensed Products and such default is not cured within a 30 day period; or if a receiver is appointed for Licensee or a substantial part of its business or assets, this agreement shall terminate upon 3 months' written notice by ODLR to Licensee.

15.    Licensee agrees that it will not, during the term of this agreement or thereafter, attack ODLR's title in and to the Licensed Mark or the validity thereof.    Licensee shall, whether during or after the term of this agreement, execute any documents reasonably required by ODLR to establish or confirm its rights in Licensed Mark either as proprietor or licensor thereof.

16.    Except as provided in paragraph 6, Licensee may not assign any of its rights or delegate any of its duties under this agreement without the written consent of ODLR which consent will not be unreasonably withheld or delayed; except that at any time, and at its sole discretion, upon written notice of ODLR, Licensee is authorized to assign this agreement and its right, title and interest hereunder in whole or in part to (a) any corporation of which Milton Stern and his Related Transferees (as defined in paragraph 17(b)), in the aggregate, beneficially own more than 50% of the voting stock, (b) any corporation which is controlled by or under common control with the Licensee, or (c) subject to paragraph 17, any corporation which shall have assumed all of the obligations hereunder of Licensee and shall have acquired by merger, consolidation or purchase all or substantially all of the assets of Licensee.    No assignment of this agreement by Licensee of Licensee's interest hereunder shall relieve Licensee of any of its obligations

-18-

hereunder until termination thereof in accordance with the terms of this agree-
ment, except in the case of an assignment pursuant to clause (c) of this paragraph.

17.    (a)    "Sellout transaction," whenever used in this agreement shall
mean any of the following transactions: (i) a sale of all or substantially all of the
assets of Licensee; (ii) a merger, consolidation or like transaction of Licensee into
or with one or more corporations, as a result of which Milton Stern and his Related
Transferees immediately after such transaction beneficially own less than 50% of
the voting stock of Licensee or the surviving entity, as the case may be; (iii) a
complete liquidation of Licensee unless the business of Licensee is continued by
distributees in liquidation and such distributees are controlled by Milton Stern and
his Related Transferees; (iv) a plan pursuant to which Milton Stern and his Related
Transferees exchange some or all of their stock in Licensee or pursuant to which
Licensee issues additional shares and, as a result of such plan, Milton Stern and his
Related Transferees immediately after such transaction beneficially own less than
50% of the outstanding voting stock of Licensee or the resultant entity, as the case
may be; or (v) Milton Stern and his Related Transferees, sell, transfer, or otherwise
dispose of (or cause the sale, transfer or other disposition of) some or all of their
stock in Licensee so that immediately after such transfers Milton Stern and his
Related Transferees beneficially own less than 50% of the outstanding voting stock
of Licensee.

(b)    "Related Transferee", whenever used in this agreement,
shall consist of Milton Stern's wife, his adult lineal descendants, the adult spouses
of his lineal descendants, any beneficiary under his last Will and Testament and
trusts for the benefit of Milton Stern or any of the foregoing or minor lineal
descendants of any of the foregoing.

(c)   If at any time during the term of this agreement, a Sellout transaction is effected by Licensee or Milton Stern, then the minimum royalties payable under paragraph 7 in such contract year and thereafter shall be increased in each such contract year by the sum of $50,000.

18.   ODLR and Oscar de la Renta jointly and severally represent as follows: (a) that Licensed Mark in respect of Licensed Products is available and unanticipated for use and/or registration in the United States, its territories and possessions other than as provided in this agreement, (b) that neither ODLR nor Oscar de la Renta is aware of any prior users and/or applicants or registrants of trademarks or trade names so similar to Licensed Mark as to be likely to interfere with or prevent the use of Licensed Mark by Licensee hereunder, it being understood that neither party has made independent investigation thereof and (c) neither of them have granted nor will grant any rights to any third parties which conflict or may conflict with the rights granted to Licensee hereunder with respect to Licensed Products.  ODLR and Oscar de la Renta hereby indemnify and agree to hold Licensee harmless from and against any losses it may suffer as a result of Licensee being unable to make free use of Licensed Mark for Licensed Products in the United States, its territories, and possessions.

19.   Nothing contained herein shall be construed to place the parties in any relationship other than that of trademark licensor and trademark licensee or to constitute either party the agent, partner, or joint venturer of the other, except to the limited extent hereinabove specifically provided.

20.   This agreement shall continue in force without limit of period, unless Licensee shall terminate the agreement by giving ODLR 180 days written

-20-

notice in advance of December 31, 1981 or any subsequent odd-year anniversary thereof. Upon this agreement being thus terminated, all rights and obligations of Licensee hereunder shall cease and Licensee shall thereupon halt all further use of Licensed Mark or of any mark confusingly similar thereto, except that Licensee shall have a term of 6 months thereafter within which to dispose of any stock of Licensed Products that it may have on hand. ODLR shall be entitled to receive royalties in accordance with paragraph 7 in respect of the net sales of the stock of Licensed Products in the Territory so disposed. It is also agreed that any instrument pursuant to which Licensee appoints or designates a sub-licensee in accordance with paragraph 6, shall contain a provision that any and all rights of said sub-licensee in and to the use of Licensed Mark shall cease and terminate upon and co-extensively with any termination of this agreement as to Licensee, subject, however, to a term of 6 months from termination within which such sub-licensee may dispose of any stock of Licensed Products that it may have on hand and to the requirement to continue previously stipulated royalty payments, if any, to Licensee on the stock of Licensed Products so disposed, in which royalty ODLR shall be entitled to share in accordance with paragraph 7.

      21.   (a)   The following events shall constitute Events of Default:

          (i)   Licensee fails to pay any payment of royalty when due and such failure shall continue for a period of 30 days after written notice thereof by ODLR to Licensee; or

          (ii)   Licensee shall violate or fail to perform any of its obligations under this agreement (other than a payment of royalties) and such violation or failure shall continue uncured for a period of 90 days after written notice thereof by ODLR to Licensee.

(b)   Upon the occurrence of any Event of Default and so long as the same shall be continuing, ODLR may, at its option, terminate this agreement by written notice to such effect given to Licensee. Termination of this agreement under the provisions of this paragraph 21 shall be without prejudice to any other rights which ODLR may have against Licensee.

22.   Any controversy or claim arising out of, in connection with, or relating to, this agreement or the breach or performance thereof, shall be determined by arbitration at the office of the American Arbitration Association in the City of New York in accordance with the rules, then obtaining, of the American Arbitration Association. ODLR and the Licensee shall share equally the full cost of such arbitration (except each shall bear its own attorneys' fees). Any decision rendered by the arbitrators shall be final and binding, and judgment may be entered in any court having jurisdiction. Neither Licensee nor ODLR shall be deemed to be in breach of this agreement unless Licensee or ODLR shall fail to comply with any award or decision by said Arbitrator.

23.   This agreement shall automatically terminate, without further notice, upon the termination of the License Agreement as of August 18, 1977 , by and between Oscar de la Renta, ODLR and Parfums Stern Ltd.

24.   Any written notice under this agreement shall be considered given when delivered personally or sent by telegraph, cable or telex, or mailed by registered mail, return receipt requested, to the parties at the following addresses (or at such address as a party may specify by notice to the other).

-22-

To ODLR:

    Oscar de la Renta, Ltd.
    550 Seventh Avenue
    New York, New York.10018

    and

    International Licensing Associates
    101 Park Avenue
    New York, New York 10017
    Attention: Mr. Leo Gore

    and

    Frank A. Wortmann, Esq.
    Wortmann & Henry
    60 East 42nd Street
    New York, New York 10017

To Licensee:

    Parfums Stern Inc.
    40 West 57th Street
    New York, New York 10019

    and

    Davis & Gilbert, Esqs.
    850 Third Avenue
    New York, New York 10022
    Attention: Michael D. Ditzian, Esq.

25.    The failure of a party to insist upon strict adherence to any term of this agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this agreement. Any waiver must be in writing and signed by the party or parties waiving.

26.    This agreement shall be binding upon and inure to the benefit of Licensee and ODLR and their respective successors and permitted assigns. This agreement shall also be binding upon and inure to the benefit of Mr. Oscar de la Renta and his heirs. This agreement contains a complete statement of all

arrangements among the parties with respect to its subject matter, and cannot be changed or terminated orally.

27.  This agreement is made in New York and shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed this 27ᵗʰ day of November , 1981 as of the day and year first above written.

_____
Oscar de la Renta


OSCAR DE LA RENTA, LTD.

By _____
Gerald Shaw, President


PARFUMS STERN INC.

By _____
Milton Stern, Chairman

-24-

## ASSIGNMENT

WHEREAS, MILTON STERN PARFUMS, INC., a corporation organized under the laws of the State of New York, with its principal place of business at 40 West 57th Street, New York, New York 10019 (hereinafter "Assignor"), is the owner of the marks OSCAR, Registration Number 1,081,451, dated January 10, 1978 and OSCAR DE LA RENTA, Registration Number 1,085,216, dated February 14, 1978, which are registered in the United States Patent and Trademark Office.

WHEREAS, PARFUMS STERN INC., a corporation organized under the laws of the State of New York, with its principal place of business at 40 West 57th Street, New York, New York 10019 (hereinafter "Assignee"), is desirous of acquiring said marks and the said registrations.

THEREFORE, for good and valuable consideration receipt of which is hereby acknowledged, said Assignor does hereby assign unto the said Assignee all rights, title and interest in and to the said marks, together with the goodwill of the business symbolized by the marks, and the registrations thereof, and all rights to damages or profits, due or accrued, arising out of past infringement of the said marks or injury to said goodwill, and the right to sue for and recover the same in the Assignee's own name.

IN WITNESS WHEREOF, this Assignment has been executed this 27th day of November, 1981.

(CORPORATE SEAL)                 MILTON STERN PARFUMS, INC.

                                 By _____
                                    Milton Stern, President

Copy - Not To Be Used As An
Original Document

STATE OF NEW YORK    )
                     : SS.:
COUNTY OF NEW YORK )

On this 27Th day of November , 1981, before me personally came MILTON STERN to me known, who being by me duly sworn, did depose and say that he is the President of MILTON STERN PARFUMS, INC. the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

_____
Notary Public

MICHAEL STERN
Notary Public, State of New York
No. 31-4526927
Qualified in New York County
Commission Expires March 30, 19 82

## ASSIGNMENT

WHEREAS, PARFUMS STERN INC., a corporation organized under the laws of the State of New York, with its principal place of business at 40 West 57th Street, New York, New York, 10019, has adopted and used the trademarks OSCAR and OSCAR DE LA RENTA, which are registered in the United States Patent and Trademark Office, Registration Numbers 1,081,451 and 1,085,216, dated respectively January 10, 1978, and February 14, 1978; and

WHEREAS, OSCAR DE LA RENTA, LTD., a corporation organized under the laws of the State of New York, with its principal place of business at 550 Seventh Avenue, New York, New York, 10018, is desirous of acquiring said marks and the registration thereof;

THEREFORE, for good and valuable consideration, receipt of which is hereof acknowledged, PARFUMS STERN INC. does hereby assign unto OSCAR DE LA RENTA, LTD., or its assigns, all rights, title and interest in and to the said marks, together with the goodwill of the business symbolized by the marks, and the registrations thereof, Numbers 1,081,451 and 1,085,216.

Date: November 27, 1981

(CORPORATE SEAL)                           PARFUMS STERN INC.

                                           By: _____
                                               Milton Stern, Chairman

Copy - Not To Be Used As An Original Document

STATE OF NEW YORK    )
                              :ss.:
COUNTY OF NEW YORK  )

On this _27^Th_ day of _November_, 1981, before me personally came Milton Stern, to me known, who, being by me duly sworn did depose and say that he is the Chairman of PARFUMS STERN INC., the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation, and that the seal affixed to said instrument is such corporate seal; that it so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

_____
Notary Public

MICHAEL STERN
Notary Public, State of New York
No. 31-4529927
Qualified in New York County
Commission Expires March 30, 1982

KNOWN ALL MEN BY THESE PRESENTS that we, PARFUMS STERN INC., a New York corporation of 40 West 57th Street, New York, New York ("Stern"), have made, constituted and appointed and by THESE PRESENTS do hereby irrevocably make, constitute and appoint OSCAR DE LA RENTA, LTD., a New York corporation of 550 Seventh Avenue, New York, New York ("Renta"), OSCAR DE LA RENTA residing at 2 East 70th Street, New York, New York, and GERALD SHAW residing at 1218 Smithridge Road, New Caanan, Connecticut, or the survivors or survivor of them, Stern's true and lawful attorney for Stern and in Stern's name, place and stead to assign, convey, transfer and/or set over all right, title and interest which Stern may now possess or subsequently acquire in the United States in and to the trademarks OSCAR and OSCAR DE LA RENTA in reslation to perfumes and goods of the same description thereof, and in particular Registrations Nos. 1081451 and 1085216 covering the said trademarks, together with the goodwill of the business symbolized thereby, hereby giving and granting unto Stern's said attorney full power and authority to do and perform all and every act or thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes, as Stern might or could do if present.

This power of attorney is irrevocable and shall be binding on Stern and Renta, their successors or assigns.

IN WITNESS WHEREOF, Stern has executed and placed its seal on this power of attorney in New York, New York this 27th day of November, 19 82.

PARFUMS STERN INC.

By _____
Milton Stern, Chairman

Copy - Not To Be Used As An Original Document

STATE OF NEW YORK    )
                     : SS.:
COUNTY OF NEW YORK   )

On the 27ᵀᴴ day of November, 1981, before me personally came MILTON STERN, to me known, who, being by me duly sworn, did depose and say that he is the Chairman of PARFUMS STERN INC., the corporation described in, and which executed, the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation; and that he signed his name thereto by like order.

_____
                Notary Public

MICHAEL STERN
Notary Public, State of New York
No. 31-4520927
Qualified in New York County
Commission Expires March 30, 19 82

page B-30

# EXHIBIT C



December 8, 1994

Sanofi Beauté, Inc.
40 West 57th Street
New York, New York 10019
U.S.A.

Parfums Stern S.A.
62, Avenue d'Iéna
75116 Paris
France

Re:  License Agreement dated April 1, 1976 among Oscar de la
Renta ("ODLR"), Oscar de la Renta, Ltd., ("Ltd.") and Milton
Stern Parfums, Inc. and License Agreement dated August 18, 1977
among ODLR, Ltd., and Parfums Stern, Inc., (collectively the
"License Agreements"); Letter Agreement dated November 27, 1981
among ODLR, LTD., Parfums Stern, Inc and Parfums Stern, Ltd. (the
"Letter Agreement") Letter Agreement, dated April 27, 1988,
between ODLR and Parfums Stern Inc. and acknowledged and accepted
by Ltd. (the "Personal Services Agreement"), Letter Agreement
dated January 30, 1990 between ODLR and Sanofi Beauté, Inc.
("SBI") SBI pertaining to additional services ("Additional
Services Agreement"), Letter Agreement dated March 5, 1992, among
ODLR, Ltd., SBI and Parfums Stern Overseas Ltd. (the "Royalty
Agreement"),  Letter Agreement dated as of March 30, 1992,
between ODLR and SBI amending the Personal Services Agreement
(the "Personal Appearances Agreement"), Letter Agreement dated
June 20, 1994, among ODLR, Ltd., and SBI modifying payment
arrangements reflected in the foregoing agreements ("Modification
Agreement") (the Letter Agreement, the Personal Services
Agreement, the Additional Services Agreement, the Royalty
Agreement, the Personal Appearances Agreement, and the
Modification Agreement shall be known collectively as "the ODLR
Agreements").

_____

Gentlemen:

     For good and valuable consideration, the sufficiency of
which is hereby acknowledged, we agree that the License
Agreements and the ODLR Agreements shall be modified as follows:

1.    The ODLR Agreements:

     The ODLR Agreements are hereby terminated effective December
31, 1994, with the exception of any terms of the ODLR Agreements

December 8, 1994
Page 2

intended to survive their termination, including, without
limitation, the releases and indemnification by ODLR and Ltd.
contained in the Personal Services Agreement and the Modification
Agreement, and the following shall be substituted in their place
and Paragraphs 7 and 9 of the License Agreements are hereby
amended accordingly:

1.1  Personal Services.  ODLR will make himself personally
available for personal appearances and consultation, at
reasonable times, as mutually agreed between SBI and ODLR.  SBI
shall use its best efforts to give ODLR at least two (2) months
prior notice of any intended meeting or personal appearance.  Any
scheduling shall be subject to ODLR's prior business and/or
personal commitments. In connection herewith, SBI shall reimburse

ODLR for his first-class travel, lodging, food and other related
expenses outside of New York City incurred by him to satisfy his
obligations hereunder.

