UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OSCAR DE LA RENTA, LTD.,

                Plaintiff,

-against-

ELIZABETH ARDEN, INC., d/b/a "EA FRAGRANCES CO.,"

                Defendant.

08 CIV 5785 (DLC)

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF INTERVENOR-DEFENDANT YSL BEAUTÉ INC.'S MOTION TO INTERVENE AND MOTION TO STAY LITIGATION PENDING ARBITRATION

ARNOLD & PORTER LLP
Louis S. Ederer
Stewart D. Aaron
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
louis.ederer@aporter.com
stewart.aaron@aporter.com

*Attorneys for Intervenor-Defendant-Counterclaim-Plaintiff YSL Beauté, Inc.*

This Reply Memorandum of Law is respectfully submitted by proposed Intervenor-Defendant-Counterclaim-Plaintiff YSL Beauté, Inc. ("YSL Beauté") in response to the opposition papers filed by Plaintiff Oscar De La Renta, Ltd. ("ODLR"), and in further support of YSL Beauté's motion to intervene in this action that ODLR commenced against Elizabeth Arden, Inc. d/b/a "EA Fragrances Co." ("EA"), and to stay this action in favor of the arbitration now pending between YSL Beauté and ODLR before the American Arbitration Association (the "Arbitration").

## PRELIMINARY STATEMENT

ODLR's opposition papers do nothing but confirm what YSL Beauté has been saying all along — that this case should never have been brought. As is evident from the correspondence that preceded this filing, the dispute here is between ODLR and YSL Beauté, and does not involve EA. All of the issues raised in this action have been presented to the arbitration panel in the Arbitration, in one form or another. Even the question whether ODLR has violated its own agreement, made in February 2008, not to bring claims of this nature against customers of YSL Beauté, is an issue that has been put to the arbitrators in the Arbitration.[1]

ODLR's opposition papers expose this action for what it is — a sideshow, brought for tactical purposes as part of ODLR's campaign to get out from under what it has come to perceive as unfavorable business terms in a 30-year old license agreement. Furthermore, contrary to ODLR's arguments, the purpose of a stay here is not to deprive ODLR of any claimed right to sue EA, but rather, among other things, to determine whether ODLR even has any such right, an issue that is before the arbitrators. In the meantime, this Court should not be burdened with issues — including the ultimate issue in this case, that is, whether EA has infringed on ODLR's

---

[1] Indeed, in its Statement of Claim in the Arbitration, YSL Beauté has asserted a cause of action for ODLR's violation of its February 2008 agreement by virtue of having brought this action against EA. See Ederer Decl. Ex. 2.

1

intellectual property rights (if, indeed, ODLR has any present rights in the ODLR Marks, another issue pending before the arbitrators) — that have also been squarely framed by the parties in the Arbitration.[2] Simply put, the Court should stay this action in favor of the Arbitration, as it is likely that the decision of the arbitrators will moot ODLR's Complaint against EA.

This Court should also not countenance ODLR's repeated misstatements and distortions of the facts and prior proceedings. *First*, contrary to ODLR's suggestion, this is not a slam dunk case where it is inevitable that at the end of arbitration YSL Beauté will have been terminated as ODLR's licensee, will have lost ownership of its trademark rights, and will have to pay ODLR $50 million in damages. YSL Beauté has more than ample defenses to each and every one of ODLR's trumped-up claims, and at the end of arbitration, ODLR's true motivation will be revealed — to get out of a license agreement, the business terms of which it no longer finds palatable. *Second*, as discussed below, ODLR's statement that YSL Beauté raised the issue of YSL Beauté's ownership rights in the ODLR Marks, and its contractual right to control infringement litigation, "for the first time" in this action, is blatantly false. YSL Beauté articulated its position on these issues weeks before this action was commenced, in an verified petition to stay any attempt by ODLR to terminate the License Agreement, that YSL Beauté was

