UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OSCAR DE LA RENTA, LTD.,

       Plaintiff,

   v.

ELIZABETH ARDEN, INC., d/b/a
"EA FRAGRANCES CO.",

      Defendant.

---

YSL BEAUTÉ, INC.,

      Intervenor-Defendant/

      Counterclaim-Plaintiff,

   v.

OSCAR DE LA RENTA, LTD.,

      Counterclaim-Defendant.

---

Civil Action No. 08 CIV 5785 (DLC)


**PLAINTIFF'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


ROPES & GRAY LLP
Peter M. Brody
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005
(212) 508-4600
peter.brody@ropesgray.com

ROPES & GRAY LLP
William I. Sussman
Lee S. Gayer
Carla E. Sereny
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
william.sussman@ropesgray.com
lee.gayer@ropesgray.com
carla.sereny@ropesgray.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY......................................................................1

STATEMENT OF FACTS..................................................................................5

    A.    The Famous Oscar de la Renta Trademarks ............................................5

    B.    The Fragrance License...........................................................................6

    C.    ODLR's Discovery Of EA's Unlawful Conduct ......................................9

ARGUMENT ...............................................................................................11

  I.  EA'S MOTION TO DISMISS SHOULD BE DENIED..................................11

    A.    ODLR Has Standing To Pursue Its Claims Against EA For Infringement And
Dilution Under Sections 32 And 43(c) Of The Lanham Act...................11

    B.    The Complaint States A Claim Against EA Under Section 43(a) Of The Lanham
Act.....................................................................................................15

    C.    ODLR Never Authorized Sale Of The Infringing Fragrance Products And
Therefore The Products Cannot Be Deemed To Be "Genuine" ..............16

    D.    The License Agreement Does Not Preclude ODLR From Enforcing Its Trademark
Rights.................................................................................................19

  II.  THE MOTION FOR A STAY OF THIS ACTION SHOULD BE DENIED..................21

CONCLUSION.............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Audiovox Corp. v. Monster Cable Products, Inc.*,
544 F.Supp.2d 155 (S.D.N.Y. 2008)........................................................................11

*Berni v. International Gourmet Restaurants of America, Inc.*,
838 F.2d 642 (2d Cir. 1988).....................................................................................15

*C.V. Starr & Co., Inc. v. American International Group, Inc.*,
No. 06-Civ-2157, 2006 U.S. Dist. LEXIS 65605, 2006 WL 2627565, 2006 WL
2671246 (S.D.N.Y. Sept. 14, 2006).............................................................3, 13, 14

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*,
440 F.Supp.2d 249 (S.D.N.Y. 2006) (Cote, J.)....................................................2, 13

*DEP Corp. v. Interstate Cigar Co., Inc.*,
622 F.2d 621 (2d Cir. 1980).....................................................................................15

*Even Street Productions, Ltd. v. Shkat Arrow Hafer & Weber, LLP*,
No. 05-cv-3834, 2008 U.S. Dist LEXIS 42397, 2008 WL 2224297 (S.D.N.Y. May
29, 2008) ..................................................................................................................21

*Iconix Brand Group, Inc. v. Bongo Apparel, Inc.*,
No. 06-Civ-8195, 2008 U.S. Dist. LEXIS 51791, 2008 WL 2695090 (S.D.N.Y. July
8, 2008) ....................................................................................................................13

*ITC Ltd. v. Punchgini, Inc.*,
482 F.3d 135 (2d Cir. 2007).....................................................................................16

*John Paul Mitchell Systems v. Pete-N-Larry's Inc.*,
862 F.Supp. 1020 (W.D.N.Y. 1994).........................................................................19

*Lee v. Sony BMG Music Entertainment, Inc.*,
557 F.Supp.2d 418 (S.D.N.Y. 2008)........................................................................11

*Liebowitz v. Elsevier Science Ltd.*,
927 F.Supp. 688 (S.D.N.Y. 1996).......................................................................13, 14

*Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*,
979 F.Supp. 224 (S.D.N.Y. 1997)........................................................................4, 17

*Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 84 N.Y.2d 430, 438, 618
N.Y.S.2d 882, 886 (N.Y. 1994) ...............................................................................20

*Nederslandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*,
    339 F.2d 440 (2d Cir. 1964)........................................................................22, 23

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*,
    102 F.3d 660 (2d Cir. 1996)....................................................................17

*Nordco A.S. v. Ledes*,
    No. 95-Civ-7753, 1997 U.S. Dist. LEXIS 13904, 1997 WL 570546......................16

*Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*,
    816 F.2d 68 (2d Cir. 1987)....................................................................17

*P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*,
    462 F.2d 134 (2d Cir. 1972)....................................................................16

*Polymer Technology Corp. v. Mimran*,
    975 F.2d 58 (2d Cir. 1992)....................................................................18

*Ryan v. Volpone Stamp Co.*,
    107 F.Supp.2d 369 (S.D.N.Y. 2002)....................................................................17

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,
    155 F.Supp.2d 1 (S.D.N.Y. 2001)....................................................................16

*U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County,
New York*,
    495 F.Supp.2d 375 (S.D.N.Y. 2007) (Cote, J.)........................................11

*Yale Electric Corp v. Robertson*,
    26 F.2d 972 (2d Cir. 1928) (L. Hand, J.) ..............................................12

## STATUTES

Lanham Act § 32 (15 U.S.C. § 1114) ................................................................. *passim*

Lanham Act § 43 (15 U.S.C. § 1125) ................................................................. *passim*

New York General Business Law § 360-*l* ................................................................11

## OTHER AUTHORITIES

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:41 (4th
    ed. 2008) ................................................................................................18

Fed. R. Civ. P. 12(b)(6)....................................................................................1, 3, 17

Fed. R. Civ. P. 56(e)(1)..............................................................................................................17

Restatement (Third) of Unfair Competition § 33 cmt. ................................................................15

Fed. R. Civ. P. 26(f)..................................................................................................................23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OSCAR DE LA RENTA, LTD.,

         Plaintiff,

   v.

ELIZABETH ARDEN, INC., d/b/a
"EA FRAGRANCES CO.",

         Defendant.

---

YSL BEAUTÉ, INC.,

         Intervenor-Defendant/

         Counterclaim-Plaintiff,

   v.

OSCAR DE LA RENTA, LTD.,

         Counterclaim-Defendant.