1.2  Compensation for Personal Services.  As and for
compensation to ODLR for the services to be rendered as set forth
in Paragraph 1, ODLR shall be paid directly a sum equal to ONE
AND ONE-HALF (1.5%) percent (the "Percentage Payment") of Net
Sales (as defined in Paragraph 2.1 below).  SBI shall pay to ODLR
each year ONE MILLION (US$1,000,000) U.S. DOLLARS (the
"Guaranteed Payment") for each year during which ODLR renders
services or makes personal appearances in connection with the
License Agreements as guaranteed, nonrefundable, minimum annual
advances against the Percentage Payment.  The Guaranteed Payment
shall be payable annually in equal quarterly installments of TWO
HUNDRED FIFTY THOUSAND (US$250,000) U.S. DOLLARS each on the
first day of each calendar quarter beginning January 1, 1995. The
Guaranteed Payment will be credited against the Percentage
Payment.  Adjustment payments, if any, and accompanying sales
reports shall be furnished by SBI to ODLR within thirty (30) days
after the first day of each calendar quarter.  This paragraph 2
shall be applicable for every year during which the License
Agreements are in effect so long as ODLR is personally involved
in supporting  the business of and related to the License
Agreements by his efforts.

2.   The License Agreements:

The License Agreements are hereby supplemented and amended
as follows:

2.1  Royalty Rate.  Paragraph 7(b) shall be amended so that
the royalties payable to Ltd., shall be equal to 3.5% on all
annual Net Sales. The royalty rate shall increase to 4.0% on all
annual Net Sales at such time as Paragraph 1.2 of the ODLR

December 8, 1994
Page 3

Agreement, above, no longer applies. "Net Sales" shall mean gross sale price to the first unrelated third party less cash and trade discounts, returns, allowances and taxes directly applicable to the sales (such as sales, use, ad valorem or other similar taxes but not taxes based on Licensees' income). There shall also be excluded from Net Sales calculations, shipping costs, insurance costs, tariffs and duties to the extent stated separately on any invoice covering sales of Licensed Products.

2.2  <u>Quarterly Meetings</u>.  Quarterly meetings among key people of Ltd., and SBI will be held and attended personally by Mr. J.F. Dehecq and Mr. Oscar de la Renta.  Such meetings will be scheduled at such times and places as mutually agreed among the parties.

2.3  <u>New Launches</u>.  Sanofi will make regular introductions/launches of new fragrances bearing the Licensed Mark (properly supported), as can be reasonably expected for important brands in the fragrance business.

2.4  <u>Grey Market</u>.  The parties recognize and agree that the Licensed Products bearing the Licensed Mark are and are to be marketed and distributed as prestigious and superior quality products.  Accordingly, the parties agree that distribution shall be only through specialty stores, department stores, perfumeries and other outlets used for similar prestigious products and, to this end, Sanofi intends and will use its best efforts to police sales of products bearing the Licensed Mark to avoid their diversion to the grey market.

2.5  <u>Separate Identity/Dedicated Brand Manager</u>.  Sanofi will maintain the specific identity of the ODLR image and will, accordingly, appoint a worldwide brand manager, acceptable to ODLR.  This brand manager will be dedicated solely to the ODLR brand and will have direct contact with ODLR on an on-going basis.  In addition, corps of customer service representatives will be created to assist and maximize sell-through and a creative/marketing/product development team will be created when justified by the level of sales achieved.

2.6  <u>Lump Sum</u>.  In addition to all other payments provided for herein, a single payment in the amount of $1,040,000 shall be paid to Mr. Oscar de la Renta upon the execution of this Agreement.

2.7  <u>Amendment</u>. This letter agreement is intended to achieve the purposes stated herein and to resolve all disputes among ODLR and Ltd and SBI and its affiliates.  Except as specifically amended hereby, the parties hereto, by their signatures below, hereby ratify, confirm, approve and agree to the terms of the License Agreements, which shall continue in full force and effect as amended.

December 8, 1994
Page 4


          Kindly confirm your agreement to the foregoing by
signing below and on the enclosed copy and returning an original
copy of this letter to the undersigned.

                    OSCAR DE LA RENTA, LTD.



                    By: _____
                         Oscar de la Renta, Chairman



                         _____
                         Oscar de la Renta


CONFIRMED AND AGREED:


SANOFI BEAUTÉ, INC.



By: _____
     B. G. Crouch
     Chairman

PARFUMS STERN, S.A.
(successor-in-interest to Parfums Stern, Ltd.)



By: _____

# <u>EXHIBIT D</u>

# ARNOLD & PORTER LLP

**Louis S. Ederer**
Louis.Ederer@aporter.com

212.715.1102
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

January 30, 2008

**BY EMAIL AND FIRST CLASS MAIL**
Peter M. Brody, Esq.
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948

Re:    Proposed Review of YSL Beauté by ODLR

Dear Mr. Brody:

We write in response to your letter dated January 18, 2008 to E. Scott Beattie of EA Fragrances Co. ("EA"), on behalf of your client Oscar de la Renta Ltd. ("ODLR"), alleging a variety of improper actions by EA.

We are truly disappointed and concerned that ODLR has chosen to contact EA directly, given that ODLR knows and has known for years that EA is a customer of YSL for licensed Oscar De La Renta brand fragrances. As the letter you received from EA's counsel makes clear, this relationship has been ongoing for more than a decade with no prior complaint or interference by ODLR. We can only assume this is part of a strategic plan by ODLR to harass YSL Beaute. Of course, YSL Beaute will not permit ODLR to interfere with existing relationships with important customers, and is prepared to take whatever action is necessary to protect itself, EA, and any other valued customer ODLR may contact.

If ODLR has a concern that a product being sold by one of YSL's customers is not legitimate, or with the packaging being used, the appropriate way to address that concern is by discussing it with YSL Beaute, not by threatening its customers. Since we were unable to clearly see the packaging in the photocopy attached to your letter to EA, please forward a better photocopy, and if possible a physical sample, to my attention, and YSL Beaute will promptly investigate the concerns you raise in your letter.

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
January 30, 2008
Page 2

Similarly, if ODLR has a concern with the quality or integrity of a product sold by one of YSL's customers, that concern, too, is appropriately directed to YSL Beaute, not its customer. YSL Beaute, as the manufacturer of the product, is in the best position to analyze the product and its composition. Of course, if your client has obtained its own test results or analyses, please provide the same to me so that YSL Beaute and its scientists can consider that information as well. Please also forward to us a sample of the product ODLR purchased so that YSL can conduct its own testing immediately.

Finally, if ODLR has a concern about the retail outlets for its products, that is not a matter to be taken up with YSL's valued customers, but is, rather, purely an issue between YSL and ODLR under the terms of the License Agreement. There is, therefore, no reason for you to have raised this issue with EA other than to impact YSL's relationship with this valued customer.

Once again, if ODLR has legitimate concerns about any licensed products being sold by YSL's customers, then we would expect ODLR to approach YSL Beaute with those concerns. Your letter, under the current circumstances, suggests that your client is not interested in resolving problems with YSL, but rather exacerbating them. We hope that ODLR will reconsider this strategy going forward.

Yours truly,

ARNOLD & PORTER LLP

By: _Louis S. Ederer_
     Louis Ederer

cc: YSL Beauté

# EXHIBIT E



ROPES & GRAY LLP

ONE METRO CENTER   700 12TH STREET, NW   SUITE 900   WASHINGTON, DC 20005-3948   202-508-4600   F 202-508-4650

BOSTON   NEW YORK   PALO ALTO   SAN FRANCISCO   TOKYO   WASHINGTON, DC   www.ropesgray.com

January 31, 2008

**BY E-MAIL AND REGISTERED MAIL**

Louis S. Ederer, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

Re:     Notice of Breach Relating to Unauthorized "OSCAR DE LA RENTA" Products

Dear Mr. Ederer:

I am in receipt of your letter dated January 30, 2008, and a letter from Oscar E. Marina, Executive Vice President & General Counsel, Elizabeth Arden Inc. ("EA"), dated January 28, 2008, regarding sales of unauthorized products ("the Products") found in Wal-Mart stores. I attach a copy of Mr. Marina's letter, in the event you have not seen it.

Based on these letters, we now understand that YSL Beauté (1) supplied and sold the Products to EA, (2) approved all packaging for the Products, (3) sublicensed EA to use the Oscar de la Renta trademarks ("the Marks"), (4) approved the manner of use of the Marks shown in the packaging, (5) authorized EA to affix the statement "© EA Fragrances Co., Dist." on the packaging, (6) and authorized EA to resell the Products in the Unites States, including at Wal-Mart.[1]  Oscar de la Renta Ltd. ("ODLR"), however, never authorized YSL Beauté to do any of the foregoing. Notably, neither you nor Mr. Marina asserts otherwise.

Accordingly, ODLR hereby gives notice to YSL Beauté that, in light of the foregoing facts, YSL Beauté is, and has for a period of time to be determined, in clear violation of numerous provisions of the trademark license agreement between ODLR and YSL Beauté ("License"),

---

[1] It is difficult to view your request for a physical sample of the Products as anything other than a stalling tactic, given that your own client is the admitted supplier of the Products and the Products are readily available at Wal-Mart, the largest retail chain in the country. Nevertheless, we are delivering this date, under separate cover, a sample of the Products to your offices.

7292616_1.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                    - 2 -                    January 31, 2008

including Sections 1, 4, 5, and 6 and Section 2.4 of the December 8, 1994 letter agreement
modifying the License.[2]

Furthermore, as you well know, the unauthorized sale of fragrance products bearing the Marks or
any other confusingly similar mark constitutes trademark infringement, trademark dilution,
trademark counterfeiting and unfair competition under United States trademark laws, *see* 15
U.S.C. § 1051, et seq., and a violation of state laws as well.  The civil penalties for the violation
of these laws can include, among other things, an injunction against the further sale of the
counterfeit and infringing products, the recall of counterfeit and infringing products from
purchasers, destruction of all counterfeit and infringing products, packages and labels, an award
of Oscar de la Renta's damages, an award of profits from the sale of counterfeit and infringing
merchandise, treble damages, costs and attorneys' fees.

We understand from your January 30 letter that YSL Beauté assumes full responsibility for any
and all remedies to which ODLR may be entitled as a result of the unlawful actions of EA or any
other "valued customer" of YSL Beauté.  Such remedies include those applicable to any willful
infringement of the Marks occurring after notice to EA and YSL Beauté via my January 18
letter.  Again, if we misunderstand you, please so advise immediately.

Further, ODLR demands that within three (3) days of your receipt of this letter, YSL Beauté
agree in writing to undertake the following actions:

1.      YSL Beauté shall confirm in writing that it has discontinued all manufacturing,
        advertising, offering for sale, sale and distribution of the Products and any other
        unauthorized, infringing and counterfeit goods bearing the Marks ("Infringing
        Goods") and agrees in writing to refrain from all such activities in the future,
        including without limitation assisting or enabling any other person to
        manufacture, advertise, offer for sale, sell or distribute Infringing Goods.

2.      YSL Beauté shall instruct EA to direct Wal-Mart and any other third parties under
        EA's control or direction that are in possession of Infringing Goods to return to
        EA all Infringing Goods and all labels, tags, packages, or other means of marking
        Infringing Goods in their possession, custody, or control.  Promptly thereafter,

---

[2] As YSL Beauté has never specified a person or persons to be provided written notices under
Section 24 of the License, this notice is provided to you, as representative of YSL Beauté, with
copies to various officers and employees of YSL Beauté.  Unless we promptly hear from you to
the contrary, we will assume that this letter meets all requirements for notice under Section 24.
We also note, as stated in prior correspondence, that YSL Beauté may be in default of the
License in numerous other respects, and ODLR is investigating those potential defaults at this
time.  This notice is without prejudice to ODLR's right to give notice of any further defaults that
may be determined to have occurred.

7292616_1.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                    - 3 -                    January 31, 2008

> YSL Beauté shall deliver to Ropes & Gray all Infringing Goods in the possession,
> custody or control of EA or any other party, together with all labels, tags,
> packages, or other means of marking Infringing Goods.

3.     YSL Beauté shall produce all books, records, documents, and other materials in
its possession, custody, or control relating to all agreements, transactions, and
communications with EA relating to the Oscar de la Renta brands and Marks.

4.     YSL Beauté shall disgorge and provide to ODLR an accounting of all profits
made by YSL Beauté and EA from the sale of Infringing Goods, together with
copies of all books, records, invoices, shipping documents and other records to
verify that account of profits.

5.     Within thirty days of compliance with the foregoing demands, YSL Beauté shall
provide Ropes & Gray with an affidavit sworn to by an officer of YSL Beauté
confirming that YSL Beauté has completed all steps necessary to comply with
these demands.

In addition, as stated in my January 18 letter to Mr. Beattie, we have reason to believe that the
fragrance supplied in the Products has not been approved by ODLR as to either formulation or
concentration. While Mr. Marina asserts that the Products are "genuine," neither your January
30 letter nor Mr. Marina's January 28 letter specifically addresses this question of prior approval.
We remind YSL Beauté that, under Section 4 of the License, YSL Beauté does not have the right
to produce or sell any formulation or concentration of a licensed fragrance product that was not
approved by ODLR. We ask that YSL Beauté promptly provide documentation of the
formulation and concentration of the Products, any purported approvals of such formulation and
concentration by ODLR, and any changes in formulation or concentration subsequent to such
approval.

With regard to your accusation of "interference" by ODLR in YSL Beauté's customer
relationships, let us be clear: ODLR has no intention of interfering in YSL Beauté's lawful
relationships with its customers and has never done so. ODLR, however, is the exclusive owner
of the Marks. As such, ODLR is fully entitled – and, indeed, obliged under Section 3 of the
License – to take all necessary and appropriate actions to enforce its rights in the Marks,
including with respect to infringing goods and uses.

No customer of YSL Beauté is legally entitled to sell unauthorized, infringing goods or to use the
Marks in any unauthorized manner. No customer of YSL Beauté may sublicense the rights to
the Marks in the United States, as EA purports to have done. No customer of YSL Beauté may
affix its own trademark or trade name on any goods bearing the Marks. Simply put, the actions
by EA, with the admitted authorization and approval of YSL Beauté, are clear violations of

7292616_1.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                       - 4 -                       January 31, 2008

ODLR's rights, and YSL Beauté should expect ODLR to take appropriate action to enforce those rights.

Indeed, in light of these circumstances, ODLR is justifiably concerned about the possibility that other such violations may have occurred, whether involving EA or another "customer" of YSL Beauté or only YSL Beauté itself. Those concerns underscore ODLR's need for a prompt and full cooperation by YSL Beauté in providing the books and records requested by ODLR in our prior correspondence.

As for your comments in your January 30 letter and in prior letters suggesting that YSL Beauté seeks a continuing and mutually satisfactory relationship with ODLR, it is difficult to credit these comments in light of a telephone call from Robert Polet, the CEO of Gucci Group and a Member of the PPR Executive Committee, to Alexander Bolen, the CEO of ODLR, on January 23, 2008. In that call, Mr. Polet informed Mr. Bolen of a proposed transaction ("the Transaction") between PPR and L'Oreal, the result of which will be that YSL Beauté will shortly *sever* its relationship with ODLR.[3]

In any event, your comments about YSL Beauté's desire for a continuing and mutually satisfactory relationship with ODLR are sharply at odds with YSL Beauté's record of performance, as perfectly illustrated by the situation with EA. The sale of the Products – and

---

[3] ODLR reminds your client of its obligations under Section 16 of the License:

> Licensee may not assign any of its rights or delegate any of its
> duties under this agreement without the written consent of ODLR
> which consent will not be unreasonably withheld or delayed;
> except that at any time, and at its sole discretion, upon written
> notice of ODLR, Licensee is authorized to assign this agreement
> and its right, title and interest hereunder in whole or in part to...(c)
> subject to paragraph 17, any corporation which shall have assumed
> all of the obligations hereunder of Licensee and shall have
> acquired by merger, consolidation or purchase all or substantially
> all of the assets of Licensee.

To date, ODLR has not been asked to give written consent to the Transaction, nor has ODLR been provided with written notice of the Transaction. Indeed, ODLR is not in possession of information sufficient to enable it to determine whether the Transaction would require ODLR's consent or merely written notice to ODLR, if it may be consummated at all. We believe that ODLR is entitled to such information, including evidence of whether the acquiror "shall have assumed all of the obligations hereunder of Licensee and shall have acquired by merger, consolidation or purchase all or substantially all of the assets of Licensee." We ask that this information be provided in timely fashion.

7292616_1.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                        - 5 -                        January 31, 2008

YSL Beauté's admitted role in their sale – abundantly demonstrate that YSL Beauté is engaged
in the wholesale destruction of the extremely valuable Oscar de la Renta brand in the fragrance
field, rather than making its "best efforts" to promote the brand, as required under the License.
What you characterize as an untoward "strategy" by ODLR and "harassment" of YSL Beauté is
nothing other than the legitimate efforts of a brand owner to hold its licensee to the express
obligations of its license and prevent further loss in the value of the brand.

We look forward to your prompt and satisfactory reply.

Sincerely,

Peter M. Brody

PMB:cs
Attachment

cc:     Alexander L. Bolen, CEO, Oscar de la Renta Ltd.
        Andrea Barbier, President and CEO, YSL Beauté
        François-Henri Pinault, Chairman and CEO, PPR
        Robert Polet, CEO, Gucci Group
        Marc Rey, CEO and Managing Director, YSL Beauté U.S.A.