---

[2] Even the ultimate issue in this case — whether EA's packaging infringes any trademark rights — is an issue that will be addressed in the Arbitration. Seven months ago, when EA was using, in its repackaging of certain ODLR fragrance products, an out-of-date OSCAR DE LA RENTA script trademark, ODLR chose not to sue EA and undertook to deal only with YSL Beauté. Thereafter, consistent with this undertaking, ODLR asserted in a notice of breach to YSL Beauté (and now again in the Arbitration) that EA's alleged infringement was the responsibility of YSL Beauté. Thus, whether EA's original complained-of packaging constituted an infringement of the ODLR Marks is something the arbitrators will have to decide. Further, after EA modified its packaging at YSL Beauté's instance and removed the allegedly offending script, ODLR nevertheless initiated this action on some sort of trade dress claim, referring to the copyright notice EA places on its packaging. Not only is this claim completely fabricated (and not ODLR's to bring), but it too is squarely before the arbitrators, since ODLR has claimed that YSL Beauté permitted ODLR's trade dress to be infringed, and that EA's modification of its packaging fails to cure YSL Beauté's initial breach of the License Agreement with respect to the conduct of EA. *See* Ederer Decl. Exs. 11, 12. Thus, the issue of whether EA infringed ODLR's (or YSL Beauté's) trademark rights, either in January 2008 with its original packaging, or subsequently with its modified packaging, is squarely before the arbitration panel.

2

prepared to file against ODLR in the Supreme Court of the State of New York.[3]

For all the foregoing reasons, as discussed more fully below, and because, as EA has indicated in its motion to dismiss, ODLR lacks standing to maintain this action, since it does not own the trademarks it seeks to enforce, YSL Beauté's motion should be granted in all respects.

## ARGUMENT

### I. The Motion to Intervene Should Be Granted Because It Is Unopposed

YSL Beauté set forth in its opening memorandum [*see* Mov. Mem. at 10-18] the reasons why its motion to intervene, pursuant to Fed. R. Civ. P. 24, should be granted. ODLR does not oppose YSL Beauté's application to intervene in this action. *See* Opp. Mem. at 4. Thus, YSL Beauté, for purposes of the instant motion, should be treated as an intervening party to this action, and the Court need only decide whether this action — which implicates the very factual and legal issues at play in the prior pending Arbitration between YSL Beauté and ODLR — should be stayed pursuant to 9 U.S.C. § 3 and the Court's inherent power to control its docket.

### II. This Action Should Be Stayed In Favor of the Pending AAA Arbitration

YSL Beauté seeks a stay of this action under Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. In its opposition brief, ODLR argues that because EA is not a party to any arbitration agreement with ODLR, 9 U.S.C. § 3 is inapplicable, and therefore YSL Beauté must satisfy a more stringent "compelling reasons" test to obtain a stay. *See* Opp. Mem. at 17. However, and in addition to the fact that EA supports the relief requested by YSL Beauté[4], ODLR's argument ignores the fact that YSL Beauté is considered a party to this action — an

---

[3] Indeed, after YSL Beauté made its position on these issues clear in early June 2008, ODLR put these issues to the arbitration panel in its Answer and Counterclaims, claiming that YSL Beauté had violated its contractual obligation not to interfere with ODLR's purported ownership of the ODLR Marks. *See* Ederer Decl. Ex. 12.

[4] EA has concurrently made a motion to dismiss on the ground that ODLR lacks standing to maintain the infringement claims asserted against it, and has indicated that it supports the instant motion for a stay in the event that its motion is not granted. Indeed, even though EA is a non-party to the License Agreement, in these circumstances it also has the right to seek a stay. *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991) (recognizing a federal court's inherent power to grant a stay to control its docket).

3

unopposed intervening defendant and counterclaim plaintiff — and it is YSL Beauté, not EA, that moves for a stay under 9 U.S.C. § 3.[5] As there can be no dispute that ODLR and YSL Beauté are parties to an agreement to arbitrate, and that the threshold issues raised in this action are entirely subsumed within the issues that ODLR and YSL Beauté agreed to arbitrate pursuant to Section 22 of the License Agreement, and are in fact arbitrating, YSL Beauté is entitled to a stay in favor of the Arbitration under the express language of the FAA.