Civil Action No. 08 CIV 5785 (DLC)

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Oscar de la Renta, Ltd. ("ODLR") hereby opposes the motion by defendant Elizabeth Arden, Inc., d/b/a "EA Fragrances Co." ("EA") to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6). The motion, in which intervenor YSL Beauté, Inc. ("YSL Beauté") has now joined, is without merit and should be denied in its entirety.

## INTRODUCTION AND SUMMARY

This is a straightforward action for trademark infringement, dilution, and unfair competition under federal and state law. Plaintiff ODLR, the company founded and still owned and run by the world-famous fashion designer, Oscar de la Renta, brought this action to halt the

distribution by defendant EA of unauthorized and infringing "Oscar de la Renta" fragrance products in retail stores throughout the United States.

EA's motion challenges ODLR's standing to sue, on the principal ground that certain trademark registrations cited in the Complaint are presently held in the name of ODLR's current licensee, YSL Beauté.  EA also argues that ODLR has suffered no cognizable injury because the goods in question are "genuine," EA having purportedly purchased them from YSL Beauté.

EA's arguments are meritless. As pleaded in the complaint, ODLR is the undisputed registrant of sixteen of the eighteen trademark registrations cited in the Complaint – a fact that EA nowhere mentions. Although these registrations identify luxury goods other than perfume, such as clothing, jewelry, watches, and handbags, such goods are closely related to the infringing goods.  As EA's lawyers should know – because they themselves successfully argued the point to this Court in a recent case – "a trademark owner has 'rights against use on related, non-competing products . . . in accord with the realities of mass media salesmanship and the purchasing behavior of consumers.'"  *De Beers LV Trademark Ltd.* v. *DeBeers Diamond Syndicate, Inc.*, 440 F.Supp.2d 249, 273 (S.D.N.Y. 2006) (Cote, J.) (quoting *Scarves by Vera, Inc.* v. *Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1172 (2d Cir. 1976)).[1]

Moreover, even with respect to the registrations held in YSL Beauté's name, ODLR's standing is clear.   As averred in the Complaint, and as explicitly acknowledged in the license agreement between ODLR and YSL Beauté ("License Agreement"), YSL Beauté holds these registrations in trust for ODLR, which is the beneficial owner of these and any other registrations held by YSL Beauté.  Moreover, ODLR has actual control over the use of the marks by its licensee, including the right to approve products and product quality.  Under settled law, ODLR

---

[1]  The same lawyers who represented the prevailing trademark owner in *De Beers* (Fross Zelnick Lehrman & Zissu, P.C.) also represent EA in this action.

thus has standing to sue for infringement and dilution.  *See C.V. Starr & Co., Inc.* v. *American International Group, Inc.*, No. 06-Civ-2157, 2006 U.S. Dist. LEXIS 65605, *14  (S.D.N.Y. Sept. 14, 2006).

Echoing YSL Beauté's motion for a stay, EA argues that, in the License Agreement, ODLR surrendered its ownership of, and right to sue for infringement or dilution of, its trademarks in the case of any product within the scope of the license.  The argument does not improve with repetition.  In effect, EA (and YSL Beauté) are attempting to transform a *license* into an *assignment*.  As ODLR demonstrated in response to YSL Beauté's motion, nothing in the License Agreement supports the construction proposed by EA and YSL Beauté.  To the contrary, the agreement explicitly recognizes ODLR's ownership of the trademarks (*see* Complaint Exhibit A, § 15) and ODLR's right, power, and obligation to "renew, protect and *enforce*" the licensed marks (*see* Complaint Exhibit A, § 2(d) (emphasis added)).  To be sure, the License Agreement puts responsibility on the licensee for monitoring the marketplace and notifying ODLR of infringements – but it certainly does not preclude ODLR from acting to protect its world-famous trademarks, especially where, as here, the licensee is more concerned about harming its relationship with a "longstanding customer" than preventing harm to the licensed marks and their owner.  *See* Memorandum of Law in Support of Intervenor-Defendant YSL Beauté's Motion to Intervene and Motion to Stay Litigation Pending Arbitration (Dkt. No. 6) at 14.

As for EA's "genuine goods" defense, that rests on supposed "facts" about the source of the products in question that not cognizable for purposes of its Rule 12(b)(6) motion.  But even if EA's "facts" were considered, they would be immaterial.  "Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale

under the mark is authorized by the trademark owner." *Liz Claiborne, Inc.* v. *Mademoiselle Knitwear, Inc.*, 979 F.Supp. 224, 231 (S.D.N.Y. 1997) (citation omitted).  Whatever the provenance of the products distributed by EA, the Complaint avers that ODLR never authorized them for sale and never authorized the packaging in which they are being sold.  Those averments must be accepted as true at this juncture, and they foreclose EA's "genuine goods" argument.

Finally, EA moves "in the alternative" for a stay of this action pending the outcome of the recently-commenced arbitration between ODLR and YSL Beauté.  For its part, YSL Beauté, despite having originally argued in its motion for a stay that this Court *cannot* resolve the question whether ODLR has the right to bring this action in light of the arbitration clause in the License Agreement, has apparently reconsidered and decided that this Court not only can, but *should* decide that issue after all.  *See* YSL Beauté, Inc.'s Joinder in the Motion Submitted by Elizabeth Arden, Inc. to Dismiss Complaint ("YSL Joinder") (Dkt. No. 29).  YSL Beauté now asks that its motion for a stay be treated as seeking relief "in the alternative" if the case is not dismissed.  *Id.*

Of course, if this Court, in ruling on EA's motion to dismiss, decides that, as a matter of law, ODLR does have the right to sue EA, YSL Beauté (now a party in this action) would be bound by that decision and could not relitigate the issue in the arbitration.  Therefore, there would be no reason to stay this action.  But even if this Court merely ruled that ODLR has pleaded facts that, if proved at trial, establish its right to sue EA, a stay of this action pending arbitration would be highly inappropriate.  Contrary to YSL Beauté's contention, the arbitration will not, and could not, resolve the core issues of likelihood of confusion and dilution present in this action.  Indeed, were the arbitrators to attempt to resolve those issues, EA, as a non-party to the arbitration, no doubt would then argue to this Court that any such resolution is not binding on

EA.  Moreover, a stay will only delay the litigation of those key issues – as well as the issue of

damages resulting from EA's conduct – while allowing EA to continue its infringing acts

unhindered.