7292616_1.DOC

# Elizabeth Arden



January 28, 2008

<u>VIA E-MAIL peter.brody@ropesgray.com</u>
<u>AND REGULAR MAIL</u>

Peter M. Brody, Esq.
Ropes & Gray
1211 Avenue of the Americas
New York, NY 10036-8704

       Re:   <u>Your Letter of January 18, 2008 to E. Scott Beattie.</u>

Dear Mr. Brody:

       The above-referenced letter was referred to me for response. Your letter is quite surprising given that we have been purchasing Oscar de la Renta fragrance products directly from YSL Beaute (and previously, Sanofi Beaute) for distribution to U.S. mass-market retailers for over 14 years.

       By way of history, you should be aware that Elizabeth Arden, Inc. has been purchasing the products directly from the world-wide manufacturer of the Oscar de la Renta fragrances pursuant to periodic, routine forecasts based on retailer demand. Our company provides the retailers in the U.S. mass market continuity of supply and product support so that the Oscar de la Renta brand can maintain both its demand and profitability in this critical channel of the market.

       The product you are referring to in your letter is, in fact, a genuine Oscar de la Renta parfum albeit in a very small size. Both the bottle and the product box were manufactured and sold to us by YSL Beaute specifically for sale to the U.S. mass market where your client found the product. Since many fragrance products in the U.S. mass market are sold in an open-sell environment and not behind locked glass cases, the retailers demand security tags, a hard plastic package and, in the case of small sizes (such as the one mentioned in your letter) a larger package, covering the product to prevent pilferage. Because U.S. laws require that secondary product packaging display certain information, including the ingredient listing, product warnings, country of origin and name and address of manufacturer or distributor (in this case our company as distributor), be visible to the consumer, the easiest way to accomplish this while making sure we comply with the retailer requirement of the large, hard plastic cover is for us to create the back panel that you saw on the product. As soon as the consumer opens the hard plastic package and removes the product and the box, it will find both the originally manufactured bottle and product box listing all required legal information, including YSL Beaute's division, Parfums Stern, as the manufacturer and its business address in France as if the consumer had purchased the product without the hard plastic cover.

       Accordingly, we have not sold any Oscar de la Renta fragrance product that has "mutilated" your client's trademarks nor have we sold products that are "of a much lower

Peter M. Brody, Esq.
January 28, 2008
Page 2

concentration than the genuine" or otherwise "contain different ingredients." Again, as noted above, the products are genuine. As to your allegation that your client has not authorized this practice, if such authorization is necessary, this question is best posed to YSL Beaute, not Elizabeth Arden.

It appears that your letter is based on a misunderstanding of facts and is not a legal matter that should involve our company. If you have any questions regarding the foregoing, do not hesitate to call me at (954) 364-3514. Please forward this letter to Mr. Bolen.

Very truly yours,

Oscar E. Marina
Executive Vice President
and General Counsel

cc: E. Scott Beattie
    Marc Rey

# **EXHIBIT F**

# ARNOLD & PORTER LLP

**Louis S. Ederer**
Louis.Ederer@aporter.com

212.715.1102
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

February 5, 2008

**BY EMAIL AND FIRST CLASS MAIL**
Peter M. Brody, Esq.
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948

Re:     YSL Beauté/Oscar De La Renta, Ltd.

Dear Mr. Brody:

We write in response to your January 18, 2008 letter, on behalf of your client Oscar De La Renta, Ltd. ("ODLR"), purporting to notify YSL Beauté of its alleged breach of Section 10 of the License Agreement between the parties, your follow-up letter on the same subject dated January 30, 2008, and your second letter declaring a breach by YSL Beauté dated January 31, 2008.

ODLR's January 18th Breach Letter

Your January 18th Notice of Breach asserts that YSL Beauté is in breach of the License Agreement as a result of, among other things, its alleged refusal to make available for inspection all of the documents called for in your December 13, 2008 letter, including business documents relating to YSL's own fragrance brands. As I have previously indicated, it is YSL Beauté's position that you have called for numerous documents plainly outside the scope of the audit provisions of Section 10. It is further YSL Beauté's position that your client is not entitled, under Section 10, to conduct the type of performance review it is seeking. We refer you to our previous letter of January 11, 2008 for a more detailed discussion of our position on these and other points. Accordingly, YSL Beauté categorically denies that it is in breach of Section 10 of the License Agreement on any of the bases that your client asserts in your January 18, 2008 letter, and rejects your client's Notice of Breach out of hand.

Nevertheless, and notwithstanding its rejection of your client's Notice of Breach, YSL Beauté, in the spirit of cooperation, and out of courtesy to your client, is still prepared to submit to a performance review beyond the scope of what, if anything, may be required under the license, strictly according to the parameters set out in my January 11, 2008 letter. However, as our client, as you are aware, is currently attending to other pressing business matters, it will not be in position to receive your client or submit to a

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
February 5, 2008
Page 2

review for at least another sixty (60) days. We will, accordingly, contact you in the next week with proposed dates for the review. We will also, at that time, propose dates for the requested factory visit.

<u>ODLR's January 31 Breach Letter</u>

Your January 31 letter alleges a variety of purportedly improper actions that you contend breach the License Agreement between ODLR and YSL Beauté. Simply put, as with your January 18th alleged breach, YSL Beauté categorically denies that any of the events to which you seem to be referring constitute a breach of the agreement.

To the extent that you are alleging that YSL Beauté is in breach because it has allowed Elizabeth Arden ("EA") to put ODLR products into a clear plastic "clamshell" that provides labeling information on the back and has put an insert into the clamshell that reproduces the ODLR trademark, we do not understand how you can complain about this now. First, contrary to the statements in your letter, YSL Beauté has no evidence that it ever authorized or approved this conduct on the part of EA. YSL Beauté is currently investigating this. Second, EA has advised that it has been selling these same ODLR products to Wal-Mart for many years, and has been using this same "clamshell" packaging for most, if not all of that time. Indeed, YSL Beauté is also investigating whether this packaging was in fact shown to and/or approved at some point by ODLR. Nevertheless, even if that is not the case, after waiting for years and accepting royalties on the sales of such products to EA throughout that entire period, ODLR is hardly in a position to complain about these issues now.

YSL Beauté does, however, no matter how long your client has known about the complained-of packaging, take very seriously your indication that the Oscar De La Renta script mark that EA is using on its packaging insert is not the current script mark being used by ODLR. Accordingly, YSL Beauté has discussed your concerns with EA, and although those discussions are ongoing, EA has preliminarily indicated that it will not make future shipments of the product in question with the complained-of packaging insert, or with any packaging insert that contains an Oscar De La Renta mark. We do ask that if you have any further issues concerning the activities of EA or any of its customers with respect to these products, that you contact us directly, as these are matters to be taken up directly between YSL Beauté and ODLR, not with any of YSL Beauté's customers.

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
February 5, 2008
Page 3

    With respect to your complaint that the product itself has a different formulation than genuine ODLR fragrances, now that you have provided a sample of the product you are questioning, YSL Beauté will conduct testing of the product to determine whether it is consistent with the formulas for the ODLR fragrances. As soon as we receive the test results, we will advise you of the findings, and any actions which may (or may not) need to be taken.

    Finally, you allege that ODLR's consent is required in connection with a potential transaction between L'Oreal and YSL Beauté. Contrary to your statements, however, Robert Polet did not tell Mr. Bolen that YSL Beauté would be "severing" its connection to ODLR; rather, he said that PPR had negotiated a potential transaction with L'Oreal pursuant to which L'Oreal would be purchasing YSL Beauté from the Gucci Group and PPR. This transaction has not been finalized or completed at this stage because a number of approvals are needed; however, since the proposed transaction contemplates L'Oreal's acquisition of YSL Beauté stock, no notice is required under the License Agreement, because YSL Beauté would not be assigning the Agreement, or any of its obligations thereunder, to L'Oreal. Mr. Polet made a courtesy call to Mr. Bolen to advise him that the proposed deal would shortly be announced, and if the requisite approvals are obtained, of course your client will be advised of that as well. We do not agree, however, that the License Agreement requires YSL Beauté to give any notice of this transaction to your client.

    I trust that the parties can begin to move on past the letter writing campaign that your client began and get back to the business of building the ODLR fragrance business.

    Please contact me directly if you have any questions or wish to respond further.

Yours truly,

ARNOLD & PORTER LLP

By: _Louis S. Ederer_

Louis S. Ederer

Cc: YSL Beauté

# **EXHIBIT G**



ROPES & GRAY LLP

ONE METRO CENTER  700 12TH STREET, NW    SUITE 900    WASHINGTON, DC 20005-3948    202-508-4600    F 202-508-4650

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    TOKYO    WASHINGTON, DC    www.ropesgray.com

February 8, 2008

**BY E-MAIL AND FIRST-CLASS MAIL**

Louis S. Ederer, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

Re:    YSL Beauté's Breaches of License

Dear Mr. Ederer:

I write in response to your letter dated February 5, 2008. Capitalized and abbreviated terms used herein have the same meaning as in previous letters.

<u>YSL Beauté's Failure to Produce Records.</u> Section 10 of the License provides that ODLR shall have the right to inspect YSL Beauté's records, documents and materials pertaining to the License "upon reasonable advance notice and during reasonable business hours." ODLR provided notice pursuant to Section 10 on December 13, 2007. Although you previously stated that records would be made available on February 13, you now state that your client will not make records available for at least another two months, if not longer, because of unspecified "pressing business matters." A delay of four months or more in the production of records pursuant to ODLR's notice is manifestly unreasonable and constitutes a further breach of YSL Beauté's obligations under Section 10. The same is true for YSL Beauté's unexplained four-month delay in complying with ODLR's December 13 request to inspect manufacturing premises pursuant to Section 4 of the License. Your candid acknowledgement that your client considers other "business matters" more pressing than resolution of ODLR's concerns is entirely consistent with ODLR's experiences and only underscores the critical importance of the "performance review" that YSL Beauté seeks to delay.

With regard to the scope of ODLR's rights under Section 10, we understand from your February 5 letter that YSL Beauté's position is unchanged from that set forth in your January 11, 2008 letter, which proposes substantial unwarranted restrictions on the information that YSL Beauté will provide. If our understanding is incorrect, please so advise me promptly and with specificity. Otherwise, ODLR considers that it has satisfied its obligation to provide notice and an opportunity for YSL Beauté to cure its failure to comply fully with Section 10's obligation to make available to ODLR its "books of account and *all* other records, documents and material in

7294105_1.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                              - 2 -                              February 8, 2008

the possession or under the control of Licensee, with respect to the subject matter of this agreement" (emphasis added).

<u>YSL Beauté's Breaches Relating to EA's Activities</u>.  With respect to EA's sales of unauthorized goods bearing the Marks, we understand from your February 5 letter that, while YSL Beauté supplied and sold the Products to EA for distribution under the Marks in Wal-Mart, YSL Beauté has no evidence that it ever authorized the Product's packaging (although your client is still "investigating this").  We infer, although you do not specifically state, that YSL Beauté also has no evidence that it ever authorized EA to use the Oscar de la Renta signature shown on the packaging or to affix the statement "© EA Fragrances Co., Dist." on the packaging.  (If we are incorrect in this regard, please so advise us promptly.)  Despite EA's lack of authorization from YSL Beauté, however, you reiterate that any complaint concerning "the activities of EA or any of its customers" be "taken up directly between YSL Beaute and ODLR."

In reliance on this statement, ODLR will look solely to YSL Beauté for any and all remedies to which ODLR may be entitled as a result of any unlawful actions of EA and will not communicate further with EA regarding this matter.  With respect to EA's customers, you do not identify any, other than Wal-Mart.  If you wish ODLR to direct to YSL Beauté any concerns about the sale of unauthorized products by EA's customers, ODLR obviously must know who those customers are.  Otherwise, ODLR is entitled, and obligated, to take any and all actions necessary and appropriate to protect its intellectual property rights against infringement by any party.

With regard to the specific demands set forth in my January 31 letter, your response is wholly unsatisfactory.  For example, your February 5 letter states that "EA has preliminarily indicated that it will not make future shipments of the product in question with the complained-of packaging insert, or with any packaging insert that contains an Oscar De La Renta mark."  ODLR, however, has demanded the cessation of all sales of the fragrance Product in question itself – not just the packaging insert.  Your letter also simply ignores ODLR's demand for, *inter alia*, an accounting of past sales and the production of records relating to YSL Beauté's relationship with EA and the formulation and concentration of the Product.  Failure to comply with these demands constitutes a further breach of the License.

We note your admission that EA "has been selling these same ODLR products to Wal-Mart for many years."  That may be.  But ODLR never authorized the Products or their sale to Wal-Mart or any other mass retail outlet, and all such sales are in clear violation of the License.  Nor is it relevant whether ODLR received royalties from YSL Beauté's sales to EA of unauthorized goods that were then sold, without ODLR's authorization, in channels specifically excluded by the License.

7294105_1.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                     - 3 -                     February 8, 2008

Finally, you state that "YSL Beaute will conduct testing of the product to determine whether it is consistent with the formulas for the ODLR fragrances." We do not understand your reference to "formulas" in the plural. To our knowledge, only one formula has ever been approved by ODLR for the "Oscar" fragrance – the formula that was approved by Mr. de la Renta in 1977. That is the formula against which the Products must be tested. We await the results of that test.

Sincerely,

Peter M. Brody

PMB:cs
Attachment

cc:     Alexander L. Bolen, CEO, Oscar de la Renta Ltd.

# EXHIBIT H

# ARNOLD & PORTER LLP

**Louis S. Ederer**
Louis.Ederer@aporter.com

212.715.1102
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

February 28, 2008

**BY EMAIL AND FIRST CLASS MAIL**
Peter M. Brody, Esq.
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948

Re:    YSL Beauté/Oscar De La Renta, Ltd.

Dear Mr. Brody:

This is in response to your February 8, 2008 letter. I will respond to your points in order.

Production of Records. First, we disagree with your position that the delay in ODLR's performance review and factory visit necessitated by the pressures of YSL Beauté's current business dealings constitutes a breach of Section 10 of the License Agreement. Section 10 of the Agreement does not require YSL Beauté to do any of the things your client has asked it to do, and it has agreed to do so only out of courtesy and to show its good faith. However, it will not disrupt its business to make documents available to your client, especially when it is doing so voluntarily. Nevertheless, we propose to make documents available for ODLR's review in New York the week of March 31, with review and a factory visit in France to follow the week of April 7. Note that, in any event, our client will need at least ten (10) days advance notice prior to any factory visit.

Second, YSL Beauté's position as to the documents and information it intends to produce for inspection remains unchanged. We also continue to maintain that such position does not constitute a violation of Section 10, and therefore no "cure" is necessary.

Elizabeth Arden. As for your various statements regarding the activities of Elizabeth Arden ("EA") and our client's position with respect thereto, be advised as follows:

First, as my previous letter confirmed, YSL Beauté has been selling genuine ODLR product to EA for many years, and EA has been selling that product to Wal-Mart for many years. Indeed, we are informed that it has been using the plastic "clamshell"

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
February 28, 2008
Page 2

packaging with the insert for at least five years. Given the period of time that this has all been happening, we are attempting to locate information that would confirm whether the packaging was approved either by YSL Beauté or ODLR. This requires a review of dated materials. To date, we have not located any such materials, but we are continuing to investigate. However, while I note that your position is that ODLR did not authorize this packaging, we believe that given the length of time that this has been occurring, in one of the biggest retail chains in the United States (where ODLR has its headquarters), this is unlikely. Of course, we will let you know if we identify any additional information about this issue.

Second, we acknowledge, and appreciate, your indication that ODLR will look solely to YSL Beauté as far as any claims it may have that YSL Beauté's customers are acting improperly or without authorization. As for your request for a list of EA customers, we think that is unnecessary. If your client becomes aware of any product being sold in the marketplace that it believes is counterfeit or infringes its trademarks, you should bring that to YSL Beauté's attention, and we will investigate it promptly.

Third, as for your demand that YSL Beauté cease all sales of the fragrance product in question, YSL Beauté sees no reason to do this and will not do so. Assuming the testing confirms that the product is the genuine OSCAR fragrance, we see no reason for further action. We simply do not understand what your basis could be for asking YSL Beauté to stop selling a genuine product that has been sold for many years. With respect to your request for books and records regarding sales of this product, your auditors have already had access to these documents twice in the last three years. YSL Beauté will make the documents that reflect the sales in 2007 available as part of its production for the inspection.

Fourth, as for your suggestion that YSL Beauté's mere sale of these products to EA, and ultimately to mass retail outlets, must be authorized by ODLR, and violates the License Agreement, this is just not true. Under the License Agreement, the channels of sale of licensed products are not subject to prior approval by ODLR, and need only meet any limitations placed on such sales. Further, since Wal-Mart sells many "similar prestigious products", YSL Beauté's position is that sales by EA to Wal-Mart fall squarely within the terms of the license. In addition, as noted above, these sales have been occurring for many years at one of the largest chain stores in the U.S.; therefore, we find it difficult to believe that no one affiliated with ODLR has ever seen the product being sold there and, thus, implicitly agreed to these sales. YSL Beauté accordingly rejects the notion that these sales are a breach of the License Agreement.

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
February 28, 2008
Page 3

Fifth, as regards the testing of the product in question, we understand the product has been submitted for testing and analysis. We should have the results shortly.

Please direct any further correspondence regarding this matter to the undersigned.