The FAA provides, in relevant part, that "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action until such arbitration has been had* ...." 9 U.S.C. § 3 (emphasis supplied). Thus, under the FAA, as an intervening party in this action, and as a party to the License Agreement which contains an arbitration provision, YSL Beauté "shall" be granted a stay against ODLR, another party to the License Agreement, since this action undisputedly involves issues that have been "referred to arbitration" under the License Agreement.

The cases cited by ODLR on this issue are inapposite.[6] In addition, ODLR's attempt to

---

[5] ODLR's reliance on *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandsten Co.*, 399 F.2d 440 (2d Cir. 1964), is misplaced, because unlike the situation there, the moving party here, YSL Beauté, is a party to the arbitration agreement and therefore is entitled to a stay pursuant to 9 U.S.C. § 3.

[6] In *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 501-02 (S.D.N.Y. 1995), where a stay was denied, the party seeking the stay was not a party to the arbitration, and it was "not at all clear" that the arbitration would decide the issues that were common to both the arbitration and the court proceedings. In *Braun Media Servs., Inc. v. Taylor*, 2006 WL 3484324 (M.D. Pa. Nov. 30, 2006), the issues presented in the pending arbitration and the lawsuit that was sought to be stayed differed. In *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 140 (3d Cir. 2004), the party opposing the stay had a contractual right to litigate. In *E.G.L. Gem Lab Ltd.*, 1998 WL 314767 (S.D.N.Y. June 15, 1998), the court granted a stay in favor of the party to the arbitration agreement, but permitted the action to proceed through discovery against non-parties to the arbitration agreement because the issues decided in the arbitration "might well be resolved on grounds that would not affect the other defendants at all." That is not, however, the case here, where the arbitrators must decide, among other things, whether the ODLR products sold by EA were authorized or unauthorized; whether EA's repackaging of the subject

Footnote continued on next page

distinguish the decision in *Petrik*, 2007 WL 3283170, a case on all fours with that at bar, falls flat. *See* Opp. Mem. at 21 n.10. In *Petrik*, the court granted a motion to intervene by a trademark licensee, in a lawsuit brought against its sub-licensee by the purported trademark owner, and stayed the litigation under 9 U.S.C. § 3 pending an arbitration between the trademark owner and the licensee. *Id*. at *3. That case also involved, claims relating to the sale of alleged unauthorized product, in addition to infringing product. Just as in *Petrik*, because YSL Beauté is an intervening party in this action and a party to an arbitration agreement with ODLR, it is entitled to a stay under 9 U.S.C. § 3 as of right, and need not show any "compelling reasons."

Further, since the Arbitration will resolve issues central to this action, including the threshold issue of whether ODLR even has the right to maintain this action under the License Agreement, and whether or not the products in question were authorized or unauthorized, or infringing or not infringing, all the key issues in suit are "referable to arbitration" under the License Agreement, and a stay pursuant to 9 U.S.C. § 3 is warranted. ODLR's contention that its claims in this action are against EA for trademark infringement, and that "[n]one" of the issues relating to the alleged infringement "will be addressed in the arbitration" [Opp. Mem. at 19], is simply wrong.[7] *First*, a fundamental premise of ODLR's Complaint [*see* ¶ 15] and its opposition memorandum [*see* Opp. Mem. at 9] is that the product sold by EA was "unauthorized." The issue of whether EA, a customer of YSL Beauté who purchased the product in question from YSL Beauté, was authorized to sell the product, depends entirely on whether YSL Beauté was

---

Footnote continued from previous page
product "cured" any infringement claim; and whether under the License Agreement ODLR had the right to commence this action. The resolution of these issues will unquestionably have an effect on EA and this action.
[7] Indeed, even ODLR's own self-serving recitation of the "issues" in this action — "(i) whether, and to what extent, EA was responsible for the packaging, labeling, and sale of unapproved "Oscar" fragrance products; (ii) to whom EA sold the products; (iii) whether, and to what extent, the packaging and labeling of the products caused or is likely to cause, confusion or dilution; and (iii) [sic] whether, and to what extent, ODLR suffered injury as a result of EA's conduct" — makes clear that each of these "issues" are subject to and dependent upon the threshold determination of who owns the ODLR Marks, and who has the right to assert infringement claims arising from such marks under the License Agreement. These are precisely the same issues that will be determined in the Arbitration.