## STATEMENT OF FACTS

### A.    The Famous Oscar de la Renta Trademarks

Oscar de la Renta, the founder and owner of ODLR, is a world-renowned fashion

designer.  Mr. de la Renta and his company ODLR have built a diverse and highly successful

business in high-fashion clothing, ready-to-wear clothing, handbags and other accessories,

sportswear, shoes, jewelry, eyewear, home goods, bridal gowns, furs, fragrances, and various

other luxury products.  ODLR luxury goods are distributed in 60 countries around the world.  *See*

Complaint ¶¶ 7, 8, 38.

The "Oscar de la Renta" name, Mr. de la Renta's signature,  and derivative marks such as

"Oscar" have been registered by ODLR as trademarks in the United States and in dozens of other

countries around the world in connection with all of the above-listed goods.  Complaint ¶ 9.  The

Complaint cites, by registration number, eighteen of the United States registrations in particular

(Nos. 0922367, 1081451, 1085216, 1334456, 1950895, 1957411, 2119455, 2132134, 2510354,

2553215, 2702388, 2928221, 3046554, 3108953, 3283357, 3303388, 3307716 and 3352817).

*Id.*[2]  In addition, as also pleaded, ODLR owns all common law trademark and trade name rights

associates with the ODLR trademarks as well as rights in all trade dress used in conjunction with

all ODLR-branded products.  Complaint ¶ 10.  The specific goods identified in the trademark

registrations cited in the Complaint are set forth in Brody Decl. Exhibit A, and encompass the

full range of products typically associated with a luxury brand, including watches, jewelry,

---

[2]  For the Court's convenience, a chart with respect to these registrations is attached as Exhibit A to the Declaration of Peter M. Brody, date August 29, 2008 ("Brody Decl.").

women's evening dresses, women's outerwear, women's swimwear, lingerie, handbags and

wallets, shoes, men's suits and sport coats, fabrics for upholstery and bedding, and, of course,

perfumes.

B.    **The Fragrance License**

In 1976, Oscar de la Renta, launched his signature perfume "Oscar."  Production,

marketing, and distribution of "Oscar" and subsequent new fragrances launched under the Oscar

de la Renta brand have been handled by a series of companies operating under the License

Agreement with ODLR.[3]  YSL Beauté has been the fragrance licensee ("Licensee") for

approximately the last 10 years.

On August 3, 1976, ODLR applied to the United States Patent and Trademark Office

("USPTO") to register the marks "Oscar" and "Oscar de la Renta" in connection with perfumes.

The USPTO registered the mark "Oscar" on January 10, 1978 (Registration No. 1081451) and

the mark "Oscar de la Renta" on February 14, 1978 (Registration No. 1085216).  On or about

May 1, 1979, ODLR assigned these two registrations to the Licensee (then called Milton Stern

Parfums, Inc.), to facilitate maintenance.

---

[3]  The License Agreement is attached as Exhibit A to the Complaint, and thus is properly considered on EA's motion.  A detailed discussion of the background of the License Agreement is set forth in Plaintiff's Memorandum in Opposition to Non-Party YSL Beauté, Inc.'s Motion to Intervene and Motion to Stay Litigation Pending Arbitration ("ODLR Stay Opposition") (Dkt. No. 16) at pp. 5-9, to which ODLR respectfully refers the Court and which is incorporated by reference herein.  In brief, an original license agreement was executed with Milton Stern Parfums, Inc., on April 1, 1976.  That agreement was replaced on November 27, 1981, with a pair of license agreements with a retroactive effective date of August 18, 1977.  One of these agreements (the one attached to the Complaint as Exhibit A), was with a new company called Parfums Stern, Inc., and covered the territory consisting of the United States, Canada and France.  The other agreement was with a foreign affiliate called Parfums Stern Ltd., and covered the rest of the world.  *See* License Agreement § 23.

In 1987, the then-Licensee, Parfums Stern, Inc., was acquired by Avon Products.  In or about July 1990, Avon sold Parfums Stern to Sanofi Beauté, Inc.  On December 8, 1994, ODLR and Sanofi Beauté executed a letter agreement supplementing the License Agreement ("1994 Letter Agreement," attached as Exhibit C to the August 4, 2008 Declaration of Peter M. Brody (Dkt. No. 17)).

Section 1 of the License Agreement provides that "Licensee shall be the sole licensee and enjoy the rights of exclusive user of the Licensed Mark in the Territory on the Licensed Products," and that Oscar de la Renta "hereby consents to such license and to the use by Licensee of his name as Licensed Mark as aforesaid."  The "Licensed Mark" is defined as follows:

> [Licensed Mark] shall include the full name Oscar de la Renta or the initials ODLR in plain or any stylized type or in any script, written or signature form, or the separable components Oscar, de la Renta, or Renta, as well as such other words or symbols with which the name Oscar de la Renta shall be or become associated in the public mind.

"Licensed Products," in turn, are defined as "perfumery, fragrances, essential oils, toiletries, cosmetics, hair lotions, and soaps, it being intended to include perfumery, beauty and toiletry preparations of all kinds."  License Agreement § 1.

The License Agreement stipulates that the Licensed Products "will be of reasonably high standards as to product quality and merchantability as reasonably approved by ODLR from time to time" and that "ODLR shall have the right to approve of Licensed Products before any commercial use thereof."  License Agreement § 4.  Similarly, the License Agreement requires the Licensee "to submit to ODLR for approval and prior to any commercial use thereof by Licensee all proposed uses of bottles, containers, packaging, labels and advertising materials bearing or containing Licensed Mark, which approval shall not be unreasonably withheld or delayed."  License Agreement § 5.

Under Section 2 of the License Agreement, ODLR was primarily responsible for securing registrations of trademarks in each country, as appropriate.  With respect to the United States, however, section 2(d) generally provides that "ODLR, at its expense will apply for and register the Licensed Mark with respect to the Licensed Products."  Section 2(a) also provides, however,

that the registrations that had been obtained originally by ODLR in 1976 and then assigned to

Milton Stern Parfums, Inc. in 1979 "shall stand of record in the name of Licensee."

Although these two U.S. registrations were to "stand of record in the name of Licensee,"

the License Agreement makes plain that ODLR remains the true owner of the Licensed Mark

without regard to the nominal owner listed on those registrations.  Indeed, Section 2(b) provides

that the Licensee must use the Licensed Mark per ODLR's directives, and further, that the

registrations would automatically "revert" to ODLR upon termination of the License Agreement.

In order to ensure that reversion, Section 2(b) further provided for the Licensee to execute:

> an irrevocable assignment thereof within thirty (30) days of the
> date of this agreement (in the form of Exhibit "2" hereto), together
> with an irrevocable power of attorney . . . a copy of which power
> of attorney is attached hereto as Exhibit "3", which executed
> assignment and power of attorney shall be forwarded to ODLR's
> attorney . . . who shall hold the same in escrow during the term of
> this agreement . . . .