Yours truly,

ARNOLD & PORTER LLP

By: _____
Louis S. Ederer

cc: YSL Beauté

# **<u>EXHIBIT I</u>**





PARFUM

**CAUTION: FLAMMABLE.
DO NOT USE NEAR HEAT OR FLAME.**

INGREDIENTS: ALCOHOL, PARFUM (FRAGRANCE), ALPHA-METHYL IONONE, AMYL CINNAMAL, BENZYL ALCOHOL,
BENZYL BENZOATE, BENZYL CINNAMATE, BENZYL SALICYLATE, CINNAMYL ALCOHOL, CITRAL, CITRONELLOL,
COUMARIN, EUGENOL, EVERNIA PRUNASTRI EXTRACT, FARNESOL, GERANIOL, HYDROXYCITRONELLAL,
ISOEUGENOL, LIMONENE, LINALOOL, AQUA (WATER), "00A10-2".

THIS GENUINE OSCAR PRODUCT HAS BEEN REPACKAGED IN THE U.S. BY EA FRAGRANCES, CO.,
NEW YORK, NY 10003, A COMPANY NOT AFFILIATED WITH OSCAR DE LA RENTA, LTD.
OSCAR DE LA RENTA, LTD. IS THE OWNER OF THE OSCAR AND OSCAR DE LA RENTA REGISTERED TRADEMARKS.
MADE IN FRANCE



OSDMMINIMW          8F02

6  8 1131 47160  2



INGREDIENTS:
ALCOHOL DENAT..
PARFUM (FRAGRANCE).
AQUA (WATER).

INFLAMMABLE · FLAMMABLE

*Oscar de la Renta*
PARFUMS

PARFUMS STERN
20,26 BOULEVARD DU PARC
92521 NEUILLY CEDEX

Echantillon - Vente interdite
Sample - Not for sale

INGREDIENTS : ALCOHOL DENAT.. AQUA
(WATER) . PARFUM (FRAGRANCE) . ALPHA-
METHYL IONONE . LINALOOL . LIMONENE.
GERANIOL . COUMARIN . EUGENOL.
HYDROXYCITRONELLAL . CITRONELLOL.
BENZYL SALICYLATE . CINNAMYL ALCOHOL.
BENZYL BENZOATE . ISOEUGENOL . FARNESOL.
CITRAL . BENZYL CINNAMATE .AMYL CINNAMAL
BENZYL ALCOHOL . EVERNIA FURFURACEA
EXTRACT . HEXYL CINNAMAL."0OA08-1"

www.oscardelarenta-fragrances.com

page 1-3







# EXHIBIT J



ROPES & GRAY LLP

ONE METRO CENTER   700 12TH STREET, NW   SUITE 900   WASHINGTON, DC 20005-3948   202-508-4600   F 202-508-4650

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    TOKYO    WASHINGTON, DC    www.ropesgray.com

March 13, 2008

Peter M. Brody
202-508-4612
peter.brody@ropesgray.com

**BY EMAIL & REGISTERED MAIL**

Louis S. Ederer, Esq.
Arnold & Porter
399 Park Avenue
New York, NY 10022-4690

Re:    Notice of Default

Dear Mr. Ederer:

Oscar de la Renta, Ltd. ("ODLR") hereby gives written notice pursuant to Section 21 of its trademark license agreement with YSL Beauté ("License") of YSL Beauté's violation and failure to perform obligations arising under the "best efforts" clause of Section 1 of the License, as well as Sections 4 and 5 of the License and Sections 2.2, 2.3, 2.4, and 2.5 of the December 8, 1994 letter agreement ("1994 Letter Agreement") modifying the License.[1]  This notice is in addition to, and without prejudice to, ODLR's two prior notices of default dated January 18, 2008, and January 31, 2008, which defaults remain uncured at this time.

Section 1 of the License imposes on YSL Beauté the obligation to "use its best efforts to exploit and publicize [the] Licensed Mark and to promote the sale of Licensed Products in the countries comprising the Territory."  Sections 2.2, 2.3, 2.4, and 2.5 of the 1994 Letter Agreement reinforce the best-efforts obligation with specific requirements pertaining to the management of the licensed business and the marketing, promotion, distribution, and sale of licensed goods.

As has become increasingly evident to ODLR, YSL Beauté's performance under the License has fallen woefully short of the "best efforts" standard under New York law.  YSL Beauté's breaches of Sections 2.2, 2.3, 2.4, and 2.5 of the 1994 Letter Agreement are equally apparent.  YSL Beauté's defaults have caused substantial economic damage to ODLR and the licensed brand.

---

[1] As YSL Beauté has never specified a person or persons to be provided written notices under Section 24 of the License, this notice is provided to you, as representative of YSL Beauté, with copies to various officers and employees of YSL Beauté.  Unless we promptly hear from you to the contrary, we will assume that this letter meets all requirements for notice under Section 24.

ROPES & GRAY LLP

Louis S. Ederer, Esq.                    - 2 -                    March 13, 2008

Under settled New York law, a "best efforts" clause "requires greater care and diligence than the ordinary care and diligence to which the promisor would otherwise be bound." *Ashokan Water Servs., Inc. v. New Start, LLC*, 807 N.Y.S.2d 550, 555 (Civ. Ct. 2006). A licensee's duty under a best-efforts clause is "to expand [the licensor's] market share, to promote it vigorously, and not merely to keep it alive." *Joyce Beverages of New York, Inc. v. Royal Crown Cola Co.*, 555 F. Supp. 271, 276 (S.D.N.Y. 1983).

Indeed, "[c]ontractual 'best efforts' clauses require that the bound party work toward the object of the contract 'to the extent of his total capabilities.'" *Burke v. Steinmann*, No. 03-Civ-1390 (GEL), 2004 WL 1117891, *7 (S.D.N.Y. May 18, 2004) (quoting *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 267 (S.D.N.Y. 1978)). Here, the object of the contract is stated expressly within the "best efforts" clause, namely, "to exploit and publicize [the] Licensed Mark and to promote the sale of Licensed Products in the countries comprising the Territory."

As we have previously noted, and as courts have found, a licensee's performance with respect to other brands that it markets, especially including brands it owns, may serve as a benchmark against which to assess whether the licensee has, in fact, met its best-efforts obligation under the license. *See Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) (best efforts clause, at a minimum, "required Falstaff to treat the Ballantine brands as well as its own" or better); *Burma-Bibas, Inc. v. Excelled Sheepskin & Leather Coat Corp.*, No. 83-Civ-4117 (MEL), 1986 WL 13470, *17 (S.D.N.Y. Nov. 20, 1986) (evaluating best-efforts standard by comparing licensee's performance as between licensor's brand and a competing brand also sold by licensee).

Particularly in light of New York law regarding best-efforts clauses, there can be no reasonable dispute that YSL Beauté has failed to comply with Section 1 of the License. Indeed, YSL Beauté's performance has been abysmal, when assessed on its own or by comparison to YSL Beauté's much more favorable treatment of other fragrance brands owned or licensed by YSL Beauté, including, but not limited to, Yves Saint Laurent, Boucheron, and Stella McCartney. YSL Beauté's deficiencies in performance of its best-efforts obligation and related obligations under the License include, without limitation, the following acts and omissions, each of which, we note, has been the subject of multiple, but fruitless, complaints by ODLR to YSL Beauté.

Inadequate advertising and promotion. YSL Beauté has utterly failed to use its best efforts to advertise and promote the ODLR line. As is demonstrable, YSL Beauté's print, billboard, and other media advertising for the ODLR line has been largely nonexistent and a far cry from the extensive and conspicuous advertising that YSL Beauté has undertaken for other brands. YSL Beauté itself has conceded the disparity. Likewise, YSL Beauté has invested little or nothing in retail displays for the ODLR line while making a large investment in displays for other brands.

ROPES & GRAY LLP

Louis S. Ederer, Esq.                        - 3 -                        March 13, 2008

The predictable consequence of this lack of investment in the brand is that sales have steadily and substantially declined during YSL Beauté's management of the brand.

In prior correspondence, you have noted that YSL Beauté has complied with the minimum advertising spending requirement contained in Section 8 of the License. That may be correct, but it is not determinative. That minimum is just that – a minimum – and the amount of spending that YSL Beauté has undertaken clearly does not represent its "best efforts," especially considering the far greater spending it has undertaken for other brands.

Insufficient new launches. Despite the increasing prevalence and importance of new launches in the fragrance industry, YSL Beauté has launched few new fragrances for ODLR, while at the same time launching multiple new fragrances for other brands. The introduction of minor "flanker" products in the ODLR line is, as YSL Beauté well knows, not the same thing as the launch of a new fragrance. To the extent YSL Beauté has launched any new ODLR fragrances, it has failed to provide appropriate marketing support for the launches, in stark contrast to YSL Beauté's treatment of its other brands. YSL Beauté's conduct with respect to new launches violates not only the best-efforts clause, but also Section 2.3 of the 1994 Letter Agreement, which obligates YSL Beauté to "make regular introductions/launches of new fragrances bearing the Licensed Mark (properly supported), as can be reasonably expected for important brands in the fragrance business."

Cheapening the brand. YSL Beauté has pursued a business strategy that has resulted in serious harm to the prestige and value of ODLR's brand. Distribution in mass-market outlets like Kohl's, Target, Wal-Mart, and CVS is spreading dramatically, with a corresponding decrease in sales of ODLR fragrance in prestige stores. Moreover, ODLR fragrance prices in mass-market outlets and other channels have been aggressively discounted by YSL Beauté, or have been aggressively discounted by others with YSL Beauté's consent, or both. These price discounts have been far deeper, and far more widespread, than for YSL Beauté's other brands. YSL Beauté's business strategy thus has effectively transformed the ODLR brand from a prestige fragrance to a mass-market product, irreparably damaging the brand and ODLR. This business strategy not only contravenes the best-efforts clause, but also violates the letter and spirit of Section 2.4 of the 1994 Letter Agreement, which obligates YSL Beauté to distribute ODLR products "only through specialty stores, department stores, perfumeries, and other outlets used for similar prestigious products."

Your suggestion that ODLR somehow has waived its rights with respect to YSL Beauté's distribution practices by having failed to object to them in the past ignores Section 25 of the License (which provides that "[a]ny waiver must be in writing and signed" and that mere failure to insist upon strict compliance "shall not be considered a waiver") and, in any event, indicates a lack of awareness of the facts. As the documentary evidence will show, ODLR has repeatedly

ROPES & GRAY LLP

Louis S. Ederer, Esq.                    - 4 -                    March 13, 2008

complained about those unsatisfactory aspects of the distribution situation of which it had
knowledge. YSL Beauté, however, has not been candid with ODLR about the full extent of
distribution in mass channels. Thus, for example, ODLR itself only recently discovered the
product at Wal-Mart: to ODLR's knowledge, that fact was not revealed in any prior
communication from YSL Beauté or in the books and records made available by YSL Beauté
during any prior audit by ODLR.

<u>Failure to use best efforts to develop and market other Licensed Products</u>. YSL Beauté has
developed and marketed only a small fraction of the products it is authorized to produce under its
license. By failing to bring any products to market in the remaining categories, YSL Beauté has
substantially failed to exploit the license rights, far short of "best efforts" in that respect.
Specifically, the License covers "perfumery, fragrances, essential oils, toiletries, cosmetics, hair
lotions, and soaps, it being intended to include perfumery, beauty and toiletry preparations of all
kinds." YSL Beauté, however, has introduced no cosmetics, no hair lotions, and no essential oil
products under the ODLR brand, and has introduced only a handful of toiletries and soaps. In
contrast, YSL Beauté has introduced numerous such products under its own brands, including
lipstick, lip balm, lip gloss, mascara, eye shadow, foundation, blush, concealer, colored powders,
nail polish, and a wide range of organic skin-care products, skin cleansers, revealers, toners,
masques, cremes, gels, and anti-age preparations.

<u>Failure to use best efforts to exploit the Territory</u>. The licensed territory is global. YSL Beauté,
however, has either failed to promote or minimally promoted the ODLR line in numerous
important markets around the world, where YSL Beauté has extensively promoted other brands.
This is a demonstrable failure under YSL Beauté's best-efforts obligation.

<u>Lack of brand management</u>. For substantial periods of time, YSL Beauté has had no worldwide
brand manager "dedicated solely to the ODLR brand," as required by Section 2.5 of the 1994
Letter Agreement, as well as the best-efforts obligation in Section 1 of the License. YSL Beauté
also has never sought to hold the regular meetings with ODLR personnel required under Section
2.2 of the 1994 Letter Agreement.

<u>Undisclosed, unapproved formula changes</u>. YSL Beauté has not denied that it has made a
number of changes to the approved formula for the flagship "Oscar" fragrance. To best of
ODLR's knowledge, none of these changes was disclosed to, or authorized by, ODLR. The only
approved formula remains the one approved by Mr. de la Renta at inception of the License. The
changes made by YSL Beauté, which likely were made to lower costs, may have significantly
degraded the quality of the product. Such conduct not only violates the best-efforts clause, but
also violates Section 4 of the License, which does not permit any "commercial use" of a product
bearing the ODLR brand without the express prior approval of ODLR.

ROPES & GRAY LLP

Louis S. Ederer, Esq.                          - 5 -                          March 13, 2008

<u>Unapproved products</u>. Most recently, disregarding the express direction of ODLR, YSL Beauté has refused to cause its agent, EA Fragrances, Inc., to remove from the market the unauthorized product that was the subject of ODLR's notice of default dated January 31, 2008. YSL Beauté's refusal to take the corrective action demanded by ODLR is in further flagrant breach of YSL Beauté's obligations. YSL Beauté also has refused to divulge whether the product is being supplied to retailers other than Wal-Mart, where the product was discovered, in violation of ODLR's information rights under Section 10 of the License.

Based on these various examples, we strongly suspect the sale of unapproved ODLR products is now widespread and growing. Although YSL Beauté's refusal to identify the retailers carrying unauthorized product renders it virtually impossible for ODLR to police the sales of unauthorized products in any systematic way (which is, in any event, YSL Beauté's responsibility, not ODLR's), ODLR has nevertheless discovered other unauthorized products for sale by various retail establishments and on-line merchants. For example, the Internet retail site fragrancenet.com is offering a 4 ml "Oscar" eau de toilette that was intended and approved by ODLR for use only as a free gift and, as approved by ODLR, bore the marking "Sample-Not For Sale." That marking has been covered up on the product sold on fragrancenet.com. Similarly, Designer Fragrances in Woodbury, New York is offering a 10 ml "Oscar de la Renta Pour Lui" eau de toilette that was intended and approved as a free gift only and bore the same marking, which has been literally scraped off the box.

ODLR cannot know whether the presence of these products in the stream of commerce results from intentional conduct by YSL Beauté or whether instead it demonstrates only YSL Beauté's abdication of its obligation to prevent the distribution of unauthorized product by others. In either case, it goes without saying, YSL Beauté has failed to use its best efforts to promote the sale of *licensed* products.

*   *   *

In sum, YSL Beauté's performance under the License has fallen grievously short of "best efforts" and has been in violation of numerous other provisions of the License. YSL Beauté's previous and continuing violations of the License have caused and continue to cause substantial harm to the ODLR brand. Among other things, YSL Beauté's conduct has caused sales of licensed products to decline steadily and substantially for a number of years, has injured ODLR's reputation in the market, and has diminished the value of ODLR's intellectual property.

It is ODLR's position that most, if not all, of the foregoing defaults are not curable, in light of their nature and extent and the substantial damages already done to the ODLR brand. In any event, based on YSL Beauté's dismissive responses to ODLR's previous notices of default, ODLR will assume that YSL Beauté has no intention of acknowledging, let alone attempting to

ROPES & GRAY LLP

Louis S. Ederer, Esq.                              - 6 -                              March 13, 2008

effect a comprehensive cure of, these defaults, unless you unequivocally advise me to the contrary in writing by close of business March 20, 2008.[2]

Sincerely,

Peter M. Brody

PMB:cs

cc:    Alexander L. Bolen, CEO, Oscar de la Renta, Ltd.
       Andrea Barbier, President and CEO, YSL Beauté
       François-Henri Pinault, Chairman and CEO, PPR
       Robert Polet, CEO, Gucci Group
       Marc Rey, CEO and Managing Director, YSL Beauté U.S.A.

---

[2] The recent e-mail to ODLR from Marc Rey, while alluding to YSL Beauté's deficient performance under the License and vaguely committing, once again, to rectify it, is an example of what does not constitute a cure. Mr. Rey's suggestion to "[f]eel free to let me know at any time if you think we can improve the modus operandi" is laughable for its understatement. Over the last several months, ODLR has repeatedly articulated the precise ways in which YSL Beauté needs to improve. And YSL Beauté has repeatedly met those grievances with denials and delay, rather than any concrete plan for change.