5

authorized to sell the product to EA in the first place, a question to be resolved in the Arbitration.

*Second*, in the Arbitration, ODLR claims that YSL Beauté breached the License Agreement by allowing EA to sell certain allegedly infringing products. YSL Beauté contends that there has been no such breach, and that, even if there had been, such breach was cured when YSL Beauté convinced EA to cease using that packaging and to modify its packaging for the ODLR products. Yet, even after EA modified its packaging, ODLR asserted, in a June 11, 2008 letter to YSL Beauté, that contrary to YSL Beauté's position, the modified packaging did not constitute a cure of YSL Beauté's breach, because the packaging continued to infringe ODLR's trademark rights.[8] Thus, ODLR's claims that both EA's original and modified packaging infringe its trademark rights are part and parcel of its claims that YSL Beauté breached the License Agreement and failed to cure such breach, and will be decided in the Arbitration.

*Third*, the issue of who owns the ODLR Marks, and who has the right, under the License Agreement, to decide whether to assert and maintain claims for infringement of such marks — two threshold issues in this action which ODLR conspicuously ignores — will be addressed and resolved in the Arbitration. In fact, a ruling in YSL Beauté's favor on this issue will moot this entire litigation, since the arbitrators will have decided that ODLR had no right to bring this suit. Further, despite ODLR's unsubstantiated contention, there is nothing "nominal" about YSL Beauté's ownership interest in the ODLR Marks. *See* Opp. Mem. at 7. As the registrant of the ODLR Marks, YSL Beauté — not ODLR — has exclusive standing and right to assert infringement actions based on the ODLR Marks.[9] ODLR's mistaken reading of Sections 2(d)

---

[8] *See* Brody Decl. Ex. M ("ODLR does not consider [EA's] modification [of the packaging] to cure YSL Beauté's breach of the License or to redress EA's violation of ODLR's trademark rights. The current packaging material is not authorized by, or acceptable to, ODLR, and moreover, *is likely to cause consumer confusion and to cause dilution of ODLR's mark*.") (emphasis supplied).

[9] The significance of the ownership issue is brought into even sharper focus when comparing Section 2 of the original license agreement between ODLR and YSL Beauté's predecessor, dated April 1, 1976 [*see* Brody Decl. Ex. A], and Section 2 of the License Agreement at issue, dated August 18, 1977 [*see id.* Ex. B]. Whereas Section 2 of

Footnote continued on next page

and 3(a) of the License Agreement cannot overcome this and artificially create standing for ODLR to maintain infringement claims against EA.[10] Indeed, in contending that "Section 2(d) of the License Agreement explicitly recognizes ODLR's right and obligation to 'renew, protect and *enforce*' the Licensed Mark[s]" [Opp. Mem. at 4 (emphasis in Opp. Mem.)], ODLR, in yet another misquote, deliberately omits language stating that it cannot do so absent instruction from YSL Beauté, and that any infringement action would be as representative of, and "*in the name of*", YSL Beauté.[11] Accordingly, both under the Lanham Act and the License Agreement, ODLR lacks standing to maintain infringement claims concerning the ODLR Marks.[12]

Equally unavailing is ODLR's argument that, even if it does not own the two registrations for the ODLR Marks in the fragrance category — which it does not — and therefore has no standing to sue under those registrations, ODLR still has standing to assert infringement claims based on its ownership of other OSCAR DE LA RENTA trademark registrations in different product categories. *See* Opp. Mem. at 3-4. If allowed, this would be nothing other than a means for ODLR to circumvent YSL Beauté's statutory and contractual right to enforce its trademarks. Allowing ODLR to maintain an infringement claim against a third party purportedly

---

Footnote continued from previous page
the original license agreement states that "[t]he Licensed Mark shall stand of record in the name of ODLR, and all use of the Licensed Mark by or for or on behalf of LICENSEE shall inure to the benefit of ODLR," Section 2 of the current License Agreement states that "the Licensed Mark shall stand of record in the name of [YSL Beauté]," and says nothing about any use "inuring to the benefit of" ODLR. Clearly, the issue of who would own these marks, and the benefits that would inure to that owner, were the subject of much negotiation back in 1976, and certainly there was nothing "nominal" about these rights when the parties negotiated over them 30 years ago.