Executed copies of Exhibits 2 and 3 are attached to the copy of the License Agreement submitted

as Exhibit A to the Complaint.

The License Agreement contains other important restrictions on the Licensee with regard

to these U.S. trademark registrations.  Among other things, Section 2(b) stipulates that the

Licensee "shall not transfer or assign the trademarks Oscar and Oscar de la Renta or the

Registration Nos. 1081451 and 1085216 thereof except to transfer and assign the same to ODLR

or its assigns as provided in this paragraph 2(b)."  Section 6 states that "Licensee shall have no

right to sub-license in the United States."  Section 15 of the License Agreement goes still further,

providing as follows:

> Licensee agrees that it will not, during the term of this agreement
> or thereafter, attack ODLR's title in and to the Licensed Mark or
> the validity thereof.  Licensee shall, whether during or after the
> term of this agreement, execute any documents reasonably

required by ODLR to establish or confirm its rights in Licensed
Mark either as proprietor or licensor thereof.

Finally, Section 19 affirms that the essential relationship between the parties is "that of trademark licensor and trademark licensee."

With respect to infringement, Section 2(d) provides that ODLR "at its expense, from time to time on notice from Licensee, shall renew, protect and *enforce* the registrations thus obtained" (emphasis added). In addition, Section 3(a) of the License Agreement provides that, if the Licensee reasonably believes that a third party is infringing or diluting the Licensed Mark in the United States, "Licensee shall inform ODLR thereof in writing and request that ODLR as the beneficial trademark owner bring suit or take such other action in the name of Licensee, as Licensee shall direct."[4] Nowhere, however, does the License Agreement prohibit ODLR from taking enforcement action with respect to the Licensed Mark on its own, if the Licensee has not requested such action (or, as is the case here, where the Licensee actively opposes it). To the contrary, as noted, Section 2(d) of the License Agreement explicitly recognizes ODLR's right, power, and obligation to "renew, protect and *enforce*" the Licensed Mark (emphasis added).

### C.    ODLR's Discovery Of EA's Unlawful Conduct

In late 2007, ODLR discovered an unauthorized fragrance product being distributed by EA under the trade name, "EA Fragrances Co." at mass retail Wal-Mart stores. The product consisted of a 4 ml bottle labeled "*parfum.*" Complaint ¶ 15. While ODLR previously had authorized the distribution of a 4 ml fragrance product as a free sample or gift with the purchase of other ODLR products, it has never authorized the separate commercial sale of such a product.

---

[4] Section 3(a) includes a dispute-resolution mechanism in the event the parties disagree over whether the requested action "has a reasonable chance for success" and provides that, under certain circumstances, the Licensee can take action itself if ODLR declines to do so. Section 3(a) also details how costs for any legal action, as well as any damages recovery, are to be allocated between the Licensee and ODLR. Section 3(b) contains somewhat similar provisions applicable in the event that Licensee believes that third party infringement is occurring in Canada and France, except that suits by ODLR there would be brought in ODLR's own name.

Complaint ¶ 15.  The words "Sample – Not for sale" are clearly visible on the back of the approved packaging for that promotional item.  *See* Complaint, Exhibit E.[5]

The unauthorized product sold by EA had been removed from its original, authentic box and repackaged in a counterfeit box contained in a plastic pegboard "clamshell" package bearing the ODLR Marks.  Complaint ¶ 16 and Exhibits D & E.  The words "Sample – Not for sale" were omitted from the box, along with various items in the list of ingredients and the web address for Oscar de la Renta fragrances.  *See* Complaint, Exhibit E.  The packaging bore an outdated version of the Oscar de la Renta signature trademark.  *See* Exhibit D.  The box itself bore the text "© EA FRAGRANCES CO., DIST., NEW YORK, NY 10003," implying that ODLR approved, endorsed, or was affiliated with EA's "distribution" business, or that EA was otherwise authorized to use the valuable ODLR marks in its business.  Complaint ¶ 16 and Exhibit D.

On January 18, 2008, ODLR wrote to EA and demanded, *inter alia*, that EA cease and desist from further sale and distribution of the unauthorized product and further use of the infringing packaging.  Complaint ¶ 20.  EA replied on January 28, 2008, admitting its sale and distribution of the product and packaging in question.  Complaint ¶ 21.

At some time after January 28, 2008, EA modified the packaging.  The new packaging bore the designation "Designer Fragrance Collectible" in proximity to the ODLR Marks and, on the reverse side, states, in small type: "THIS GENUINE OSCAR PRODUCT HAS BEEN REPACKAGED IN THE U.S. BY EA FRAGRANCES, CO., NEW YORK, NY 10003, A COMPANY NOT AFFILIATED WITH OSCAR DE LA RENTA, LTD."  Complaint ¶ 23 and Exhibit F.  From ODLR's perspective, these modifications only made matters worse.

---

[5]  Photographs of the approved promotional item and the unauthorized, infringing product are attached to the Complaint as Exhibits D, E and F.

Accordingly, on June 26, 2008, ODLR commenced this action, asserting five causes of action against EA under federal and state law: (i) trademark infringement and false designation of origin under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (First Cause of Action); (ii) unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Second Cause of Action); (iii) trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (Third Cause of Action); (iv) trademark dilution under New York General Business Law § 360-*l* (Fourth Cause of Action); and (v) unfair trade practices under New York law (Fifth Cause of Action).

## ARGUMENT

## I.    EA'S MOTION TO DISMISS SHOULD BE DENIED

Accepting ODLR's factual allegations as true, and drawing all inferences in its favor[6], ODLR clearly has standing to pursue its claims, and EA's motion should be denied.

### A.    ODLR Has Standing To Pursue Its Claims Against EA For Infringement And Dilution Under Sections 32 And 43(c) Of The Lanham Act

EA seeks dismissal of ODLR's claims for trademark infringement under Section 32 of the Lanham Act and dilution under Section 43(c) on the sole ground that ODLR is not the registrant of two of the trademark registrations cited in the Complaint, namely the two registrations identified in the License Agreement covering perfume (Registration Nos. 1081451 and 1085216). Memorandum of Law in Support of Defendant Elizabeth Arden, Inc.'s Motion to Dismiss ("EA Mem.") (Dkt. No. 24) at 3. EA's position is untenable.