# EXHIBIT K

# ROPES & GRAY

ROPES & GRAY LLP

1211 AVENUE OF THE AMERICAS    NEW YORK, NY 10036-8704    212-596-9000    F.212-596-9090

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    TOKYO    WASHINGTON, DC    www.ropesgray.com

January 18, 2008

**BY E-MAIL AND REGISTERED MAIL**

Louis S. Ederer, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

Re:    Notice of Breach of License

Dear Mr. Ederer:

I am in receipt of your letter dated January 11, 2008. Based on your letter, Oscar de la Renta, Ltd. ("ODLR"), hereby gives written notice pursuant to Section 21 of its trademark license agreement with YSL Beauté ("License") of YSL Beauté's violation and failure to perform obligations arising under Section 10 of the License.[1] This notice is without prejudice to any other and further notices by ODLR of violations of, or failures to perform, the License by YSL Beauté, as ODLR's further investigation warrants.

YSL Beauté's obligations under Section 10 are clear and unambiguous:

> Licensee shall maintain appropriate books of account at its head office in which accurate entries shall be made concerning all transactions within the scope of this agreement, and ODLR shall have the right upon reasonable advance notice and during reasonable business hours, through any accountant or other authorized representative of its choice, and at the expense of ODLR, to examine and take extracts from such books of account and all other records, documents and material in the possession or under the control of Licensee, with respect to the subject matter of this agreement. All such books of account shall be kept available by Licensee for at least two (2) years after the close of each reporting year.

---

[1] As YSL Beauté has never specified a person or persons to be provided written notices under Section 24 of the License, this notice is provided to you, as representative of YSL Beauté, with copies to various officers and employees of YSL Beauté. Unless we promptly hear from you to the contrary, we will assume that this letter meets all requirements for notice under Section 24.

ROPES & GRAY LLP

- 2 -                                                         January 18, 2008

The positions taken by YSL Beauté in response to ODLR's request for inspection, as set forth in your letter, are flatly inconsistent with the clear terms of Section 10 in numerous respects. In brief:

1.   YSL Beauté's position that ODLR's inspection rights are limited to "books of account" is explicitly contradicted by the provision for inspection of "all other records, documents, and material in the possession or under the control of Licensee, with respect to the subject matter of this agreement." The fact that previous audits of YSL Beauté's books and records have been more limited in scope than the current inspection demanded by ODLR is of no significance: as has been previously noted to your client, the audits were intended only to confirm "that YSL Beaute, Inc. owes no additional royalties to ODLR for United States royalties." Audit Report of Richard Ellis & Assoc. § 7, at 3 (Apr. 17, 2005); *accord* Audit Report of Richard Ellis & Assoc. § 7, at 5 (Mar. 12, 2007). As your client well knows, the License imposes substantial obligations on YSL Beauté far beyond merely paying royalties on such sales of licensed goods as YSL Beauté makes. The broad rights of inspection provided under Section 10 are plainly intended to enable ODLR to assess YSL Beauté's performance of those substantial obligations. Notably, you do not suggest any other means by which such an assessment could occur.

2.   YSL Beauté's position that it is entitled to limit the timeframe of the production to 2006 and 2007 is without basis in Section 10. That provision obligates your client to produce for inspection all records, documents, and material regarding the subject matter of the License that are "in the possession or under the control of Licensee," not merely those created in the past two calendar years.[2]

3.   YSL Beauté's attempt to distinguish, for purposes of Section 10, between its "Int'l" and "U.S." activities (whatever those terms may mean) likewise is without basis. Your client is obliged to maintain and produce records pertaining to all activities pursuant to the License, whether characterized as "U.S." or "Int'l."

4.   YSL Beauté has categorically refused to produce any information regarding its other brands, although such information is clearly relevant to "the subject matter of" the License, including, by way of illustration only, the following obligations:

     a.   the obligation to use "its best efforts to exploit and publicize License Mark and to promote the sale of Licensed Products" set forth in Section 1 of the License;

---

[2] With regard to the category of records referred to as "books of account," Section 10 requires YSL Beauté to maintain such records for "at least (2) two years" but does not temporally limit the obligation to *produce* any existing records for inspection. (In fact, during the two prior audits that you reference, YSL Beauté provided books of account for four-year periods.)

ROPES & GRAY LLP

- 3 -                                                                                    January 18, 2008

    b.  the obligation to "make regular introductions/launches of new fragrances bearing the Licensed Mark (properly supported), as can be reasonably expected for important brands in the fragrance business" set forth in Section 2.3 of the December 8, 1994 letter agreement between Oscar de la Renta, Ltd. and Sanofi Beauté incorporated into, and modifying, the License ("1994 Letter Agreement");

    c.  the obligation to use "outlets used for similar prestigious products" and "best efforts to police sales of products bearing the Licensed Mark" set forth in Section 2.4 of the 1994 Letter Agreement.

    d.  the obligation to use "its best efforts to police sales of products bearing the Licensed Mark" set forth in Section 2.4 of the 1994 Letter Agreement.

Under controlling New York law, such obligations, among others, require YSL Beauté to provide at least the same level of investment and effort with regard to ODLR's brand as with regard to any of YSL Beauté's other brands. *See, e.g., Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979); *Burma-Bibas, Inc. v. Excelled Sheepskin & Leather Coat Corp.*, No. 83-Civ-04117 (MEL), 1986 WL 13470, *13 (S.D.N.Y. Nov. 20, 1986). As these authorities establish, information about how YSL Beauté treats its other brands is relevant – indeed, essential – to an assessment of YSL Beauté's compliance *vel non* with such obligations. Moreover, to the extent that YSL Beauté is concerned about the confidentiality of such information, that concern is easily addressed through an appropriate non-disclosure agreement, as you suggest elsewhere in your letter.

5.    In addition to attempting to impose the foregoing unwarranted general limitations on YSL Beauté's production of information, YSL Beauté has not provided adequate specificity with regard to those records, documents, and materials that YSL Beauté does contemplate producing. Notably, your letter omits to address the specific parts and subparts of ODLR's request for inspection, as set forth in my letter to Robert Polet dated December 13, 2007. Accordingly, we have no basis to determine whether, or to what extent, YSL Beauté intends to produce records, documents, and materials in each of those categories.

As indicated at the outset of this letter, ODLR is continuing to investigate whether YSL Beauté may have breached obligations arising under other provisions of the License, including those cited above. To that end, ODLR intends to proceed with inspection of such records as YSL Beauté chooses to provide on the dates indicated in your letter. Our doing so should in no way be construed as acquiescence in the unwarranted limitations and omissions in YSL Beauté's production of information nor as a waiver of any default under Section 10 of the License.

As for ODLR's forthcoming inspection of the premises of the manufacturer(s) of licensed products, nothing in Section 4 of the License limits the number of ODLR representatives that

ROPES & GRAY LLP

- 4 -                                                            January 18, 2008

may attend such inspections to two, as you propose, nor does YSL Beauté have any basis to believe that any number larger than two will cause "disruption" to any manufacturing activity, as you suggest. Accordingly, ODLR does not intend to limit itself to two representatives for the inspection. With regard to the possibility of disclosure of "YSL Beauté's proprietary business and confidential information relating to other products," we suggest that any such information be removed from the premises during the inspection. If that is infeasible, we are prepared to consider such confidentiality terms as you may wish to propose.

Finally, with respect to your vague reference to "unexpected difficulties" that YSL Beauté believes it has encountered in "working with ODLR on marketing and sales programming," ODLR is unaware of any such "difficulties." While YSL Beauté has, on occasion, attempted unsuccessfully to secure approval from ODLR to market inferior products, in contravention of the requirements of the License, any such "difficulties" should not be "unexpected" but could, and should, have been entirely expected.

We trust that all of the above described deficiencies will be corrected promptly.

Sincerely,

*Peter M. Brody / cs*

Peter M. Brody

PMB:cs


cc:     Alexander L. Bolen, CEO, ODLR
        Andrea Barbier, President and CEO, YSL Beauté
        François-Henri Pinault, Chairman and CEO, PPR
        Robert Polet, CEO, Gucci Group
        Marc Rey, CEO and Managing Director, YSL Beauté U.S.A.

# **EXHIBIT L**

# ARNOLD & PORTER LLP

Louis S. Ederer
Louis.Ederer@aporter.com

212.715.1102
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

June 10, 2008

**BY EMAIL AND FEDERAL EXPRESS**
Peter M. Brody, Esq.
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948

Dear Mr. Brody:

On behalf of YSL Beauté, Inc. ("YSL Beauté"), we write in response to your letter of March 13, 2008, in which Oscar de la Renta, Ltd. ("ODLR") purports to give written notice, pursuant to Section 21 of the August 1977 license agreement between the parties, as modified by the December 8, 1994 letter agreement (collectively, the "License Agreement"), of YSL Beauté's alleged violation of and failure to perform obligations under Sections 1, 4 and 5 of the 1977 license agreement and Sections 2.2, 2.3, 2.4 and 2.5 of the 1994 letter agreement.

YSL Beauté categorically denies that it has failed to use its best efforts to exploit, publicize and promote the sale of licensed ODLR products. In fact, under the circumstances, including the facts that (i) the fragrance industry as a whole has been in severe decline in the U.S., (ii) the ODLR brand has limited development outside the Americas, and (iii) the ODLR brand, although well known in some circles in the United States, does not have the growth momentum of other fashion house brands, and consequently has not achieved significant awareness beyond its core constituency of upper class, fashion-conscious women, the efforts that YSL Beauté has made over the last ten years to exploit, publicize and promote the sale of licensed ODLR products have been monumental. Such efforts have been well beyond that which could be reasonably expected of YSL Beauté given the state of the fragrance industry and the ODLR brand overall, and well in excess of any reasonable interpretation of the term "best efforts" under New York law. By any measure, whether by reference alone to the effort YSL Beauté has put into the ODLR brand, or by comparison to the efforts made for other comparable fragrance brands, YSL Beauté has more than met its obligation under the best efforts clause in the License Agreement.

Before addressing each individual performance area set out in your March 13 letter, we wish to respond to your repeated assertion that the ODLR brand is worthy of the same treatment

363702_3.DOC

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 2

by YSL Beauté as that of its other brands, and in particular the world famous YVES ST. LAURENT brand. Even if YSL Beauté's treatment of its own brands were pertinent to any best efforts analysis, which we do not concede, there is simply no basis for the assertion that the YVES ST. LAURENT brand and the ODLR brand are comparable. YVES ST. LAURENT is an internationally known brand, desired throughout the world. A review of the many articles written about the recent passing of the designer Yves St. Laurent confirms the immeasurable fame that he and the YVES ST. LAURENT brand have achieved. Further, in addition to apparel and fragrance, YSL Beauté has consistently marketed and sold, over the past thirty years, a full line of YVES ST. LAURENT brand accessory products, including cosmetics such as makeup and skin care products, which have been staples of the YVES ST. LAURENT line since the 1970's. The manner in which an iconic, international brand such as YSL should be treated, in terms of the approach to marketing and promotion, and the resources to be devoted to it, cannot be compared to the manner in which a more regional brand, such as ODLR, should be handled. That said, even if a comparison were relevant, the efforts YSL Beauté has made with respect to the exploitation, publicizing and promotion of the ODLR brand compare very favorably to the efforts it has made with respect to the YVES ST. LAURENT brand. Further, the efforts YSL Beauté has made with respect to the ODLR brand more than favorably compare with the efforts made with respect to other Gucci Group-owned brands, such as BOUCHERON and STELLA McCARTNEY, which brands are more comparable to the ODLR brand. Further, YSL Beauté is prepared to empirically demonstrate this in any arbitration of the parties' dispute that may ensue.

I now take the opportunity to address the individual areas of concern set out in your March 13 letter:

### Alleged Inadequate Advertising and Promotion

YSL Beauté has made substantial efforts to advertise and promote the ODLR line of licensed products, well in excess of what the License Agreement requires, and well in excess of what ODLR's sales and the overall consumer awareness of the ODLR brand have called for. First, we point out that each and every year, YSL Beauté prepares a detailed and meticulous marketing plan for ODLR, comparable to those prepared for its other brands, which is reviewed with and approved by ODLR, and which sets out in detail the manner in which the ODLR brand is to be promoted, and then executes that plan. Second, in addition to more than meeting the spending requirements under the License Agreement, from the standpoint of spend ratios, YSL Beauté is spending the same on advertising and promoting the ODLR brand as it does for its other brands (and in some instances, for ODLR, YSL Beauté has exceeded its spend ratios for its other brands). Third, as your client well knows, billboard and print advertising are not the most effective way to advertise a mature, classic brand such as ODLR, so often the advertising and promotion spend is directed towards in-store promotion and PR placements. In addition, YSL

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 3

Beauté devotes a significant amount of its promotional spending towards gifts with purchase. Fourth, when YSL Beauté has introduced new ODLR brand fragrances (see discussion below), it has spent more money on those launches than on launches for its other brands during the same period, including BOUCHERON and STELLA McCARTNEY. Fifth, ODLR's assertions concerning YSL Beauté's investment in retail displays is misplaced. Generally, retail displays are not permitted by U.S. retailers other than in connection with a launch, and YSL Beauté creates extensive retail displays for ODLR products in Canada and other important international markets.

In short, ODLR's assertion that YSL Beauté has failed to use its best efforts to advertise and promote the ODLR brand is completely without merit.

## Alleged Insufficient New Launches

Although it is well-known in the fragrance industry that new launches are very risky, especially for more mature brands that have unproven appeal outside their core constituency, YSL Beauté has more than met its obligation to make "regular introductions/launches of new fragrances bearing the ODLR mark." Indeed, given the declining market for fragrances in general. YSL Beauté has done well more than the circumstances call for it to do in this area.

First, two new ODLR products were introduced into the market between 1994 and 2000. Second, YSL Beauté has made extraordinary efforts in this area since 2000. In this period, two launches of new ODLR fragrances were made, in 2002 (INTRUSION) and 2004 (ROSAMOR). ODLR was fully aware of these launches and was involved in and approved every aspect of them. INTRUSION was a modern fragrance introduced at Saks Fifth Avenue and directed at a younger and more upscale (from a fashion standpoint) target than the classic ODLR customer base. Despite enormous YSL Beauté support (indeed, as indicated above, YSL Beauté devoted more resources to the INTRUSION and ROSAMOR launches than it did to launches of its other brands during the same period), the Intrusion launch was a failure. The same can be said for ROSAMOR, which was launched domestically and internationally in 2004, and failed, in part, due to a lack of international awareness of the ODLR brand, and in spite of the significant investment.

Learning from these failed launches, YSL Beauté has adopted other approaches to introducing new ODLR brand fragrances (in this regard, we note that the letter agreement does not require YSL Beauté to make "launches" of new products, but to reasonably "make regular introductions/launches" of new ODLR fragrances), several of which have been successful. For example, in every year beginning with 2005, YSL Beauté has introduced at least two "flanker" lines that have a different fragrance than the original, signature ODLR fragrance, but that tie back to the signature fragrance. One of these "flanker" products, BAMBOO, was later converted

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 4

to a new line in and of itself, as the result of its success. In addition, YSL Beauté has successfully introduced ODLR "range extensions," such as CELEBRATION in 2007.

Further, as far as new launches are concerned, as ODLR well knows, YSL Beauté has considered and prepared to make three other new launches in the last four years, none of which came to fruition. For example, YSL Beauté was set to launch a new fragrance in 2006, but the decision was made, with the full knowledge and approval of ODLR, not to launch this product because it was not believed that the basic signature product was strong enough at the time to support the launch. YSL Beauté was also prepared to launch another new fragrance, O OSCAR, in conjunction with the new fashion line being introduced at Macy's, but this project was not pursued because of a lack of interest on Macy's part. Another potential launch through Avon was scrapped in 2005, at ODLR's request.

Despite this checkered history of new introductions/launches, YSL Beauté remains committed to making new introductions/launches of ODLR brand fragrance products going forward. Indeed, discussions are being held internally at this time about new launches for 2009 and/or 2010. A brand platform analysis is in the process of being done.

Accordingly, YSL Beauté categorically denies that it has failed to meet its contractual obligations as far as new introductions/launches are concerned.

### Alleged Cheapening of the Brand

In your letter, you assert that by selling ODLR branded products into mass market distribution channels, YSL Beauté has harmed the prestige and value of the ODLR brand, and violated Section 2.4 of the 1994 letter agreement, requiring YSL Beauté to sell ODLR products through, inter alia, "other outlets for similar prestigious products." YSL Beauté categorically denies these charges.

First, for many years ODLR has known about, and endorsed, YSL Beauté's sale of ODLR products to the wholesale market for mass distribution. Your suggestion that ODLR has only recently learned that ODLR fragrances products are sold at Wal-Mart is disingenuous in the extreme, and belied by documents in YSL Beauté's possession. Second, this approach is consistent with the distribution patterns for many "prestigious" brands, including more popular American brands such as Ralph Lauren and Calvin Klein, as well as many of YSL's own brands. The fragrance industry has been in precipitous and steady decline since 2000, and department stores and other more traditional outlets have substantially cut back space devoted to fragrance products. This has resulted in a radical change in distribution patterns, including the opening of mass market channels for the distribution of these products. Today, many if not all of the top prestige brands in the U.S. are sold in the mass market. It is, simply, a fact of life in the industry.