[10] *See* 15 U.S.C. § 1114(1) (authorizing claims for infringement commenced by the "registrant" of a mark). For a further discussion of the standing issue, YSL Beauté refers to the arguments made in the Memorandum of Law in Support of Defendant Elizabeth Arden, Inc.'s Motion to Dismiss.

[11] *See* Section 2(d) ("ODLR . . . *on notice from Licensee*, shall renew, protect and enforce the registrations") and Section 3(a) ("If the *Licensee* shall reasonably believe that a third party's [conduct infringes the ODLR Marks] . . . then Licensee shall inform ODLR thereof in writing and request that ODLR as the beneficial trademark owner bring suit or take such other action in the name of the Licensee, *as the Licensee shall direct* . . . .") (emphasis supplied).

[12] ODLR's reliance on the absence of a clause in the License Agreement expressly prohibiting it from pursuing infringement actions is misplaced. The License Agreement need not spell out that which is made clear under the law — ODLR's mere contingent reversionary interest in the ODLR Marks does not afford it standing to maintain infringement claims based on such marks.

7

trading in infringing fragrance products (*i.e.*, EA) — the product category in which YSL Beauté owns the ODLR Marks — on the basis of a registration covering, for example, "umbrellas and traveling bags" (Reg. No. 1957411), would render Sections 2(d) and 3(a) of the License Agreement meaningless, and strip YSL Beauté of its rights under the Lanham Act.[13]

*Fourth*, another threshold issue presented in the Arbitration going to ODLR's standing to sue EA — which may moot this entire action — is whether ODLR violated its February 2008 undertaking that it would look only to YSL Beauté regarding any issues it may have with the manner in which YSL Beauté's customers sell ODLR products. YSL Beauté has put this very issue to the arbitration panel in its Statement of Claim, contending that ODLR's filing of this lawsuit constitutes a breach of that undertaking, and seeks injunctive relief with respect thereto.

In *E.G.L. Gem Lab Ltd.*, 1998 WL 314767 (S.D.N.Y. June 15, 1998), another case ODLR mistakenly relies on, the court noted that a stay under 9 U.S.C. § 3 is "particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Id.* at *6. As set forth above, not only are ODLR's claims in this lawsuit of questionable merit, since ODLR lacks standing to bring such claims under the Lanham Act (not to mention that its claims for trade dress infringement are unintelligible), the License Agreement, and its February 2008 undertaking, but all of the issues raised in this action have been presented to the

---

[13] ODLR's contention that YSL Beauté has "cynical[ly]" asserted its ownership rights in the ODLR Marks, and the ancillary rights to protect and enforce such rights against third party infringers, "for the first time" in response to the commencement of this action against EA is not only false, but belied by correspondence annexed to the Declaration of its counsel, Peter M. Brody, Esq. Opp. Mem. at 3. In fact, YSL Beauté notified ODLR of its position with respect to these issues two weeks prior to ODLR's commencement of the instant action against EA. Thus, on June 10, 2008, YSL Beauté provided ODLR with a copy of a Verified Petition it intended to file in the Supreme Court of State of New York which clearly states that "Parfums Stern and its successors, including YSL Beauté, have been and continue to be the owners of all right, title and interest, in the U.S., in and to the very valuable ODLR Marks in the fragrance cosmetic products category." Ederer Decl. Ex. 5, ¶ 6. Thereafter, by letter dated June 13, 2008, YSL Beauté reminded ODLR that "pursuant to the terms of the License Agreement, *YSL Beauté is the registered owner of the trademarks in question, and it is for YSL Beauté to determine if the relevant trademarks have been infringed and whether to take any action relating thereto.* The License Agreement expressly provides in Section 3(a) that YSL Beauté may request that ODLR bring suit or take action with respect to the licensed trademarks 'in the name of [YSL Beauté], as [YSL Beauté] shall direct.'" Brody Decl. Ex. N (emphasis supplied).

arbitration panel in the Arbitration. Accordingly, YSL Beauté meets the requirements for a mandatory stay pursuant to 9 U.S.C. § 3.