---

[6]  The standard of review on EA's Rule 12(b)(6) motion "is heavily weighted in favor of the plaintiff." *Lee v. Sony BMG Music Entertainment, Inc.*, 557 F.Supp.2d 418, 423 (S.D.N.Y. 2008); *accord Audiovox Corp. v. Monster Cable Products, Inc.*, 544 F.Supp.2d 155, 157-158 (S.D.N.Y. 2008); *U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, New York*, 495 F.Supp.2d 375, 384 (S.D.N.Y. 2007) (Cote, J.).

Even if ODLR did not have standing to assert the two perfume registrations in this action, (which, for the reasons stated *infra*, it clearly does), ODLR also has asserted rights under sixteen *other* federal trademark registrations for related goods, as to which ODLR is the registrant.  EA simply ignores that inconvenient fact, which is fatal to its position.

The Second Circuit has long recognized the right of a trademark owner to enforce a trademark against the seller of products that are not identical to the products covered by the mark.  *See, e.g., Yale Electric Corp* v. *Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (L. Hand, J.) (affirming injunction sought by lock manufacturer against maker of flashlights).  Indeed, in *Scarves by Vera, Inc.* v. *Todo Imports, Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976), a case in which the holder of two registered trademarks covering scarves, neckties, blouses, kerchiefs, barbecue aprons, smocks and other items of clothing sold under the "VERA" mark sought to enjoin the defendant's use of the "VERA" mark on fragrance products, the Second Circuit, relying on Judge Hand's decision in *Yale Electric*, held that "the defendant's products [cosmetics and fragrances] were by their nature so closely related to plaintiff's own products [scarves and other fashion items] that plaintiff was entitled to protection against defendant's use of the mark "VERA" on its products."  *Id.* at 1174.

As noted above, the sixteen non-perfume registrations cited in the Complaint cover the full range of products typically associated with a luxury brand, including watches, jewelry, women's evening dresses, women's outerwear, women's swimwear, lingerie, handbags and wallets, shoes, men's suits and sport coats, fabrics for upholstery and bedding.  Even if ODLR did not own the two registrations covering perfumes – indeed, even if a wholly independent party owned those registrations or those registrations did not exist at all – ODLR clearly would be entitled under Section 32 of the Lanham Act to relief against EA for infringement of these

registered marks, as long as it can prove at trial that EA's actions are likely to cause confusion over the source or sponsorship of EA's unauthorized "Oscar" fragrance products. ODLR's pleading of these registrations therefore is plainly sufficient to state a claim under Section 32. Indeed, as noted above, EA's own lawyers made this exact same argument, successfully, in a recent case before this Court. *See De Beers LV Trademark Ltd.*, 440 F.Supp.2d at 273-274 (holding that trademark covering luxury items sold in retail stores is sufficiently related to rough cut diamonds sold over the Internet so as to cause a likelihood of confusion).

As for the two registrations covering perfumes, EA's standing argument rests on the language in Section 32 rendering an infringer "liable in a civil action by the *registrant*." 15 U.S.C. § 1114(1). But Section 32 refers interchangeably to "the remedies given to the *owner* of a right infringed under this Act." *Id.* § 1114(2). And Section 43(c), the dilution provision, provides a remedy to "the *owner* of a famous mark" (and does not use the term "registrant" at all). 15 U.S.C. § 1125(c).[7]

Likewise, courts in this District have made clear that it is *ownership*, not simply the name on the registration, that is the critical issue for purposes of determining standing under Section 32, and ownership is determined on the basis of who exercises ultimate *control* over the quality of the goods or services sold under the trademark in question.[8] *See, e.g.*, *C.V. Starr & Co.*, 2006 U.S. Dist. LEXIS 65605 at *14; *Liebowitz* v. *Elsevier Science Ltd.*, 927 F.Supp. 688, 696 (S.D.N.Y. 1996).

---

[7] EA makes no mention whatsoever of New York's dilution statute, N.Y. Gen. Bus. Law § 360-*l*, which does not require a mark to be registered at all to be protected.

[8] ODLR's allegation that it is the owner of the trademarks for perfumes (Complaint ¶¶ 7, 9 & 10) serves to distinguish this Court's recent decision in *Iconix Brand Group, Inc. v. Bongo Apparel, Inc.*, No. 06-Civ-8195, 2008 U.S. Dist. LEXIS 51791 (S.D.N.Y. July 8, 2008). There, unlike here, the plaintiff "concede[d] that it is 'neither the 'registrant' *nor the owner*' of the Bongo mark . . .", *id.* at *17 (emphasis added), and so plaintiff withdrew its § 32 and § 43(c) claims. That is not this case. (ODLR further notes that other claims survived a Rule 12(b)(6) motion, even in *Iconix*.)

Thus, for example, in *C.V. Starr*, both plaintiff and defendant held registrations related to the brand at issue. The plaintiff sought to enforce its rights under certain trademarks that were registered under its name. The defendant, AIG, asserted counterclaims for trademark infringement against C.V. Starr under the same trademarks. C.V. Starr moved to dismiss AIG's counterclaims, arguing that C.V. Starr was the "rightful owner" of each of the trademarks registered under its name, and that AIG therefore lacked standing to pursue its counterclaims relating to those trademarks. AIG claimed to be the "beneficial owner" of those marks. The court denied the motion to dismiss, holding that "[w]hether the relationship is that of licensor/licensee or parent/subsidiary, the one entity which *controls* the nature and quality of the goods sold under the mark is the owner." *C.V. Starr*, 2006 U.S. Dist. LEXIS 65605 at *14 (citation omitted) (emphasis in original). The court further held that because AIG alleged that it exercised the crucial role of ensuring quality of services and had other indicia of ownership, AIG had standing to pursue its claims under Section 32 of the Lanham Act, even though it was not the registered owner of the marks. *Id.* at **16-17; *see also, e.g.*, *Liebowitz*, 927 F.Supp. at 696 ("[W]hoever controls the quality of the goods marketed under the trademark is the source and therefore owns the trademark. Thus, the answer to the question of ownership of the marks at issue here will be found by determining who controls the quality of the goods.").