- 4 -

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 5

Third, it is the consumer, and not the 1994 letter agreement, that dictates where a product should be sold. "Prestige" or not, ODLR is a brand that appeals to "Middle America," and Middle America shops in mass channel retail outlets as well as department stores, with consumers now being known to "cross-shop" in all channels. Fourth, as far as discounts are concerned, the discounts given on sales of ODLR brand products into mass distribution channels are consistent with those given by other suppliers in the marketplace, and those given for YSL Beauté's own brands sold into these channels. Fifth, YSL Beauté sells into these channels only through trusted, well-known wholesale distributors; it refuses to deal with any distributor that engages in unethical behavior.

Accordingly, YSL Beauté vehemently denies that it has pursued a business strategy that has cheapened the ODLR brand. Brands of equal or greater prestige, including some of YSL Beauté's own brands, are distributed in exactly the same way.

### Alleged Failure To Use Best Efforts To Develop And Market Other Licensed Products

ODLR asserts that YSL Beauté has failed to bring to market a large fraction of the licensed products, including cosmetics, hair lotions and essential oil products, whereas it has introduced numerous such products under its own brand names. Presumably, ODLR is referring to the YVES ST. LAURENT brand, which has had a full, successful cosmetics line for thirty years.

Once again, even if a comparison with YSL Beauté's own brands were relevant, there is no comparison to be made here with the YVES ST. LAURENT brand. YVES ST. LAURENT is far better known, and has supported a cosmetics line for many years, introduced in conjunction with and as a part of the YVES ST. LAURENT fashion line. Very few of the most famous international fashion brands have been able to sustain cosmetics lines, YVES ST. LAURENT, DIOR and CHANEL are the only examples that come to mind. Notably, some of the best known American designers have tried and failed to introduce cosmetics lines, including Ralph Lauren and Calvin Klein (which is still on the market but not performing well); indeed, there is not one successful makeup brand known to YSL Beauté in the U.S. that was licensed by a well-known American fashion house. Even internationally, the likes of Versace cannot get its makeup line off the ground. Further, no prestige fashion brands have hair care lines, and few have introduced successful skin care products.

As noted above, the "best efforts" clause in the License Agreement requires YSL Beauté to use its best efforts under the circumstances. The circumstances here, as has been amply demonstrated, are that only the best-known, internationally famous fashion brands can support cosmetic lines in addition to fragrance. ODLR is not one of those brands, and there is nothing in

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 6

the law that says that a "best efforts" clause requires YSL Beauté to commit economic suicide by introducing a line of goods that history demonstrates is destined for failure.

That said, it is disingenuous on your client's part to suggest that YSL Beauté has not introduced other licensed products besides fragrances. In fact, in the last ten years alone, YSL Beauté has introduced the following ancillary ODLR products: body lotion; body mist; body powder; body talc; body cream; body oil; shimmering body oil; dry oil; body polish; body talc (for men); body tonic; deodorant stick; perfumed deodorant; shower gel; body bath; bath oil; bath powder; bath glitters; exfoliating gel; soaps; bath galets; bath pearls; shave cream; shave foam; after shave balm; after shave gel; hand treatment; lip gloss; and solid perfume. As indicated earlier, it has been YSL Beauté's considered determination that this is the extent of ancillary products that the ODLR brand is strong enough to support.

Accordingly, YSL Beauté categorically denies that it has failed to use its best efforts to develop and market other licensed products.

### Alleged Failure to Use Best Efforts to Exploit the Territory

ODLR claims that the licensed territory is global, and that YSL Beauté has failed to exploit the license in numerous important markets internationally, where it has extensively promoted its other brands.

As a preliminary matter, the License Agreement we have understood you to be speaking to was the agreement covering the U.S., Canadian and French markets. There is a second license agreement covering the rest of the world, which you are now also, apparently, referring to in connection with this particular assertion.

The attempt to compare the ODLR brand with other YSL Beauté brands here is not only irrelevant, but absurd. YVES ST. LAURENT is an internationally famous brand first introduced in Europe, and BOUCHERON and STELLA McCARTNEY were also European brands to begin with, and, in addition, their distribution, as well as that of another Gucci Group-owned brand ROGER & GALLET, is extremely selective outside of their home markets. ODLR is a U.S. brand which has never taken hold in international markets — indeed, your client's own materials indicate that there are few international outlets for ODLR's core fashion line. Fragrance is an "accessory" to the core fashion line, and YSL Beauté is not bound by any "best efforts" clause to foolishly attempt to leverage the ODLR brand in markets where the core brand has little awareness. Incidentally, this is, again, no different from other fragrance brands whose core popularity is in the U.S. — for example, BEAUTIFUL by Estee Lauder, the top U.S., fragrance brand since 2000, is not among the top fifteen fragrance products in France, Italy, Germany, Britain or Spain.

- 6 -

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 7


Nevertheless, YSL Beauté treats the ODLR brand no differently than its other brands as far as international selling opportunities are concerned. YSL Beauté maintains a worldwide network of distributors for its brands, and each and every year, like very other YSL Beauté fragrance brand, the ODLR brand is presented, in detail, to the entire network. There is nothing to stop any distributor from purchasing ODLR fragrance products, but, revealingly, 90% of ODLR sales are in the U.S., Canada, Latin America, the U.K. and Australia, where there is brand awareness to one degree or another. Once again, YSL Beauté is not required to commit economic suicide by promoting the sale of ODLR brand fragrance products in countries where the core ODLR brand is not known, and, again, a comparison to YSL Beauté's own brands here is completely unfounded, but, nevertheless, it is noted that in the last ten years, ODLR fragrance products have been sold in at least the following additional countries: France; Germany; Switzerland; Netherlands; Belgium; Austria; Italy; Portugal; New Zealand; Japan; Hong Kong; Spain; Greece; Argentina; Bolivia; Brazil; Chile; Columbia; Costa Rica; Ecuador; Guatemala; Honduras; Mexico; Nicaragua; Panama; Paraguay; Peru; Salvador; Uruguay; Venezuela; Abaco; Antigua; Aruba; Bahamas; Bermuda; Bonaire; Cayman; Curacao; Dominica; Grenada; Haiti; Jamaica; Puerto Rico; St. Bart's; St. Croix; St. Johns; St. Kitts; St. Lucia; St. Thomas; St. Martin; Suriname; Tortola; Dominican Republic; Bosnia/Herzegovina; Byelorussia; Croatia; Kazakhstan; Mongolia; Serbia & Montenegro; Ukraine; Czech Republic; Poland; Slovak Republic; Israel; Jordan; Syria; Lebanon; Egypt; Angola; Botswana; Namibia; Lesotho; Swaziland; South Africa; Denmark; Estonia; Finland; Iceland; Latvia; Norway; and Sweden.

### Alleged Lack of Brand Management

ODLR's claim that "[f]or substantial periods of time YSL Beauté has had no worldwide brand manager 'dedicated solely to the ODLR brand'" is false. At all times since 1994, there has been a dedicated brand manager for ODLR. Further, YSL Beauté has had at least two formal meetings per year with ODLR personnel for at least the last five years, in addition to near daily contact by phone and email. YSL Beauté categorically denies any violation of Section 2.2 of the 1994 letter agreement.

### Alleged Undisclosed, Unapproved Formula Changes

YSL Beauté denies that it has made a number of changes to the approved formula for the signature "Oscar" fragrance. The formula for that product has remained the same since its inception, save for any molecular changes required under EU regulations, and the approved scent has never changed. This has been the case notwithstanding that the ODLR "juice" has consistently been one of the most expensive in YSL Beauté's portfolio to manufacture. In this regard, we should report that the product purchased by ODLR at Wal-Mart earlier this year has been tested and found consistent with the approved ODLR juice. Accordingly, your assertions concerning undisclosed, unapproved formula changes are simply and utterly baseless.

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 8


### Alleged Unapproved Products

YSL Beauté has not sold, and is not selling, products that were not approved by ODLR. The Elizabeth Arden ("EA") product that was the subject of ODLR's earlier breach notice, the 4 ml. signature parfums product, is an approved product that ODLR has known about for years. When ODLR brought to YSL Beauté's attention that EA was selling the product in improper packaging, YSL Beauté immediately acted to stop to EA's sales of those products. We have previously addressed our position with respect the EA matter in detail in our letters dated February 5 and 28, 2008.

The sale of "unapproved" ODLR brand products is not "widespread" and it is not "growing." The products referred to on page 5 of your March 13 letter were not sold by YSL to the parties referred to in your letter. To the extent these parties acquired these goods from other sources, it was without YSL Beauté's knowledge. As noted earlier, YSL Beauté does not deal with any parties that it knows to divert products from their intended destination, and has never "abdicated" any responsibility it may have had to prevent the distribution of unauthorized product by others.

In summary, YSL Beauté completely and categorically denies that it is in violation of any of the provisions of the License Agreement referred to in your March 13 letter. Accordingly, it is YSL Beauté's position that no cure is required, and that it is not in default under the License Agreement. In any event, as indicated in our prior letters, as your claims of breach have been controverted, Section 22 of the License Agreement overtakes Section 21, which refers to uncontroverted defaults, and YSL cannot be deemed to be in breach of the license agreement, and accordingly cannot be terminated by ODLR, until there has been an adverse decision or award in arbitration, and YSL Beauté has failed to comply with such award. Section 22 clearly reflects the parties' intention, when they entered into the License Agreement thirty-one years ago, that no termination would issue or take effect until arbitration of the disputed offense had been concluded. In that regard, you are hereby notified that YSL Beauté has, this day, filed a Demand For Arbitration with the American Arbitration Association in relation to not only your March 13, 2008 Breach Notice, but also your earlier January 18, 2008 and January 31, 2008 Breach Notices. A copy of the Demand for Arbitration is enclosed.

Although it is YSL Beauté's firm position, under Section 22 of the License Agreement, that now that YSL Beauté has filed a Demand for Arbitration, ODLR is not entitled to proceed with any termination of the License Agreement, we understand from your earlier correspondence that you disagree with this position. You have further made very clear that ODLR reserves the right and intends to proceed with a termination at any time. However, as noted above, any attempt on ODLR's part to terminate the License Agreement at this time would not only constitute a breach of the License Agreement, and violate the parties' intent as expressed in

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
Ropes & Gray LLP
Page 9


Section 22 of the License Agreement, but would also cause YSL Beauté incalculable and irreparable harm. Accordingly, as your client appears to intend to proceed with a termination, we have prepared the enclosed papers for filing in the Supreme Court of the State of New York, New York County seeking appropriate injunction relief. Hard copies of the papers are being delivered to your New York Office. If we do not have your written assurance by 12 noon tomorrow, **June 11, 2008**, that your client will refrain from any attempt to terminate the License Agreement pending the outcome of the arbitration, we will present the enclosed papers to the Court in the Motion Support Office tomorrow afternoon at **2:00 pm**, at which time you are invited to appear.

Yours truly,

ARNOLD & PORTER LLP

By: _Louis S. Ederer_

Louis S. Ederer


cc: YSL Beauté, Inc.

- 9 -

**RECEIVED**

JUN 1 0 2008

INTERNATIONAL CENTER

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

---

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent | Name of Representative (if known) |
|---|---|
| Oscar de la Renta, Ltd. | Peter M. Brody, Esq. |

| Address | Name of Firm (if applicable) |
|---|---|
| 550 Seventh Avenue | Ropes & Gray LLP |

|  |  |  | Representative's Address |  |  |
|---|---|---|---|---|---|
|  |  |  | One Metro Center, 700 12th Street, N.W. |  |  |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10018- | Washington | DC | 20005-4650 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 212-354-6777 | 212-382-1181 | 202-508-4612 | 202-508-4650 |

| Email Address: | Email Address: |
|---|---|
|  | peter.brody@ropesgray.com |

The named claimant, a party to an arbitration agreement dated <u>August 18, 1977</u>, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
Respondent alleges Claimant has breached various provisions of a trademark license agreement between the parties and asserts it has the right to terminate the agreement. Claimant disputes the alleged breaches and seeks a declaration that no such breaches occurred, and that termination prior to the determination of the parties' disputes by the arbitrators would be unlawful and improper.

| Dollar Amount of Claim  $0.00 | Other Relief Sought:  ☐ Attorneys Fees   ☐ Interest |
|---|---|
|  | ☐ Arbitration Costs   ☐ Punitive/ Exemplary  ☒ Other Declaratory |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $3,250.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Arbitrator should have experience with trademark license agreements, specifically in the luxury goods area.

Hearing locale New York, New York        (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business:  Claimant  Fragrance/cosmetics company |
|---|---|
| _____ hours or __3__ days | Respondent  Fashion design and licensing company |

Is this a dispute between a business and a consumer? ☐Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000  ☐ $100,000 - $250,000  ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☐ Dallas, TX  ☐ East Providence, RI  ☐ Fresno, CA  ☒ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)      Date: | Name of Representative |
|---|---|
| *Louis S. Ederer*    6/9/08 | Louis S. Ederer |

| Name of Claimant | Name of Firm (if applicable) |
|---|---|
| YSL Beauté, Inc. | Arnold & Porter LLP |

| Address (to be used in connection with this case) | Representative's Address |
|---|---|
| 685 Fifth Avenue | 399 Park Avenue |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10022- | New York | NY | 10022-4690 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 212-715-7331 | 212-715-7377 | 212-715-1102 | 212-715-1399 |

| Email Address: | Email Address: |
|---|---|
|  | louis.ederer@aporter.com |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

**[further enclosures omitted]**

# EXHIBIT M



ROPES & GRAY LLP

ONE METRO CENTER  700 12TH STREET, NW  SUITE 900  WASHINGTON, DC 20005-3948  202-508-4600  F 202-508-4650

BOSTON  NEW YORK  PALO ALTO  SAN FRANCISCO  WASHINGTON, DC  www.ropesgray.com

June 11, 2008

Peter M. Brody
202-508-4612
peter.brody@ropesgray.com

**BY EMAIL**

Louis S. Ederer, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

Re:    Dispute between Oscar de la Renta, Ltd. and YSL Beauté

Dear Mr. Ederer:

I am in receipt of your letter dated June 10, 2008, and attachments thereto.

Your letter confirms that YSL Beauté does not intend, and clearly never intended, to take any action to cure the many violations of the license agreement between the parties ("License") set forth in my letter dated March 13, 2008. Thus, an Event of Default has occurred under Section 21(a)(ii) of the License, and Oscar de la Renta, Ltd.'s rights and remedies with respect to that Event of Default include those set forth in Section 21(b).

We understand that YSL Beauté disputes the occurrence of any violations of the License or any Event of Default, and we are in receipt of the courtesy copy of the demand for arbitration that YSL Beauté has submitted to the American Arbitration Association in accordance with Section 22 of the License. We also understand that it is YSL Beauté's position that Section 22 precludes ODLR from terminating the License despite YSL Beauté's uncured breaches thereof and its stated refusal to cure any such breaches, unless ODLR incurs the cost and suffers the delay of obtaining an arbitral award declaring that ODLR has the right to terminate the License. We strongly disagree with that reading of the License, which is contrary to the clear language of Section 21, the obvious intent of the parties, and common sense. ODLR believes it has the clear right to terminate the License under Section 21 at this time.

Nevertheless, ODLR prefers, for its own reasons, to secure a prompt and definitive resolution of the parties' respective rights and obligations before considering alternative business strategies with respect to its fragrance and beauty business. Therefore, ODLR agrees to your request that ODLR defer termination of the License pending resolution of the arbitration. Of course, your client remains fully obligated to perform under the License in all respects while the arbitration proceeds, and any additional breaches will be for your client's account, just as with past breaches.

ROPES & GRAY LLP

Louis S. Ederer, Esq.                    - 2 -                    June 11, 2008

In this regard, as ODLR previously has stated, ODLR believes it is entitled to substantial compensation for the damages it has suffered as a result of YSL Beauté's many breaches of the License. Your letter in no way dissuades us from our view that YSL Beauté owes ODLR substantial damages; indeed, it appears you are seriously misinformed about many of the facts and circumstances. ODLR therefore intends to serve a counterclaim in arbitration seeking damages, in addition to declaratory and other relief to which ODLR is entitled.

ODLR also is entitled to relief resulting from infringement of its trademark rights by Elizabeth Arden, Inc. ("EA") or its affiliates. According to your papers, YSL Beauté did not authorize those acts of infringement and was unaware of them prior to notification by ODLR. Unless you advise me to the contrary by close of business today, we will assume that YSL Beauté will not answer, in the arbitration or otherwise, for any liability on the part of EA for those acts of infringement. In that event, given that EA is not a party to the License and its arbitration provision, and cannot be compelled to join the arbitration, ODLR intends separately to seek a remedy for EA's infringement of ODLR's trademark rights.[1]

In light of ODLR's agreement to defer termination of the License pending conclusion of the arbitration that YSL Beauté has initiated, we are proceeding on the understanding that YSL Beauté will not be submitting the application for judicial relief referred to in your June 10 letter. Please confirm that this is the case, by return e-mail today by **noon**.

Sincerely,

Peter M. Brody

cc:     Alexander L. Bolen, CEO, Oscar de la Renta, Ltd.