As for ODLR's claim that a more stringent two-pronged "compelling reasons" test must be met because EA is not a party to any agreement to arbitrate, YSL Beauté also meets that misapplied test. *First*, contrary to ODLR's arguments, as indicated above, the Arbitration will resolve all issues in this action because the issues are *entirely* subsumed in the Arbitration. In the Arbitration, ODLR has asserted that YSL Beauté breached the License Agreement by virtue of its dealings with EA, particularly (i) its sale of unauthorized products to EA, (ii) its failure to act against EA in respect of EA's alleged "infringement" of the ODLR Marks, (iii) its failure to cure EA's alleged "infringement" of the ODLR Marks by authorizing modified packaging, and (iv) its challenge to ODLR's ownership rights in the ODLR Marks. YSL Beauté, in turn, seeks a declaration that there has been no such breach of the License Agreement, and in any event ODLR has no right to maintain this action, because it does not own the ODLR Marks and does not have the right to assert and maintain infringement litigation. Section 22 of the License Agreement requires that these and all disputes between YSL Beauté and ODLR arising under the License Agreement be resolved in arbitration, and, in fact, they are and will be.

*Second*, contrary to ODLR's contention, a stay would neither cause it "undue hardship", nor result in "pointless delay." Opp. Mem. at 21-22. The Arbitration has been commenced and the parties have exchanged pleadings. Arbitrator selection is underway, and the case is expected to move quickly.[14] Further, ODLR has not shown any need for expediency. ODLR could have brought this action in January 2008, when EA's alleged infringing conduct was arguably much worse — the alleged use of an out-of-date script mark. ODLR could have sought preliminary

---

[14] ODLR's contention that a stay will prevent it from proceeding with discovery of EA overlooks the fact that the Commercial Arbitration Rules of the American Arbitration Association (R-31) permit arbitrators, as well as parties, to subpoena witnesses and documents in connection with an arbitration.

injunctive relief, but again it chose not to, perhaps reflecting an understanding of the weakness of its substantive case. Moreover, it is not true that a stay deprives ODLR of a forum for seeking relief from EA; if the decision of the arbitrators does not moot this entire action, there will be nothing preventing ODLR from resuming what is left of it against EA.

Finally, even assuming, *arguendo*, that YSL Beauté is not entitled as of right to a stay pursuant to 9 U.S.C. § 3, the Court may nevertheless grant a stay "pursuant to the power inherent in every court 'to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Birmingham Assocs. v. Abbott Labs.*, 547 F. Supp. 2d 295, 302 (S.D.N.Y. 2008) (citations omitted). Indeed, granting a stay here is consistent with the strong federal policy favoring the enforcement of arbitration agreements, as well as notions of judicial economy. *See id.* ("Stays are particularly appropriate where they '"promote judicial economy, avoidance of confusion and possible inconsistent results."'") (citations omitted); *see also Progressive Cas. Ins. Co. v. C.A. Reasegurandora Nacional De Venezuela*, 991 F.2d 42, 45 (2d Cir. 1993) ("Federal policy, as embodied in the [FAA], strongly favors arbitration as an alternative dispute resolution process."). Thus, as a matter of policy and judicial economy, this action should be stayed until the Arbitration has concluded.

## CONCLUSION

For all the foregoing reasons, as well as those contained in YSL Beauté's moving papers, it is respectfully urged that this Court grant YSL Beauté's motion to intervene and stay this action in favor of the Arbitration pending between YSL Beauté and ODLR.

Dated: New York, New York  
August 11, 2008

Respectfully submitted,  
ARNOLD & PORTER LLP

By: _____  
Louis S. Ederer  
Stewart D. Aaron  
*Attorneys for Intervenor-Defendant-Counterclaim-Plaintiff YSL Beauté, Inc.*