Here, the License Agreement provides that ODLR – as owner and licensor of the trademarks – has the right to approve products and to ensure "reasonably high standards as to product quality and merchantability as reasonably approved by ODLR," and requires the Licensee to "submit to ODLR for approval prior to any commercial use thereof" all packaging, labeling, bottles, containers, and other materials bearing the Licensed Mark. License Agreement §§ 4 & 5. Thus, in addition to the sixteen non-perfume registrations as to which ODLR's

standing is unquestionable, ODLR also clearly has standing under the quality control doctrine to assert the two perfume registrations under Sections 32 and 43(c) of the Lanham Act, even though they are nominally held of record by the Licensee.[9]

### B.    The Complaint States A Claim Against EA Under Section 43(a) Of The Lanham Act

EA recognizes that, even without a federal registration, the owner of a trademark may bring an action to enforce its common-law rights in a mark under Section 43(a) of the Lanham Act.  *See* EA Mem. at 4.  In the First Count of the Complaint, ODLR asserts a claim under that provision, based on the pleaded facts regarding ODLR's longstanding use of its marks in commerce.  *See* Complaint ¶¶ 7-8, 11.  Thus, even if ODLR owned *no* federal registrations (and it owns many), ODLR would be entitled to proceed with its infringement claim under Section 43(a).

EA argues that ODLR lacks standing to assert such a claim on the ground that ODLR "does not allege that it has ever used or sold any fragrance products under the Oscar de la Renta name."  EA Mem. at 4.  EA's argument fails, for at least two reasons.

First, EA ignores the settled rule that "[u]se of the mark by a licensee to identify or distinguish goods is sufficient to create enforceable rights in favor of the licensor."  *Hawaii-Pacific Apparel Group, Inc.* v. *Cleveland Browns Football Co. LLC*, 418 F.Supp.2d 501, 506 (S.D.N.Y. 2006); Restatement (Third) of Unfair Competition § 33 cmt. b (1995) ("the benefits of

---

[9]   The cases relied upon by EA confirm that indicia of ownership, not registration, are determinative for purposes of standing to pursue a Section 32 claim.  For example, in *DEP Corp. v. Interstate Cigar Co., Inc.,* 622 F.2d 621 (2d Cir. 1980), the Second Circuit recognized that a non-registrant could have standing to sue under Section 32, but held that the plaintiff in that case did not, because the agreement under which plaintiff distributed the goods in question specifically stated that the plaintiff had *no* right whatsoever in the trademarks at issue.  Similarly, in *Berni v. International Gourmet Restaurants of America, Inc.*, 838 F.2d 642 (2d Cir. 1988), the plaintiffs were the heirs of a restaurant owner who never owned or registered trademarks for the restaurant.  The Second Circuit held that the plaintiffs had no connection with the marks at issue at all, and therefore lacked standing under Section 32.  The facts of those cases stand in stark contrast to the facts in this case, where the License Agreement firmly establishes ODLR's ownership rights.

the licensee's use accrue to the trademark owner"). Indeed, "a trademark licensee cannot independently develop its own goodwill in a licensed mark, as such goodwill inures *solely* to the benefit of the licensor." *Twentieth Century Fox Film Corp.* v. *Marvel Enterprises, Inc.*, 155 F.Supp.2d 1, 20 (S.D.N.Y. 2001) (emphasis added).

The Complaint pleads the authorized use of ODLR's marks on perfumes and other fragrance products by ODLR's various licensees over a period of decades. Complaint ¶ 11. Such use, if proved at trial, would establish common-law rights on the part of ODLR, even if it could not assert the perfume registrations (or, again, even if no such registrations existed).[10]

Second, EA again overlooks ODLR's use of its marks in connection with many other related goods in the luxury field. *Id.* ¶ 8. Such use, if proved, would entitle ODLR to protection of its marks from the unauthorized use by EA, or any other party, on perfumes and other fragrance products, where such unauthorized use is likely to cause confusion. *Scarves by Vera,* 544 F.2d at 1174.

In sum, viewed in the light most favorable to ODLR, the Complaint states a claim for infringement of common-law trademark rights under Section 43(a).

C.     **ODLR Never Authorized Sale Of The Infringing Fragrance Products And Therefore The Products Cannot Be Deemed To Be "Genuine"**

EA also argues that ODLR is barred from pursuing its claims because EA allegedly purchased the infringing products from the registrant of the perfume registrations and ODLR's exclusive licensee, and those products therefore should deemed to be "genuine." EA Mem. at 5-

---

[10]   EA's reliance on *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135 (2d Cir. 2007), and *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.,* 462 F.2d 134 (2d Cir. 1972), is misplaced, as in both of those cases the trademark owner had abandoned the mark. Likewise, *Nordco A.S. v. Ledes,* No. 95-Civ-7753, 1997 U.S. Dist. LEXIS 13904 (S.D.N.Y. Sept. 12, 1997), provides no support for EA's arguments, as in that case the court held that there was no evidence whatsoever to support the plaintiff's bald assertion that a purchaser of the trademarks was operating merely as a representative of plaintiff.

6.  As a threshold matter, EA's argument is inappropriate under Rule 12(b)(6), because EA relies, not on any of the allegations of the Complaint or its exhibits, but on facts alleged in letters by EA's and YSL Beauté's lawyers that were submitted with YSL Beauté's motion to intervene and for a stay.  *See* EA Mem. at 3 (citing Declaration of Louis S. Ederer in Support of YSL Beaute's Motion to Intervene and Motion to Stay Litigation Pending Arbitration ("Ederer Decl.") (Dkt. No. 7), Ex. 10).  For this reason alone, EA's argument should be disregarded.[11]  *See Newman & Schwartz* v. *Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) (reversing district court's dismissal of action because court improperly relied on an affidavit and attachments accompanying the defendant's motion to dismiss).

But even if this Court were to consider – and credit – EA's allegation that it purchased the infringing goods from YSL Beauté, EA still would not be entitled to dismissal.  That is because "'[i]t is not sufficient that the goods come from the source identified by the trademark if the trademark owner has not authorized the use of the mark on those particular goods.'"  *Liz Claiborne, Inc.*, 979 F.Supp. at 231 (If the sale of the goods was not authorized in the first place, the goods "cannot be genuine for infringement purposes."); *accord, e.g.*, *Ryan* v. *Volpone Stamp Co.*, 107 F.Supp.2d 369, 382 (S.D.N.Y. 2002) ("If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.").

Likewise, if a trademarked product *or its packaging* has been altered without authorization, it cannot be deemed "genuine" even if purchased from a authorized supplier.  *See, e.g.*, *Original Appalachian Artworks, Inc.* v. *Granada Electronics, Inc.*, 816 F.2d 68, 73 (2d Cir. 1987) ("Cabbage Patch" dolls made by licensed manufacturer were not deemed to be genuine

---

[11]   As pure self-serving hearsay, the lawyers' letters would be objectionable even on a motion for summary judgment, *see* Fed. R. Civ. P. 56(e)(1), and the Court should not convert EA's motion to a summary judgment motion.

because they were repackaged with Spanish-language "adoption papers" without authorization by brand owner); *see generally* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:41 (4th ed. 2008) ("[I]t is only where the goods are resold without change that the 'first' sale or 'exhaustion' rule applies to cut off the trademark owner's rights. Thus, the unauthorized repackaging or reconstruction or other modification of the goods by a distributor are exceptions to the first sale defense.").