---

[1] We are aware of the modification of the packaging of the unauthorized product found in Wal-Mart stores, including the re-labeling of the product as a "Designer Fragrance Collectible" that has been "repackaged" by "a company not affiliated with Oscar de la Renta, Ltd." ODLR does not consider this modification to cure YSL Beauté's breach of the License or to redress EA's violation of ODLR's trademark rights. The current packaging material is not authorized by, or acceptable to, ODLR, and moreover, is likely to cause consumer confusion and to cause dilution of ODLR's mark. Furthermore, as we have repeatedly stated, ODLR has never authorized the separate sale of a 4 ml fragrance product in any packaging, nor has ODLR agreed to the distribution of its products in mass retail outlets, including, among others, Wal-Mart. Accordingly, the Event of Default identified in my letter dated April 30, 2008, continues uncured, and ODLR's rights and remedies with respect to that Event of Default remain as set forth in Section 21(b) of the License.

# EXHIBIT N

# ARNOLD & PORTER LLP

**Louis S. Ederer**
Louis.Ederer@aporter.com

212.715.1102
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

June 13, 2008

**BY EMAIL AND FEDERAL EXPRESS**

Peter M. Brody, Esq.
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948

      Re:   YSL Beauté, Inc./ Oscar de la Renta, Ltd.

Dear Mr. Brody:

On behalf of YSL Beauté, Inc. ("YSL Beauté"), we write in response to your letter of June 11, 2008. This letter supplements our telephone conversation and my e-mail of yesterday.

As indicated in my e-mail, YSL Beauté does not agree with the positions taken by Oscar de la Renta, Ltd. ("ODLR") in your June 11 letter. By way of example, you refer to "uncured breaches" of the License Agreement by YSL Beauté, and to YSL Beauté's alleged "stated refusal to cure any such breaches." As my letters of April 16, April 25 and June 10, 2008 (among others) make plain, however, while YSL Beauté is not in breach of the License Agreement, it nevertheless took steps to cure certain of the alleged breaches, in case they were later determined in arbitration to be breaches. Furthermore, inasmuch as the arbitration proceeding was just commenced by YSL Beauté, there has been no award or decision by the arbitrators that YSL Beauté has failed to comply with, and therefore, under Section 22 of the License Agreement, YSL Beauté can not be "deemed to be in breach of [the] agreement."

In your letter, you also indicate that since YSL Beauté asserts that it was not aware of the repackaging used by Elizabeth Arden, Inc. ("EA") of which ODLR complained in its January 31, 2008 Notice of Breach, ODLR intends to "separately to seek a remedy" for alleged trademark infringement by EA, unless YSL Beauté will answer for those claims of trademark infringement within the arbitration or otherwise. However, this same issue was addressed by YSL .Beauté in my February 5, 2008 letter, in which I told you that YSL Beauté had not approved of EA's conduct , and then indicated that "if you have further issues concerning the activities of EA…, that you contact us directly, as these are matters to be taken up directly between YSL Beauté and

# ARNOLD & PORTER LLP

Peter M. Brody, Esq.
June 13, 2008
Page 2

ODLR, not with any of YSL Beauté's customers." In response, you indicated, in your February 8, 2008 letter, that "ODLR will look solely to YSL Beauté for any and all remedies to which ODLR may be entitled as a result of any unlawful actions of EA and will not communicate further with EA regarding this matter." As nothing about EA's prior complained of activities has changed, we fail to see why your prior undertaking should change either, and so we continue to expect that "ODLR will look solely to YSL Beauté for any and all remedies to which ODLR may be entitled as a result of any unlawful actions of EA and will not communicate further with EA regarding this matter."

Further, as you are aware, pursuant to the terms of the License Agreement, YSL Beauté is the registered owner of the trademarks in question, and it is for YSL Beauté to determine if the relevant trademarks have been infringed and whether to take action relating thereto. The License Agreement expressly provides in Section 3(a) that YSL Beauté may request that ODLR bring suit or take action with respect to the licensed trademarks "in the name of [YSL Beauté], as [YSL Beauté] shall direct." It now appears from the footnote in your June 11 letter that ODLR is complaining that a recent modification of certain packaging by EA constitutes trademark infringement. YSL Beauté hereby requests that ODLR provide a sample of such packaging to YSL Beauté, and explain to YSL Beauté why it believes the modified packaging is infringing, so YSL Beauté can make its own determination.

This letter shall be without prejudice to YSL Beauté's rights in relation to the parties' disputes, all of which are expressly reserved.

Yours truly,

ARNOLD & PORTER LLP

By: _Louis S. Ederer_

Louis S. Ederer

cc: YSL Beauté, Inc.

- 2 -

# EXHIBIT O

# ROPES &GRAY

ROPES & GRAY LLP
ONE METRO CENTER   700 12TH STREET, NW   SUITE 900   WASHINGTON, DC 20005-3948   202-508-4600   F 202-508-4650
BOSTON   NEW YORK   PALO ALTO   SAN FRANCISCO   WASHINGTON, DC   www.ropesgray.com

June 27, 2008

Peter M. Brody
202-508-4612
peter.brody@ropesgray.com

**BY EMAIL**

Louis S. Ederer, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

Re:    YSL Beauté, Inc./ Oscar de la Renta, Ltd.

Dear Mr. Ederer:

I write in response to your letter dated June 13, 2008.

Although, in my letter dated February 5, 2008, I stated that ODLR was prepared to look to YSL Beauté for any and all remedies to which ODLR may be entitled as a result of any unlawful actions of Elizabeth Arden, Inc. ("EA"), much has transpired since that time, and it appears to ODLR that YSL Beauté is neither willing nor able to provide ODLR complete relief.

Among other things, YSL Beauté has initiated arbitration proceedings against ODLR. EA is not a party to that arbitration or any arbitration agreement with YSL Beauté. Therefore, unless YSL Beauté agrees that, in that arbitration, ODLR may seek damages from YSL Beauté for any and all unlawful actions by EA, and that, if awarded, YSL Beauté will pay such damages, ODLR is without any alternative but to seek those damages directly from EA.

Moreover, following my February 5 letter, you stated in your letter dated February 28, 2008, that YSL Beauté is unwilling to cease sales of the unauthorized 4 ml fragrance products to EA for resale to retailers, despite ODLR's repeated demands for a cessation of those sales, among other relief.[1] Thus, we presume that EA will continue to resell the product to its customers, whom YSL Beauté refuses to identify. Since EA, by your own admission, is not controlled by YSL Beauté (and, in fact, YSL Beauté has advised that EA has acted previously without the knowledge or authorization of YSL Beauté), ODLR's right to an injunction against further resale

---

[1] Although we understand that EA has modified the product packaging, ODLR has repeatedly informed YSL Beauté that the 4 ml fragrance products themselves are not authorized for commercial sale. Separately, and as previously noted, ODLR regards the recent changes in EA's packaging of this product (*see* attached photocopies) to constitute a further clear violation of ODLR's trademark rights, and that violation also is actionable.

7316471_3.DOC

ROPES & GRAY LLP

Louis S. Ederer, Esq.                    - 2 -                    June 27, 2008

of the product plainly cannot be vindicated in any action or arbitration against YSL Beauté alone,
absent an assurance by YSL Beauté that EA will be bound by any injunction issued in such
action or arbitration.

Finally, in your letter, you contend, for the first time, that YSL Beauté has sole authority to
determine whether ODLR may seek relief from infringement of its rights by EA. That
contention is plainly incorrect and only reinforces the need for ODLR to act to protect its rights.
To be sure, Section 3(a) of the license agreement permits YSL Beauté to request that ODLR, as
the acknowledged trademark owner, take action to remedy any third-party infringement. Neither
that provision nor any other provision, however, in any way restricts ODLR from asserting its
rights in its registered and common-law trademarks and trade dress in the absence of such a
request by YSL Beauté, let alone where, as here, YSL Beauté itself has not taken adequate
corrective action and, indeed, refuses to do so.

Accordingly, unless ODLR receives, by close of business June 30, 2008, adequate assurances
that (1) YSL Beauté will be responsible for any damages demonstrated by ODLR to have been
caused by EA's unlawful distribution of the 4 ml fragrance products, EA's packaging thereof,
and any other unlawful actions by EA that have damaged ODLR, (2) such claims for damages
shall be within the scope of the arbitration now pending between the parties, and (3) EA will
respect and be bound by any injunction awarded, in arbitration or otherwise, against sale of the 4
ml fragrance products or use of EA's packaging thereof or both, ODLR will be compelled to take
appropriate action to secure complete relief for EA's violations of its rights. To that end, ODLR
has filed the attached complaint against EA in the United States District Court for the Southern
District of New York. In the event the requested assurances are provided, ODLR will promptly
dismiss the complaint without prejudice. Otherwise, ODLR will proceed with the action.

We look forward to a timely reply.

Sincerely,

Peter M. Brody

PMB:cs

cc:    Alexander L. Bolen, CEO, Oscar de la Renta, Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE COTE

OSCAR DE LA RENTA, LTD.,

        Plaintiff,

    v.

ELIZABETH ARDEN, INC., d/b/a
"EA FRAGRANCES CO.",

        Defendant.

Civil Action No. ___

**08 CIV 5785**

**JURY TRIAL DEMANDED**

RECEIVED
JUN 27 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Oscar de la Renta, Ltd. ("ODLR"), by its attorneys Ropes & Gray LLP, as and for its complaint herein against defendant Elizabeth Arden, Inc., in its own name and d/b/a EA Fragrances Co. ("Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for trademark infringement and false designation of origin under Section 32 of the Lanham Act, 15 U.S.C. § 1114 and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), 15 U.S.C. § 1125(a), trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), trademark dilution under New York General Business Law § 360-*l*, and unfair trade practices under New York law.

## PARTIES

2.      Plaintiff Oscar de la Renta, Ltd. is a corporation organized and existing under the laws of the State of New York and having its principal place of business at 550 Seventh Avenue, New York, New York, 10018.

**[further enclosures omitted]**

# EXHIBIT P

**ARBITRATION PROCEEDINGS**
**AMERICAN ARBITRATION ASSOCIATION**
-------------------------------------------------------- x

YSL BEAUTÉ, INC.,
                       Claimant,

         - v. -                 CASE NO 13 133 01389 08

OSCAR DE LA RENTA, LTD.,

                    Respondent.

-------------------------------------------------------- x

## STATEMENT OF CLAIM OF YSL BEAUTÉ, INC.

Claimant YSL Beauté, Inc. ("YSL Beauté"), through its counsel, hereby submits its

Statement of Claim against Oscar De La Renta, Ltd. ("ODLR"):

### I.    <u>Introduction and Procedural History</u>

1.    On June 10, 2008, YSL Beauté filed a Demand for Arbitration with the American

Arbitration Association ("AAA"). A copy of the Demand for Arbitration is attached hereto as

Exhibit 1.

2.    At that time, there was a real possibility that ODLR would terminate the license

agreement it had with YSL Beauté and, as a result, reassign ownership of valuable trademarks.

Because of that possibility, YSL Beauté took steps to preserve the status quo while the disputes

under the license agreement were heard before the AAA. Specifically, YSL Beauté prepared

papers for filing with the New York Supreme Court, including a Verified Petition of Marc Rey

("Petition") and Memorandum of Law in Support of Petition for Temporary Restraining Order

and Preliminary Injunction And/Or Specific Performance and Final Injunction of Limited

Duration, Preserving Status Quo During Arbitration Proceedings ("Memorandum of Law").

3.      Also on June 10, 2008, YSL Beauté sent courtesy copies of the Petition and Memorandum of Law to ODLR and advised ODLR that, if ODLR did not agree to maintain the status quo, YSL Beauté would file the documents in court. ODLR subsequently notified YSL Beauté that it would indeed defer termination of the License Agreement pending resolution of the Arbitration, and the court papers were not filed.

4.      YSL Beauté's court papers, including the exhibits thereto, provide a detailed discussion of the underlying facts in this dispute. The Petition and exhibits thereto are annexed to the Statement of Claim as Exhibit 2 and are incorporated by reference.

5.      Annexed as Exhibit 3 is the Memorandum of Law, which also is incorporated by reference. The AAA's attention is called to the Relevant Facts section and Section I.B.3 of the Argument section of the Memorandum of Law.

## II.    Parties

6.      YSL Beauté is a domestic corporation duly organized and existing under the laws of the State of New York, with its principal place of business at 3 East 57th Street, New York, New York 10022-2557. YSL Beauté is an affiliate of the France-based owner of the world famous YVES SAINT LAURENT brand name for fashion products and accessories, and is the exclusive U.S. importer and distributor of the internationally renowned YVES SAINT LAURENT line of cosmetic, fragrance and beauty products. YSL Beauté also sells and distributes other well-known fragrance products, including OSCAR DE LA RENTA brand fragrances, for which YSL Beauté holds the exclusive worldwide license.

7.      Upon information and belief, ODLR is a domestic corporation duly organized and existing under the laws of the State of New York, with its principal place of business at 550 Seventh Avenue, New York, New York 10018-3207. ODLR is a well-known American fashion design house, which designs apparel for men and women, and which licenses its trademarks for a

2

number of products, including jewelry, eyewear, lingerie, home furnishings, luggage and fragrances.

## III.    The License Agreement and Amendments

8.    On November 27, 1981, Parfums Stern Inc. (which is a predecessor to YSL Beauté) ("Parfums Stern") and ODLR executed a license agreement, dated as of August 18, 1977 (the "License Agreement"), which granted to Parfums Stern the exclusive license in the U.S., Canada and France to use the OSCAR DE LA RENTA trademarks (the "ODLR Marks") in the manufacture, promotion and sale of fragrances and other ancillary products. A copy of the License Agreement is annexed as Exhibit A to the Petition.

9.    The License Agreement provides in Section 1 that "Licensee shall use its best efforts to exploit and publicize Licensed Mark and to promote the sale of Licensed Products in the countries comprising the Territory."

10.    In addition to granting a worldwide license to use the ODLR Marks in the United States, as part of the License Agreement, ODLR *actually assigned* its trademark rights and registrations for the ODLR Marks in the fragrance and cosmetic products category to Parfums Stern. Parfums Stern and its successors, including YSL Beauté, have been and continue to be the owners of all right, title and interest in, the U.S., in and to the ODLR Marks in the fragrance and cosmetic products category, including the goodwill symbolized by those marks.

11.    As registered owner of the ODLR Mark in the U.S., YSL Beauté has the right to determine if the ODLR Marks have been infringed and whether to take action relating thereto. To that end, Section 3(a) of the License Agreement expressly provides that if YSL Beauté reasonably believes that a third party is infringing on the ODLR Marks, YSL Beauté may request that ODLR bring suit or take action with respect to the licensed trademarks "in the name of [YSL Beauté], as [YSL Beauté] shall direct."

3

12.     Under Sections 21 and 22, ODLR may terminate the License Agreement only if an undisputed Event of Default has occurred that remains uncured after 90 days.

13.     The License Agreement states in Section 21 that an Event of Default occurs if the Licensee fails to perform any obligations under the agreement (except for payment of royalties), and such failure continues for a period of 90 days after written notice by ODLR.

14.     The License Agreement provides in Section 22 for binding arbitration of any dispute between the parties relating to the agreement:

> Any controversy or claim arising out of, in connection with, or relating to, this agreement or the breach or performance thereof, shall be determined by arbitration at the office of the American Arbitration Association in the City of New York in accordance with the rules, then obtaining, of the American Arbitration Association. ... Any decision rendered by the arbitrators shall be final and binding, and judgment may be entered in any court having jurisdiction. ...

15.     ODLR and Sanofi Beauté, Inc. (the successor to Parfums Stern) entered into a letter agreement, dated December 8, 1994, which amended and modified the License Agreement (the "12/8/94 Amendment"). A copy of the 12/8/94 Amendment is annexed as Exhibit C to the Petition.

16.     The 12/8/94 Amendment provides that Sanofi Beauté, Inc., as licensee, "will make regular introductions/launches of new fragrances bearing the Licensed Mark (properly supported), as can be reasonably expected for important brands in the fragrance business." It also provides that "distribution [of licensed products] shall be only through specialty stores, department stores, perfumeries and other outlets used for similar prestigious products and, to this end, Sanofi [now, YSL Beauté] intends and will use its best efforts to police sales of products bearing the Licensed Mark to avoid their diversion to the grey market."

4

17.     Following an acquisition of Sanofi Beauté, Inc. in 1999 by an affiliate company

of YSL Beauté, the corporate name of Sanofi Beauté, Inc. was changed to YSL Beauté, Inc. in

May 2000, and thereafter YSL Beauté continued to operate under the License Agreement and the

12/8/94 Amendment.

**IV.     YSL Beauté's Business in ODLR Brand Products**

18.     During the ten-year period that YSL Beauté has been the owner of the OSCAR

DE LA RENTA trademarks for fragrance and cosmetics products, and the exclusive licensed

marketer and distributor of ODLR brand fragrance products, YSL Beauté has made an enormous

investment in building and expanding sales of ODLR fragrance and cosmetics products, in terms

of time, money, effort and company resources.

19.     YSL Beauté has sold over $500 million worth of ODLR brand fragrance products

worldwide, and ODLR brand fragrances have been the second largest selling brand in YSL

Beauté's United States portfolio behind only the world famous YVES ST. LAURENT brand,

and represents approximately 24% of YSL Beauté's overall business in the United States.

20.     YSL Beauté has spent approximately $80 million marketing, advertising and

promoting ODLR brand fragrance products worldwide, and has devoted substantial human

capital and resources to the marketing, promotion and sale of OSCAR DE LA RENTA brand

fragrance products.