ODLR authorized the use of the 4 ml "Oscar" *parfum* at issue solely as a promotional item, to be given with the purchase of other ODLR branded goods. Complaint ¶ 15. ODLR never approved the sale of those products on a standalone basis. Indeed, the original packaging expressly stated "Sample – Not for sale." Complaint ¶ 15, Ex. E. That statement was removed from the label and other unauthorized changes were made.[12] For example, the unauthorized EA box does not use the distinctive colors of genuine Oscar de la Renta products, has a different texture, is missing the distinctive embossed flower design, and is encased in a cheap plastic clamshell package.[13] Complaint ¶¶ 15-17.

In sum, because ODLR never authorized the sale of the 4 ml *parfum*, and because the product has been sold in unauthorized packaging, the product cannot be considered "genuine," and EA has no immunity from suit under the "genuine goods" defense.[14]

---

[12] If the Ederer Decl. where considered (which it should not be), it would show that even YSL Beauté has admitted that it did not approve the packaging used by EA. *See* Ederer Decl. Exhibits 10 & 11.

[13] It is not known at this stage of the proceeding whether the liquid contained in the *flacon* was itself made with the authorized formula for "Oscar" *parfum*. If not, that would be a further alteration that would be actionable. But even if the perfume, by itself, matched the authorized formula, the *product* must be considered to be the entirety of the offering, including the 4 ml size, the bottle, the box, and the packaging, none of which were authorized for sale. *See Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62-63 (2d Cir. 1992) (product includes bottles and packaging in which eye care products were sold). By analogy, if a licensed bottler of Coca-Cola decided, on its own, to come out with a new size bottle or can of the product, or a new six-pack carton, and sold those goods to a distributor, those goods would not be "genuine," and Coca-Cola could seek a remedy for any downstream sales of those goods by the distributor.

[14] The cases relied upon by EA in its moving papers (EA Mem. at 5-6) confirm that EA is not entitled to the protection afforded to a seller of genuine products. *See Polymer Technology Corp.*, 975 F.2d at 62-63 (reversing

**D.     The License Agreement Does Not Preclude ODLR From Enforcing Its
Trademark Rights**

In the "Facts" portion of its motion, EA asserts that, under the License Agreement, YSL

Beauté has the "sole responsibility and right to . . . protect the ODLR trademark" and that

"ODLR has no right to prosecute any type of action for trademark infringement in its own

name."  EA Mem. at 2.  Presumably, EA intended this assertion as a further argument against

ODLR's standing.  As such the argument would apply by its terms only to the registrations cited

in the License Agreement.  But even as to them, the argument is wrong.

The License Agreement clearly states that the Licensee is just that, a licensee, with the

exclusive right to *use* the fragrance trademarks, but not own them.  Ownership of the fragrance

trademarks resides with ODLR, which is repeatedly referred to as the trademark owner, with all

the rights of ownership that have been described above.  Significantly, nothing in the License

Agreement provides that the Licensee has the "exclusive" right to enforce the fragrance

trademarks.  To the contrary, Section 2(d) of the License Agreement explicitly recognizes

ODLR's right and obligation to "renew, protect and *enforce*" the Licensed Mark.

While Section 3(a) of the License Agreement provides that, if the *Licensee* reasonably

believes that a third party is infringing or diluting the Licensed Mark in the United States,

"Licensee shall inform ODLR thereof in writing and request that ODLR as the beneficial

trademark owner bring suit or take such other action in the name of Licensee, as Licensee shall

direct," nowhere does the License Agreement prohibit ODLR from taking enforcement action on

its own, where the Licensee has not requested such action (or, as is the case here, where the

---

denial of preliminary injunction where plaintiff submitted evidence, including photographs, reflecting that the seller
removed bottles from their authorized packaging prior to re-sale); *John Paul Mitchell Systems v. Pete-N-Larry's
Inc.*, 862 F.Supp. 1020, 1026-1027 (W.D.N.Y. 1994) (motion for summary judgment denied where re-seller
packaged the products in inferior-quality packaging, and where it could be inferred that consumers might attribute
such inferior packaging to the trademark holder).

Licensee actively opposes it). To the contrary, Section 3(a) specifically contemplates that ODLR may be a plaintiff in an action to enforce the fragrance trademarks, and Section 3(a)(iv) reflects that either party to the License Agreement may "undertake a suit or action" involving a claim of infringement.

Section 3(a)(iii) of the License Agreement also contemplates that, if ODLR does not wish to bring suit against an infringer, the Licensee may do so. Without that provision, the Licensee would have no legal standing to sue in its own name. *See, e.g.*, *Silverstar Enterprises, Inc. v. Aday*, 537 F.Supp. 236, 239 (S.D.N.Y. 1982). But ODLR's agreement to *share* with the Licensee the right to sue, under limited circumstances, hardly equates to an abandonment or forfeiture of ODLR's *own* rights to enforce its marks. Such a reading would violate New York's approach to contracts.

> A court will endeavor to give the [contract] construction most
> equitable to both parties instead of the construction which will give
> one of them an unfair and unreasonable advantage over the other.
> It is highly unlikely that two sophisticated business entities, each
> represented by counsel, would have agreed to such harshly uneven
> allocation of economic power under the Agreement. Language in
> contracts placing one party at the mercy of the other is not favored
> by the courts.

*Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 84 N.Y.2d 430, 438, 618 N.Y.S.2d 882, 886 (N.Y. 1994) (citations and internal quotation marks omitted).

It makes perfect sense that the License Agreement preserves ODLR's rights to enforce the fragrance trademarks. That is because the fragrance trademarks do not exist in vacuum. Rather, they are part of a wide array of luxury products that fall within the Oscar de la Renta brand – a brand which ODLR, as the owner of numerous Oscar de la Renta trademarks, has the right and obligation to protect. To preclude ODLR from enforcing its trademark rights under the License Agreement, or under the numerous other non-fragrance trademarks, as the law clearly

allows, would result in extreme prejudice to ODLR, which would be forced sit by and watch as

its licensee, YSL Beauté, refuses to take action against clear infringement by YSL Beauté's long-

time customer EA, to the detriment of the ODLR brand.  YSL Beauté's purported answer – that

these issues be thrown into the mix in the arbitration proceeding between ODLR and YSL

Beauté – is no answer at all.  As discussed further in Point II, below, ODLR cannot obtain relief

against EA's infringement in an arbitration proceeding in which EA is not even a party.  Thus,

under the EA/YSL Beauté scenario, EA's infringement will be permitted to continue, and the

damage to ODLR's brand would continue to accrue unabated.