21.     The OSCAR DE LA RENTA brand, while not having the same growth

momentum as other fashion house brands, is still a well-known, reputable and prestigious brand

in the U.S. and throughout the Americas.  YSL Beauté is known throughout the fragrance

industry, and among the consuming public, particularly in North America, as the successful

proprietor of ODLR brand fragrance products, and the goodwill enjoyed by YSL Beauté as the

5

result of its status as owner of the ODLR Marks in the U.S. and exclusive marketer and distributor of such a brand is incalculable.

22.    During this entire period, YSL Beauté has maintained near daily contact with representatives of ODLR, has kept ODLR informed of its marketing and distribution strategies for ODLR brand fragrance products, and has not pursued any important marketing, promotional or distribution strategy that ODLR has disagreed with or disapproved.

**V.    ODLR's Notices of Alleged Breach**

23.    In late 2007, ODLR embarked on a campaign designed, ultimately, to lead to the termination of the License Agreement.  ODLR began to assert a number of formal written complaints about YSL Beauté's performance under the License Agreement.  Following a series of letters exchanged between the parties commencing in late November 2007, ODLR provided three separate notices of breach of the License Agreement to YSL, *i.e.*, on January 18, 2008, January 31, 2008 and March 13, 2008.

24.    By letter dated January 18, 2008, counsel for ODLR provided written notice to YSL Beauté concerning YSL Beauté's alleged failure to perform its obligations under Section 10 of the License Agreement, which pertains to ODLR's rights to inspect books and records with respect to the subject matter of the License Agreement.  Counsel for ODLR also sent a letter, dated January 30, 2008, relating to the books and records issue.  Copies of the January 18, 2008 notice and January 30, 2008 letter are annexed as Exhibit E to the Petition.

25.    By letter dated January 31, 2008, counsel for ODLR provided written notice to YSL Beauté concerning YSL Beauté's alleged violations of provisions of the License Agreement and 12/8/94 Amendment relating to the sale by Elizabeth Arden, Inc. ("EA"), a customer of YSL Beauté, of purportedly unauthorized ODLR brand fragrance products.  Among other things,

6

ODLR took issue with the outer packaging EA was using for such products. A copy of the January 31, 2008 notice is annexed as Exhibit F to the Petition.

26.    By letter dated March 13, 2008, counsel for ODLR provided written notice to YSL Beauté concerning YSL Beauté's alleged violations of its performance obligations under the License Agreement, including provisions of the License Agreement and 12/8/94 Amendment relating to YSL Beauté's purported breach of its best efforts obligations; inadequate advertising and promotion; insufficient new launches; "cheapening" the brand; failure to use best efforts to develop and market other licensed products and to exploit the territory; lack of brand management; undisclosed, unapproved formula changes; and unapproved products. A copy of the March 13, 2008 notice is annexed as Exhibit H to the Petition.

27.    YSL Beauté timely responded (i.e., within the 90 day cure period), to each of these breach notices. Copies of YSL Beauté's responses are annexed as Exhibit I to the Petition.

A.    <u>First Notice of Breach: Books and Records Inspection</u>

28.    ODLR has made overbroad and unreasonable requests for access to YSL Beauté books and records that are outside the scope of those books and records to which ODLR is entitled under Section 10 of the License Agreement, and then claims YSL Beauté has breached Section 10 by failing to provide access to such records. Section 10 focuses on maintaining "appropriate books of account" and making "accurate entries" and — as is typical in trademark licenses of this nature — concerns the licensor's right to confirm the accuracy of royalty and other payment obligations of the licensee.

29.    ODLR and YSL Beauté have always treated Section 10 as a royalty audit provision. There have been several royalty audits conducted by ODLR, including two in the last three years. Notably, after the second such audit, in March 2007, ODLR's auditor "verified" that "the [ODLR brand fragrance] business is being managed [by YSL Beauté] in a controlled

7

manner, congruent with the provisions contained in the [License] Agreement." *See* Exhibit K to the Petition.

30.    There has never before been any attempt on ODLR's part, in thirty years, to claim that Section 10 entitles ODLR to the kind of all-encompassing performance audit that ODLR now seeks.

31.    Notwithstanding that Section 10 of the License Agreement relates only to royalty audits, YSL Beauté indicated in its April 16, 2008 letter that it was prepared to make available to ODLR broad categories of documents and information, which YSL Beauté believes go beyond that which is required under Section 10. *See* Exhibit I to the Petition.

32.    Thus, YSL Beauté is not in breach of Section 10 of the License Agreement, as ODLR contended in its January 18 Notice of Breach.

**B.    Second Notice of Breach: YSL Beauté's Relationship with EA and Sales of Licensed Products to EA**

33.    There also has been no breach by YSL Beauté of the License Agreement arising out of YSL Beauté's relationship with EA or sale of licensed products to EA, and the repackaging of products by EA, as was alleged in ODLR's January 31 Notice of Breach.

34.    YSL Beauté never approved EA's packaging of ODLR brand fragrance products. In any event, EA advised YSL that EA had been using the same packaging for many years.

35.    ODLR has known for many years that EA is a customer of YSL Beauté for licensed ODLR brand fragrance products, and was aware of EA's packaging for such products. Yet, YSL Beauté has no record of ODLR having made any prior complaint about EA.

36.    Notwithstanding that YSL Beauté committed no breach of the License Agreement in respect of EA, as soon as it was advised that EA was using packaging for ODLR brand fragrance products with an improper trademark YSL Beauté took steps to cure, as delineated in

8

YSL Beauté's letter to ODLR, dated April 25, 2008 (included as part of Exhibit I to the Petition).

Among other things, YSL Beauté caused EA to cease using the packaging of which ODLR

complained, and caused EA to agree not to ship any more of its inventory in the complained of

packaging.

**C.    Third Notice of Breach: YSL Beauté's Purported Failure to Meet Best
Efforts Obligations**

37.    On March 13, 2008, ODLR sent YSL Beauté a third and final breach notice that

contains a myriad of alleged breaches. Each of these alleged breaches is addressed in the

Petition (and exhibits thereto) and in the Memorandum of Law. In the main, the alleged

breaches relate to YSL Beauté's purported breach of its "best efforts" performance obligations.

38.    The fragrance industry as a whole has been in severe decline in the U.S.

Moreover, the ODLR brand has limited development outside the Americas and has not had the

same growth momentum as other fashion house brands. Under these circumstances and in

context, YSL Beauté's efforts have been substantial and more than meet YSL Beauté's

obligations under the License Agreement. Exhibit 2, at ¶¶ 39-66.

39.    YSL Beauté has always used its good faith business judgment in devising

marketing and sales strategies for the ODLR brand. All of these strategies have been discussed

with ODLR. Further, the efforts YSL Beauté has made with respect to the ODLR brand more

than favorably compare with the efforts made with respect to other YSL Beauté brands, such as

BOUCHERON and STELLA McCARTNEY, which are comparable to ODLR. Exhibit 2, at ¶

43.

40.    In addition, YSL Beauté has amply demonstrated in the Petition and

Memorandum of Law that it has not committed the other, specific breaches of which it is

accused by ODLR in its March 13, 20008 letter. As set out in detail in Exhibit 2, at ¶¶ 44-72,

9

and in YSL Beauté's June 10, 2008 letter, YSL Beauté has met its obligations under the License Agreement.

41.     Specifically, YSL Beauté has adequately advertised and promoted ODLR brand products. Exhibit 2, at ¶¶ 44-46.

42.     YSL Beauté has diligently pursued new launches of ODLR brand products in compliance with the License Agreement. Exhibit 2, at ¶¶ 47-51.

43.     Contrary to ODLR's assertions, YSL Beauté has not "cheapened" the ODLR brand by selling ODLR fragrance products in mass market channels; on the contrary, many top prestigious fragrance brands are sold in these channels. Exhibit 2, at ¶¶ 52-56.

44.     ODLR also claims in its March 13, 2008 letter that YSL Beauté has breached an obligation under the License Agreement to develop products in other categories covered by the License Agreement. Exhibit 2, at ¶ 57. YSL Beauté, however, has no such obligation, and, in any event, YSL Beauté has introduced numerous OSCAR DE LA RENTA brand products aside from fragrance products. Exhibit 2, at ¶¶ 58-59. Nor has YSL Beauté breached any obligation to sell ODLR products in global markets. Exhibit 2, at ¶¶ 60-62.

45.     YSL Beauté also is not in breach of the License Agreement by failing to appoint a world wide brand manager for ODLR products or to hold regular marketing and sales meetings with ODLR. As demonstrated in the Petition, this claim is completely without merit. Exhibit 2, at ¶¶ 63-66.

46.     YSL Beauté also is not in breach of the License Agreement for allegedly selling fragrance products having formulas not approved by ODLR. Exhibit 2, at ¶¶ 67-70.

47.     Finally, as set forth in the Petition, ODLR's allegation that YSL Beauté made sales of unapproved products is without merit. Exhibit 2, at ¶¶ 71-72.

**VI.    ODLR Breached the License Agreement by Filing a Complaint Against EA**

48.    On February 5, 2008, YSL Beauté responded by letter to ODLR's Second Notice of Breach. In that letter, YSL Beauté took issue with the fact that ODLR had directly threatened to sue YSL Beauté's customer, EA, for trademark infringement, and demanded that, "if [ODLR] has any further issues concerning the activities of EA or any of its customers with respect to [ODLR] products, that you contact us directly, as these are matters to be taken up directly between YSL Beauté and ODLR." *See* Exhibit I to the Petition.

49.    On February 8, 2008, ODLR responded to YSL Beauté that "ODLR will look solely to YSL Beauté for any and all remedies to which ODLR may be entitled as a result of any unlawful actions of EA and will not communicate further with EA regarding this matter." A copy of ODLR's February 8, 2008 letter is attached hereto as Exhibit 4.

50.    Notwithstanding ODLR's assurances that it would not communicate further with EA regarding its sale of ODLR fragrance products, and without providing YSL Beauté the opportunity even to review EA's alleged acts of infringement, as required under Section 3(a) of the License Agreement, on June 27, 2008, ODLR filed a complaint against EA in its own name, alleging that EA had engaged in the unauthorized sale of ODLR fragrance products, and in acts of trademark and trade dress infringement. Further, upon information and belief, ODLR immediately publicized the filing of the complaint in the media and within the fashion industry, before it even served the complaint upon EA, thereby negatively impacting YSL Beauté's business relationship with EA. A copy of this Complaint is attached hereto as Exhibit 5.

51.    By suing EA for trademark and trade dress infringement, ODLR has breached Sections 1 and 3(a) of the License Agreement, and in addition, has violated its undertaking, in its February 8, 2008 letter, that "ODLR will look solely to YSL Beauté for any and all remedies to

11

which ODLR may be entitled as a result of any unlawful actions of EA and will not communicate further with EA regarding this matter."

52.    As a result of the foregoing, YSL Beauté has suffered damages in an amount to be determined in arbitration.

### VII.    ODLR Tortiously Interfered with YSL Beauté's Relationship with EA

53.    In addition to the foregoing, by virtue of its filing of the complaint referenced in Paragraph 50, ODLR has tortiously interfered with YSL Beauté's relationship with EA.

54.    ODLR is well aware of the fact that EA is, and has been for many years, a customer of YSL Beauté. The complaint filed by ODLR against EA, in addition to being violative of the terms of the License Agreement and ODLR's February 8, 2008 undertakings, is completely without merit, and was filed for the sole purpose of harassing YSL Beauté's customer and YSL Beauté. ODLR's claim against EA for the unauthorized sale of a fragrance product is a claim that should have been directed against YSL, as EA purchased such product in the ordinary course of its business from YSL Beauté, and the issue of whether the product in question is authorized is an issue in this arbitration proceeding.

55.    As a result of ODLR's tortious interference with YSL Beauté's business relationship with EA, YSL Beauté has suffered damages in an amount to be determined at arbitration.

### VIII.    Relief Requested

WHEREFORE, YSL Beauté respectfully requests that the Arbitrator(s):

A.    Declare that YSL Beauté is not in breach of the License Agreement as was alleged in ODLR's first notice of breach, dated January 18, 2008;

B.    Declare the YSL Beauté is not in breach of the License Agreement as was alleged in ODLR's second notice of breach, dated January 31, 2008;

12

C.    Declare that YSL Beauté is not in breach of the License Agreement as was alleged in ODLR's third notice of breach, dated March 13, 2008;

D.    Issue injunctive relief preventing ODLR from terminating the License Agreement;

E.    Award YSL Beauté damages in an amount to be determined at the arbitration hearing for breach of contract;

F.    Award YSL Beauté damages in an amount to be determined at the arbitration hearing resulting from ODLR tortious interference with YSL Beauté's business relationship with EA; and

G.    Grant such other and further relief to which YSL Beauté may be entitled.

Dated: July 1, 2008
        New York, New York

ARNOLD & PORTER LLP

By: _Louis S. Ederer_
        Louis S. Ederer

399 Park Avenue
New York, NY 10022
(212) 715-1000

*Counsel for Claimant YSL Beauté, Inc.*

13

# **EXHIBIT Q**

American Arbitration Association
*Dispute Resolution Services Worldwide*

## ARBITRATION
### Answering Statement and Counterclaim Request

| | |
|---|---|
| **MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box. There is no additional administrative fee for this service.* | ☐ |

| | |
|---|---|
| Name of Claimant<br>YSL Beauté, Inc. | Name of Representative (if known)<br>Louis S. Ederer |
| Address:<br>685 Fifth Avenue | Name of Firm (if applicable)<br>Arnold & Porter LLP |
| | Representative's Address:<br>399 Park Avenue |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10022 | New York | NY | 10022-4690 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 212-715-7331 | 212-715-7377 | 212-715-1102 | 212-715-1399 |

| | |
|---|---|
| Email Address: | Email Address:<br>louis.ederer@aporter.com |
| AAA CASE # (if known)  13 133 01389 08 | Filing a Counterclaim:   Yes ☑   No ☐<br>*If yes, please describe nature of counterclaim in space below.* |

**PLEASE ANSWER CLAIMANT DEMAND FOR ARBITRATION (AND DESCRIBE COUNTERCLAIM, IF APPLICABLE):**
*Attach additional pages as necessary.*

Claimant has breached numerous obligations under a trademark license agreement between the parties (the "License"), including: (a) the obligation to use "best efforts" to publicize and promote licensed products; (b) the obligation to make regular launches of new licensed products; (c) the obligation to maintain the prestige of Respondent/Counterclaimant's brand; (d) the obligation to exploit the full scope of the License, in terms of both the range of licensed products and the geographic territory in which licensed products are marketed; (e) the obligation to obtain approval for any and all licensed products that are marketed and any material changes to the packaging and trade dress of licensed products; (f) the obligation, upon reasonable request, to produce books and records related to Claimant's performance under this License; and (g) the obligation not to attack Respondent/Counterclaimant's title in and to the licensed trademarks. As a result of said breaches, Respondent/Counterclaimant is entitled to (i) an award of compensatory damages of not less than $50 million; (ii) an award of punitive or exemplary damages in an amount to be determined at the hearing for any intentional injuries to Respondent/Counterclaimant; (iii) a declaration that Respondent/Counterclaimant is entitled to terminate the License due to Claimant's uncured defaults and violations; and (iv) and award of attorneys' fees and costs incurred in connection with this arbitration and the dispute between the parties.

| | |
|---|---|
| Dollar Amount of Claim or Counterclaim $ 50,000,000.00 | Other Relief Sought:  ☒Attorneys Fees  ☒Interest<br>☒Arbitration Costs  ☒Punitive/ Exemplary  ☐Other |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $ 16,500.00

**PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:**
The panel should include (i) one or more arbitrators with experience in the fragrance and cosmetics industry; (ii) one or more arbitrators with knowledge of New York law of contracts (the choice of law specified in the contract at issue); and (iii) at least one arbitrator with judicial experience.

| | |
|---|---|
| Hearing locale  New York, NY | (check one) ☐Requested by Respondent   ☑Locale provision included in the contract |

Estimated time needed for hearings overall:             hours or        10        days

| Signature (may be signed by a representative)   Date:<br>*[signature]*   July 7, 2008 | Name of Representative<br>Peter M. Brody |
|---|---|
| Name of Respondent<br>Oscar de la Renta, Ltd. | Name of Firm (if applicable)<br>Ropes & Gray LLP |
| Address (to be used in connection with this case)<br>550 Seventh Avenue, Eighth Floor | Representative's Address:<br>700 12th Street N.W., Suite 900 |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10018-3229 | Washington | DC | 20005-3948 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (212) 282-0500 | (212) 382-1181 | (202) 508-4612 | (202) 383-7777 |

| | |
|---|---|
| Email Address: | Email Address:<br>peter.brody@ropesgray.com |

**PLEASE SEND TWO COPIES OF THIS ANSWERING STATEMENT, WITH THE FILING FEE FOR ANY COUNTERCLAIM, AS PROVIDED FOR IN THE RULES, TO THE AAA. SEND THE ORIGINAL ANSWERING STATEMENT TO THE CLAIMANT.**

Please visit our website at www.adr.org if you would like to file this counterclaim online.    AAA Customer Service can be reached at 800-778-7879