The License Agreement cannot properly be interpreted so as to deprive ODLR of its

rights to enforce its trademarks.  Rather, viewing its provisions in the light most favorable to

ODLR, as must be done, the Court should deny EA's motion to dismiss and allow this action to

proceed as to both the registrations referenced in the License Agreement and the other ODLR

registrations and common-law rights not even implicated by EA's argument. *See, e.g., Even

Street Productions, Ltd.* v. *Shkat Arrow Hafer & Weber, LLP*, No. 05-cv-3834, 2008 U.S. Dist

LEXIS 42397, *19-20 (S.D.N.Y. May 29, 2008) (denying motion to dismiss where, provisions of

assignment agreement, viewed in the light most favorable to the plaintiff, reflect that plaintiff has

standing to bring suit).

## II.    THE MOTION FOR A STAY OF THIS ACTION SHOULD BE DENIED

EA states in its motion papers that, if its motion to dismiss is denied, this Court should

stay this litigation pending the arbitration between ODLR and YSL Beauté.  EA Mem at n.5.

YSL Beauté, in turn, has joined in EA's motion to dismiss and agreed that its own motion to stay

should be treated as alternative to the motion to dismiss.  *See* YSL Joinder.  That transparently

coordinated gambit should be rejected.

If this Court denies the motion to dismiss because it determines that, as a matter of law, ODLR does have the right to sue EA, YSL Beauté would be barred from relitigating that issue in the arbitration. Therefore, there would be no justification whatsoever for a stay of this action.

But even if this Court merely ruled that ODLR has pleaded facts that, if proved at trial, establish its right to sue EA, a stay of this action pending arbitration would be inappropriate under the applicable "compelling reasons" standard enunciated by the Second Circuit in *Nederslandse Erts-Tankersmaatschappij, N.V.* v. *Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964).[15]

First, in the absence of EA, the arbitration will not, and could not, resolve the core issues of likelihood of confusion and dilution present in this action. Indeed, EA, as a non-party to the arbitration, no doubt would take the position that any determinations regarding those issues made by the arbitrators would have no binding effect on EA in this action.

Moreover, a stay will substantially delay the litigation of those key issues, to the prejudice of ODLR. YSL Beauté's representation to this Court that the arbitration proceeding "is expected to move quickly" is without any basis and, frankly, far-fetched. Reply Memorandum of Law in Further Support of Intervenor-Defendant YSL Beauté, Inc.'s Motion to Intervene and Motion to Stay Litigation Pending Arbitration (Dkt No. 25) at 9. The arbitration has now been pending since June 10, 2008 – nearly three months – and the panel of arbitrators has not even been selected yet. Indeed, YSL Beauté has delayed that selection process by filing an unwarranted objection to the appointment of an arbitrator, even while admitting that "we are

---

[15] YSL Beauté argues in its reply papers that because it is an intervening party in this action, and because YSL Beauté and ODLR are parties to the arbitration agreement, a mandatory stay should be issued pursuant to Section 3 of the Federal Arbitration Act. YSL Beauté Reply Mem. at 3-4. But this argument ignores the fact that ODLR commenced this action *against EA*, and that EA is *not* a party to the arbitration agreement. Under these circumstances, the mandatory stay provision of the FAA is inapplicable, as made clear in *Nederslandse* and the numerous cases following it, cited in ODLR's Memorandum in Opposition.

-22-

not suggesting that [the arbitrator] could not be impartial in this proceeding." *See* Brody Decl.
Exhibit B (letter dated August 20, 2008). *See Nederslandse*, 339 F.2d at 441 (stating, with
regard to the delay issue, that "[w]ithout attempting to list all relevant factors, we point out that
the defendants should demonstrate to the satisfaction of the court that they have not taken nor
will take any steps to hamper the progress of the arbitration proceeding, that the arbitration may
be expected to conclude within a reasonable time, and that such delay as may occur will not
work undue hardship.).

Moreover, discovery in the arbitration will be substantial and time-consuming.[16]  Indeed,
during a Rule 26(f) conference among all counsel in this action on August 27, 2008, counsel for
YSL Beauté estimated that discovery in *this* action – which involves a very limited set of
relatively simple factual matters – would take six months.  By contrast, the arbitration involves
many complex factual matters extending over a period of more than ten years.[17]

Accordingly, if EA's motion to dismiss is denied, as ODLR submits it should be, this
Court should also deny YSL Beauté's motion for a stay pending arbitration and permit this
action to proceed in the normal course

## **CONCLUSION**

For the reasons set forth above, ODLR respectfully requests that this Court: (i) deny EA's
motion to dismiss in its entirety; and (ii) deny YSL Beauté's motion for a stay pending
arbitration.

---

[16]  The arbitration will proceed under the American Arbitration Association's Commercial Arbitration Rules for
Large, Complex Cases, under which discovery can be extensive.

[17]  In fairness, we note that, during Rule 26(f) conference, YSL Beauté proposed, and EA and ODLR agreed,
that efforts would be made to coordinate discovery in the arbitration and in this action to avoid duplication.  But
while the coordination of discovery between the two proceedings is a worthwhile objective, it will not necessarily
result in the shortening of the discovery process in the arbitration, and in fact, may lengthen it.

Dated:  New York, New York
       August 29, 2008

                                   Respectfully submitted,

                                   ROPES & GRAY LLP


                                   By:___*William I. Sussman*_____
                                   William I. Sussman
                                   Lee S. Gayer
                                   Carla E. Sereny
                                   1211 Avenue of the Americas
                                   New York, NY 10036
                                   (212) 596-9000
                                   william.sussman@ropesgray.com
                                   lee.gayer@ropesgray.com
                                   carla.sereny@ropesgray.com

                                   Peter M. Brody
                                   One Metro Center
                                   700 12th Street, NW, Suite 900
                                   Washington, D.C. 20005
                                   (202) 508-4600
                                   peter.brody@ropesgray.com

                                   *Attorneys for Plaintiff*